## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ALICIA M. PAGE, CARMEL COOPER, and CINDY MUNIZ, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ALLIANT CREDIT UNION, and DOES 1-100, <br><br> Defendants. | Case No.: 1:19-cv-05965 <br><br> **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs Alicia M. Page, Carmel Cooper, and Cindy Muniz ("Plaintiffs"), by their attorneys, hereby bring this class action against Alliant Credit Union and DOES 1 through 100 (collectively "ACU" or "Defendant").

## NATURE OF THE ACTION

1.     All allegations herein are based upon information and belief except those allegations which pertain to Plaintiffs or their counsel. Allegations pertaining to Plaintiffs or their counsel are based upon, *inter alia*, Plaintiffs' or their counsel's personal knowledge, as well as Plaintiffs' or their counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.     This is a class action brought by Plaintiffs to assert claims in their own right, and in their capacities as class representatives of all other persons similarly situated. ACU wrongfully charged Plaintiffs and the Class members overdraft fees and non-sufficient funds (NSF) fees.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to ACU's policy and practice of assessing overdraft or NSF fees on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment and for charging repeat NSF fees on the *same* electronic item.  The charging for such overdraft and NSF fees breaches ACU's contracts with its customers, who include Plaintiffs and the members of the Class.

4.     The charging for such overdraft fees also violates federal law.  ACU failed to describe its actual overdraft service in its Opt-In Contract because, *inter alia*, the language in its Opt-In Contract fails to describe the actual method by which ACU calculates its overdraft fees, instead describing a method under which overdrafts only result when there is not enough money in the account to pay for a transaction.  Alternatively, ACU did not obtain appropriate opt-ins from its customers whatsoever or otherwise violated the requirements for being allowed to lawfully charge overdraft fees since August 15, 2010.  By way of example, on information and belief, despite Regulation E, 12 C.F.R. §§1005.17 *et seq*., of the Electronic Fund Transfer Act, 15 U.S.C.A. §§ 1693 *et seq*., prohibiting ACU from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions, 12 C.F.R. §1005.17(b)(1), ACU did so anyway.

## PARTIES

5.     Plaintiff Alicia M. Page is a resident of Hoboken, New Jersey, and was a member of ACU at all times relevant to the class action allegations.  Ms. Page as class representative suffered, at least, improper non-sufficient funds fees imposed on her by ACU, including but not limited to repeat NSF fees.  Plaintiff Carmel Cooper is a resident of Pittsburg, California, and was a member of ACU at all times relevant to the class allegations.  Ms. Cooper as class representative suffered, at least, improper overdraft fees imposed on her by ACU.  Cindy Muniz is a resident of Phoenix, Arizona, and was also a member of ACU at all times relevant to the class action allegations. Ms. Muniz as class representative suffered, at least, improper overdraft fees imposed on her by ACU.

6.    Based on information and belief, Defendant ACU is and has been an Illinois state-chartered credit union with branch offices located throughout the country, including in Illinois. ACU is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i).

7.    Without limitation, Defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of ACU and, upon information and belief, also own and/or operate ACU branch locations.  Each of Defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i).  As used herein, where appropriate, the term "ACU" is also inclusive of Defendants DOES 1 through 100.

8.    Plaintiffs are unaware of the true names of Defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.    There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named Defendants (including DOES) such that any corporate individuality and separateness between the named Defendants has ceased, and that the named Defendants are *alter egos* in that the named Defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.    At all material times herein, each Defendant was the agent, servant, co-conspirator and/or employer of each of the remaining Defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and ratified and approved the acts of the other Defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendants under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure because they would be subject to the jurisdiction of a court of general jurisdiction in Illinois. Furthermore, Defendant is headquartered in Chicago, Illinois.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTUAL ALLEGATIONS

16.     ACU is one of the largest credit unions in the country, with over $11 billion in assets nationwide. ACU offers its consumer banking customers a checking account. One of the features of an ACU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services. In addition to receiving a debit card, other features of an ACU checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

17.     In connection with its processing of debit transactions (debit card, ATM, check,

ACH, and other similar transactions), ACU assesses overdraft fees or NSF fees to customer accounts when it purports to determine that a customer's account has been overdrawn.

18.     Overdraft and NSF fees constitute the primary fee generators for banks and credit unions.  In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.  While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks.  For credit unions such as ACU, overdraft fees are a major source of revenue and a profit center.  According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions.  Filene Research Institute Report, *Overdraft Regulation A Silver Lining In The Clouds?*  (Filene Research Institute 2010).

19.     The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90 percent of customers who were assessed overdraft fees overdrew their account by mistake.  Pew Charitable Trust Report, *,* at p. 4 (May 2012).   More than 60 percent of the transactions that resulted in a large overdraft fee were for less than $50.  Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014).  More than 50 percent of those who were assessed overdraft fees do not recall opting into an overdraft program, *id*. at p. 5, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee, *id*. at p. 10.

20.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  *Id*. at p. 1.  A 25-year-old is 133 percent more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*. at p. 3.  More than 50 percent of the customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p. 4.  Non-whites are 83 percent more likely to pay an overdraft fee than whites.  *Id*. at p. 3.

21.     With regard to ACU, as a result of charging overdraft fees and NSF fees when

5

none were due, members of ACU's upper executive management, on information and belief, have compensated themselves millions of dollars in personal salary. For example, according to ACU's Form 990, ACU CEO David Mooney in 2016 alone was compensated $1,696,688; CFO Harry Zhu, $466,355; Senior Vice President Philip Salis, $558,579; Senior Vice President Timothy Wartman, $546,165; Senior Vice President Jason Osterhage $475,327; Senior Vice President Lee Shafer, $528,310; and Senior Vice President George Rudolph, $496,658. (*See* Exhibit A, Alliant Credit Union Form 990 for Fiscal Year Ending December 2016, pp. 7-8.)

22.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks and credit unions repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

23.     The U.S. Government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so through an Opt-In Contract. 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").

24.     To qualify as affirmative consent, the Opt-In Contract must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day;

---

[1]http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_Rulemaking.pdf, at p. 74-75 [last viewed September 5, 2019].

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available;

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box; and

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

25.     At all relevant times, ACU has had an overdraft and NSF program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contracts with members; (2) contrary to ACU's representations about its overdraft and NSF program to its members; and (3) contrary to its members' expectations regarding the assessment of overdraft fees.

26.     Under ACU's contracts with its members, ACU states that it will only assess an overdraft fee or NSF fee against an account when ACU pays a transaction that results in a negative balance for that account or when ACU returns an item unpaid.  Further, when ACU returns an item unpaid it does not state anywhere in its agreements there will be repeat NSF fees imposed for the same item.  In fact, to the contrary, ACU's Schedule of Fees states that an NSF fee will be charged per "item" ("each item") and does not state it will be "per occurrence."  This "each item" language for NSF fee charges is in stark contrast to the language in the same Schedule of Fees used for its Courtesy Pay Overdraft fees which states "per occurrence."  (*See* Exhibit B, Alliant Schedule of Fees.)

27.     ACU entered into at least two written contracts with Plaintiffs and its other

customers regarding the fees at issue in this lawsuit.  On information and belief, ACU entered into the first contract with Plaintiffs and its other customers when they agreed to enter ACU's overdraft program.  On information and belief, it is titled, "What You Need To Know About Overdrafts And Overdraft Fees" and is referred to herein as the "Opt-In Contract."  ACU was required by Regulation E to provide this contract, which governs the terms under which ACU may assess Plaintiffs and the Class members overdraft fees for ATM and non-recurring debit card transactions, to Plaintiffs and the Class members, and it provides them with the means to accept those terms.  In the Opt-In Contract, ACU promised that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  Additionally, ACU states that, "If you opt in for enhanced coverage, Courtesy Pay may also cover Point-of-Sale and signature-based transactions on your Alliant Visa debit card that would not have cleared otherwise due to insufficient funds."  These promises mean that ACU is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction.  It does not in any way state that there will be deductions made from the money in the customer's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed, nor does it state that holds placed on deposited funds in the account would reduce the amount of money in the account for the purposes of determining when an overdraft has occurred, and an overdraft fee will be assessed.  Because, *inter alia*, the Opt-In Contract does not describe ACU's actual overdraft service, the Opt-In Contract also fails to comply with the requirements of Regulation E.  The Opt-In Contract nonetheless contains promises to which ACU is contractually bound.  (Exhibit C, Opt-In Contract.)

28.     Plaintiffs and the Class members entered into a second contract, titled "Account Agreement and Disclosures," and referred to herein as the "Account Contract" when they opened their accounts.  (Exhibit D, Account Contract dated November 2013; Exhibit E, Account Contract dated November 2017.)  The Account Contract contains a promise that ACU will not

charge overdraft or NSF fees for any type of transaction where there is enough money in the account to pay for the transaction. It states in the section titled "Overdraft Protection Plan," that "If an item is presented for payment and there are not sufficient funds in your account to pay it . . . ." It does not say, "If an item is presented for payment and there are not sufficient funds in your account to pay it *after deducting holds we have placed on deposits and after also deducting holds we have placed on pending debit card transactions* . . . ." Thus, a fee can only be imposed where there are "not sufficient funds" in the account; *i.e.*, when the account as a whole contains less money than has been called for. Nowhere in the Account Contract is there any indication or statement whatsoever that in determining when an overdraft or NSF fee is imposed that ACU will place holds on pending debit card transactions or deposits for purposes of imposing a fee, or that these funds will not be counted in determining when a fee is imposed. That is the very practice this case confronts.

29. The Account Contract, at most, states in a separate section pertaining to deposits rather than to overdraft/NSF fees that temporary holds might be placed on certain deposited items before they can be withdrawn (the "collected available balance") but this section does not state that such holds will be considered in determining when overdraft/NSF fees occur, and indeed nowhere is it stated in the Account Contract that overdraft/NSF fees can result from holds placed on funds earmarked for pending debit card transactions (the "artificial available balance").

30. Therefore, under the Account Contract, although Plaintiffs dispute it, the only funds which even *arguably* could not be considered as "available" for purposes of overdrafts or NSFs were those which were subject to temporary holds immediately upon deposit (meaning the "collected available balance," even though this is not stated or disclosed in the section pertaining to overdrafts) but not funds on which holds were placed due to pending transactions (the "artificial available balance"). Although it is Plaintiffs' position that during the class period ACU, under its contractual terms with the class members, could only charge an overdraft or NSF fee if the balance in the account became negative without regard to any deductions for holds on

deposits, or any other holds, the absolute best case scenario for ACU is that it was allowed under the Account Contract in certain circumstances to place holds on recently deposited funds in the account and deduct those from the balance in determining whether or not an overdraft or NSF has occurred ( *i.e.*, "the collected available balance"), but ACU was not even arguably permitted by any language to deduct from the account funds on which holds had been placed for transactions which had not yet gone through (the "artificial available balance").

31.     Contrary to these promises in the Account Contract and Opt-In Contract, ACU's policy and practice is to ignore whether there is money in the account or a negative balance. Instead, ACU's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial internal calculation by which it deducts holds it has placed on either pending debit card transactions and deposits, the "artificial available balance," rather than use the actual money in the account as required by the Opt-In Contract, or the funds in the account as required by the Account Contract, without deduction for pending debit card transactions, or holds placed on deposits, to determine whether an overdraft has occurred for purposes of assessing an overdraft fee or NSF fee.

32.     There are three balances in an account: the "balance;" the "collected available balance;" and, the "artificial available balance." The "balance" (sometimes called actual balance or ledger balance) is the money in the account, without deductions for holds on pending transactions or on deposits. It is the official balance of the account. It is the balance provided to the customer in monthly statements, which are the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, it is the balance which is used by ACU to report its deposits to regulators, shareholders, and the public. It is the deposit balance provided to regulators in call reports and reserve reports. It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. And it is the balance used by credit reporting agencies in providing credit ratings of ACU.

33.     The "collected available balance" is the balance less holds placed on certain

deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP"). Regulation CC, 12 C.F.R. part 229, establishes maximum permissible hold periods for checks and other deposits and all financial institutions are required by it to have an FAP.

34. The "artificial available balance" as used by ACU is a completely different calculation than the "collected available balance." It takes the "collected available balance" and then further deducts from it pending debit card transactions which have not yet posted, meaning the money is still in the account of the credit union member. ACU does this so that it may increase the overdraft fees it charges its members. There is no requirement to use the "artificial available balance" and ACU had no authority or disclosure or statement in any of its contracts that it would use the "artificial available balance" for purposes of assessing overdraft or NSF fees.

35. ACU's practice of charging overdraft fees, even when there is enough money in the account to cover a transaction presented for payment, is inconsistent with how ACU expressly describes the circumstances under which overdraft fees are assessed. Further, ACU has charged its customers, including Plaintiffs and the members of the Class, overdraft fees for ATM and/or non-recurring debit card purchases, without obtaining their appropriate consent to do so, in violation of Regulation E, and in violation of its contractual promises that it would not charge overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers' separate consent, because ACU's opt-in method or methods do not include providing its customers the information required to obtain their legally binding informed consent because, *inter alia*, the description in the Opt-In Contract did not describe what ACU was actually doing, as required by Regulation E.

36. The importance of Regulation E is highlighted by the fact that the Bureau's study of actual practices found that: (a) ATM and debit card transactions are by far the most frequent transactions that occur; (b) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and (c) opted-in accounts have seven times as many overdrafts that result

in fees as not opted-in accounts.[2]

37.     ACU's contractual promises in the Account Contract and the Opt-In Contract to assess overdraft or NSF fees only when there is not enough money in the account to cover the item was also repeated to customers in other disclosures and marketing materials. Further, ACU also promises in the Opt-In Contract, Account Contract, and marketing materials that it will not assess overdraft or NSF fees on ATM and non-recurring debit card transactions against any customer who does not "opt-in" to the overdraft service.

38.     ACU also has an improper practice of charging multiple NSF fees for the *same* electronic transaction. ACU charges a $25 NSF fee when an electronic transaction is processed for payment and ACU determines that there is not enough money in the account to cover the transaction (a practice that wrongfully uses the "artificial available balance" described above). ACU then charges *additional* NSF fees if the same transaction is presented for processing again by the payee, even though the account holder took no action to resubmit the transaction for payment. This violates the Account Contract, *inter alia*, at paragraph 8.a., which states that once ACU makes its "determination of an insufficient account balance . . . [w]hether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule." The foregoing language unambiguously states that once the insufficiency of an account balance is determined (even if under ACU's "artificial available balance" accounting gimmick), the item, whether "paid or returned[,]" subjects the accountholder to *"a charge . . . ."* "A charge" is singular and does not mean *several charges or multiple charges*. Furthermore, "the item" means "the item," and does not mean *every time the same item is presented*. Furthermore, the Schedule of Fees referenced by the Account Contract states the fee is for "each item," not *per occurrence* or *for each presentment of the same item*. In contrast to this "per item" language for the NSF fee, in the same Schedule of Fees for Courtesy Pay Fees it states, "per occurrence." An

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf [last viewed September 5, 2019].

electronic item reprocessed after an initial return for supposed insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional item for multiple fee assessment purposes as Defendant has been doing. At a minimum, to be even arguably allowed to do that, the contract would have needed to state, "per occurrence" or "per presentment." Instead it states, "per item."

39.     ACU's practice of charging multiple NSF fees for a single electronic transaction is made all the more egregious because, as described, ACU assesses such fees using the improper calculation of the balance in a member's account (the "artificial available balance"), causing additional confusion and ambiguity. ACU often charges NSF fees improperly, and that improper $25 deduction from a member's balance further decreases the "balance," generating even more NSF fees or overdraft fees.

40.     Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

41.     Meanwhile, Plaintiffs and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods. When ACU refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the balance without deduction for pending debit card transactions or holds on deposits. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." Consumer Finance Protection Bureau, *Supervisory Highlights*, at p. 9 (Winter

2015).[3]

42.    Plaintiff anticipates that ACU might try to argue that it was required by Regulation E to use the language: "[a]n overdraft occurs when you do not have enough money in your checking account to cover a transaction, but we pay it anyway." Regulation E contains no such requirement. Numerous credit unions and banks, when utilizing an overdraft fee regime which assesses overdraft fees in a manner in which the financial institution creates an artificially lower balance by placing holds on pending debit card transactions or on deposits, affirmatively disclose this hold to be placed on pending debit card transactions or deposits in their Opt-In Contracts. To the extent that Defendant attempts to argue it was not allowed to deviate from suggested form language such that it was required to use a description of its overdraft fee practices which was inaccurate, Plaintiffs will demonstrate not only that this is contrary to the law and common sense, but it is also contrary to the language used by numerous other financial institutions in their Opt-In Contracts which affirmatively disclose that holds would be placed on pending debit card transactions and/or deposits when the financial institutions do so in assessing whether to impose overdraft fees. As just one example, TD Bank's Opt-In Contract states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." As another example, Credit Union 1, another Illinois credit union serving the greater Chicago Metropolitan area, with over 87,000 members, states in its Overdraft Opt-In Contract, "An overdraft occurs when you do not have enough available money (i.e., less any holds) in your checking account to cover a transaction, but we pay it anyway." (Exhibit F, Credit Union 1 Opt-In Contract.) For further example, the Overdraft Opt-In Contract of EECU, a credit union based in Texas with over

---

[3] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf [last viewed September 5, 2019].

300,000 members, states:

**"AVAILABLE" BALANCE IS USED TO DETERMINE
WHEN MY ACCOUNT IS OVERDRAWN."**

(Exhibit G, EECU Opt-In Contract, (emphasis in original).)

It goes on to state,

> **Available Balance**
> My available balance is the amount of the actual balance that is
> available to me for use without incurring an overdraft fee or
> transfer fee (as applicable). My available balance takes into
> account holds that have been placed on deposits and pending
> transactions (such as pending debit card transactions) that the
> credit union has authorized but that have not yet posted to my
> account. **In other words, the available balance is my actual
> balance less any pending ATM withdrawals, debit card
> purchases, ACH transaction, checks
> being processed or other pending withdrawals from my
> account and less any deposits that are not yet available due to
> the credit union's funds availability policy.**

(*Id.* (emphasis in original).)

43.     ACU clearly could have, but did not, accurately describe its overdraft program in

its Opt-In Contract.  Because it did not, it breached that agreement when it charged overdraft fees

on a positive balance, and it violated Regulation E, *inter alia*, by charging any overdraft fees

whatsoever on ATM and debit card transactions, given that it did not accurately describe its

overdraft program in the required notice.

44.     Similarly, countless banks' and other credit unions' account contracts, unlike

ACU's, when artificially lowering the balance to increase revenue from overdraft fees as ACU

does, clearly state they are doing so.  For example, Navy Federal Credit Union is the largest

credit union in the country, with over $100 billion in assets, and its account contract provides:

"The Available Balance includes pending transactions that have been authorized but may not yet

have been processed (posted) . . . ."  The Golden 1 Credit Union, with an asset size very similar

to ACU's asset size, that being about $11 billion, states in its account contract: "Your available

balance does not reflect all your outstanding checks, automatic bill payments that you have

authorized, or other outstanding transactions that have not been paid from your account." As yet another example, Suncoast Credit Union, another credit union with an asset size very similar to ACU's, states in its account contract: "Your available balance is your actual balance less: (1) holds placed on deposits; (2) holds on debit card or other transactions that have been authorized but are not yet posted . . . ." And San Diego County Credit Union, yet another credit union similar in asset size to ACU, states in its account contract: "In determining the available balance in your account, we will consider all transactions that have posted to your account, any holds that may be in place on deposits you have made, and any pending transactions (such as pending debit card purchases) . . . ." In stark contrast to these other credit unions, ACU's Account Contract nowhere states that holds placed on pending debit card purchases would affect the balance, let alone that such holds would cause an overdraft fee to be imposed.

45.     Therefore, Plaintiffs, on behalf of themselves and all others similarly situated, seek relief as set forth below.

46.     Plaintiffs were harmed by Defendant's policy and practice of charging overdraft and NSF fees when there was money in their accounts to cover the transaction, and by assessing repeat NSF fees. Plaintiffs entered into at least two agreements with ACU, wherein ACU contracted to charge fees only if their accounts did not contain enough money to cover the transaction. By nonetheless charging Plaintiffs Cooper and Muniz overdraft fees when their accounts did contain enough money to cover the transaction at issue, and by charging Plaintiff Page NSF fees when her account did contain enough money to cover the transaction, and also repeat NSF fees, ACU breached its contracts with Plaintiffs and violated Regulation E. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft and NSF fee; however, Plaintiffs have already uncovered many. With regard to overdraft fees, to give one example, on February 24, 2018, Ms. Cooper had $35.63 in her account when she engaged in a debit card transaction for $11.60, leaving her with a balance of $24.03. Nonetheless, ACU imposed on her a $28 "Courtesy Pay Fee." Also with regard to overdraft fees, to give another example, on May 20, 2018, Ms. Muniz had $11.40 in her account when she

16

engaged in a debit card transaction for $7.91, leaving her with a balance of $3.49. Nonetheless, ACU imposed on her a $28 "Courtesy Pay Fee." With regard to NSF fees, to give one example, on January 4, 2017, Ms. Page was charged a $25 fee labeled "NSF" for attempting to pay a bill in the amount of $6,000 when her account contained $6,670.94. While Ms. Page's fee was labeled "NSF" rather than "Courtesy Pay," and while it was assessed for a transaction which was returned, rather than paid, it equally violated the contracts in this case. Ms. Page's fee was charged against her as a result of ACU's refusal to pay a transaction when there was enough money in her account to pay for that transaction. Under the contracts, when there are sufficient funds to pay for a transaction in the account, no fee can be charged for that transaction, yet ACU charge her a fee. The NSF fee was therefore also violative of the Account Contract. These are just some examples for illustrative purposes at this time. Plaintiffs have a reasonable belief that discovery and a complete review of Plaintiffs' and ACU's records will show multiple instances in which ACU improperly charged Plaintiffs overdraft fees for transactions despite the fact that Plaintiffs had enough money in their accounts to cover the transactions.

47. Regarding repeat NSF fees, as just one example, on January 12, 2017, ACU charged Ms. Page repeated $25 NSF fees multiple times, on information and belief, for the same item. There are numerous other such examples. This is just one example for illustrative purposes at this time. Plaintiffs have a reasonable belief that discovery and a complete review of Plaintiffs' and ACU's records will show multiple instances in which ACU improperly charged Plaintiffs repeat NSF fees for transactions.

48. Moreover, the assessment and unilateral taking of improper overdraft fees and NSF fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which ACU assesses further overdraft/NSF fees. This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

Consumer Financial Protection Bureau, *Supervisory Highlights*, at pp. 8-9 (Winter 2015). A complete evaluation of ACU's records is necessary to determine the full extent of Plaintiffs' harm from this practice.

49. Additionally, because, *inter alia*, the Opt-In Contract did not describe ACU's actual overdraft service, ACU violated Regulation E by charging overdraft fees on ATM and non-recurring debit card transactions. Because it failed to provide the full and accurate disclosures to Plaintiff required by Regulation E, ACU failed to obtain Plaintiffs' fully informed consent as required by Regulation E in order for ACU to be authorized to charge such overdraft fees. Because ACU was not legally authorized to enroll Plaintiffs into the Courtesy Payment program for non-recurring debit card and ATM transactions, ACU violated Regulation E when it assessed *any* overdraft fees against Plaintiffs for non-recurring debit card and ATM transactions.

50. Plaintiffs were harmed by this practice when they were assessed overdraft fees for nonrecurring debit card and ATM transactions. A complete evaluation of ACU's records is necessary to determine the full extent of Plaintiffs' harm from this practice as well.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this case, and each of their respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following class.

52.     The "Class" is composed of four classes:

**The Positive Balance Overdraft Fees Class:**

> **All United States residents who have or have had accounts with ACU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions during the period beginning ten years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Positive Balance NSF Fees Class:**

> **All United States residents who have or have had accounts with ACU who incurred an NSF fee or NSF fees when the balance in the checking account was sufficient to cover the transactions during the period beginning ten years preceding the filing of this Complaint and ending on the date the Class is certified.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with ACU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.**

**The Repeat NSF Class:**

> **All United States residents who have or have had accounts with ACU who incurred an NSF fee more than once for the same item during the period beginning ten years preceding the filing of this Complaint and ending on the date the class is certified.**

53.     Excluded from the Classes are: (a) any entity in which Defendant has a controlling interest; (b) officers or directors of Defendant; (c) this Court and any of its employees assigned to work on the case; and (d) all employees of the law firms representing Plaintiffs and the Class members.

54.     This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

55.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiffs, and can only be determined through appropriate discovery, Plaintiffs believe that the Class is likely to include thousands of members based on the fact that ACU has approximately $11 billion in assets and operates hundreds of branches nationwide.

56.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of ACU's customers have been harmed by its practices and thus qualify as Class members.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class members through notice published in newspapers or other publications.

57.     **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiffs and the Class members include, but are not limited to, the following:

   a.     Whether, pursuant to the Opt-In Contract, Defendant promised to Plaintiffs and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

b. Whether, pursuant to the Account Contract, Defendant promised to Plaintiffs and the Class members that it would not charge an overdraft fee if there was enough money in the account to cover the transaction;

c. Whether, pursuant to the Account Contract, Defendant promised to Plaintiff and the Class members that it would not charge an NSF fee if there was enough money in the account to cover the transaction;

d. Whether Defendant breached the Opt-In Contract or Account Contract by assessing overdraft fees for transactions when customers' accounts contained enough money to cover the transactions;

e. Whether Defendant breached the Account Contract by assessing NSF fees for transactions when customers' accounts contained enough money to cover the transactions;

f. Whether, pursuant to the Account Contract and Schedule of Fees, Defendant contracted it would charge an NSF "per item" or "per occurrence," and was this language ambiguous or clear;

g. Whether Defendant breached the Account Contract or Schedule of Fees by assessing repeat NSF fees each time the same "item" was presented for payment;

h. Whether the language in the Opt-In Contract described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees;

i. Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment, money had and received, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act; and

j. Whether Defendant's conduct violated 12 C.F.R. § 1005.17 (Regulation E).

58. **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiffs' claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiffs and all of the Class

members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Opt-In Contract and Account Contract and Schedule of Fees, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiffs and Class members. Accordingly, in pursuing their own self-interest in litigating their claims, Plaintiffs will also serve the interests of the other Class members.

59. **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the Plaintiffs and the members of the Class that would make class certification inappropriate. Plaintiffs and their counsel intend to prosecute this action vigorously.

60. **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiffs and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would

establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiffs and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

61. Plaintiffs are not aware of any separate litigation instituted by any of the Class members against Defendant. Plaintiffs do not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiffs have demonstrated above that their claims are typical of the other Class members and that they will adequately represent the Class. This particular forum is a desirable forum for this litigation because Defendant resides in this District, and its principal place of business is in this district. Plaintiffs do not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

62. Plaintiffs anticipate the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiffs anticipate the use of additional media and/or mailings.

63. This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    a. Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1. Inconsistent or varying adjudications with respect to individual

members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2.      Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.      Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1.      The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.      The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3.      The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4.      The difficulties likely to be encountered in the management of a class action.

## **FIRST CAUSE OF ACTION**

### **(Breach of the Opt-In Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing)**

64.      The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

65.      Plaintiffs and each of the Class members entered into the Opt-In Contract with

Defendant covering the subject of overdraft transactions. This contract was drafted by and is binding upon Defendant.

66. In the Opt-In Contract, Defendant promised that ACU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

67. The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all Opt-In Contracts for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

68. Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

69. Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing fees when there was money in the account to cover the transaction or transactions at issue.

70. Additionally, the implied covenant of good faith and fair dealing are elements of every contract. Under the implied covenant, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. The parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

71. ACU has breached the implied covenant of good faith and fair dealing in the Opt-In Contract through its abusive overdraft fee policies and practices as alleged herein. Instead of exercising any discretion that it has in good faith and consistent with Plaintiffs' and Class

25

members' reasonable expectations, ACU abused that discretion to assess overdraft and take money out of their checking accounts without their permission and contrary to their reasonable expectations that they would not be charged overdraft fees when they had money in their accounts.

72.     By exercising its discretion to enrich itself and gouge its customers as it did, ACU consciously and deliberately frustrated the agreed common purposes of the contract and reasonable expectations of the Plaintiffs and Class members, thereby depriving them of the benefit of their bargain.

73.     To the extent the Opt-In Contract does not explicitly bar the policy described herein, ACU exploited any contractual discretion to the detriment of accountholders and breached good faith and fair dealing when it used the policy.  The allegations that ACU has contractual discretion are made in the alternative to the allegations that the overdraft practices are expressly in breach of the contracts.

74.     As a proximate result of Defendant's breach of the contract, Plaintiffs and each member of the Class have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Account Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing)

75.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

76.     Plaintiffs and each of the Class members entered into the Account Contract with Defendant covering the subject of overdraft and NSF fees.  This contract was drafted by and is binding upon Defendant.

77.     In the Account Contract, Defendant promised that ACU would assess overdraft/NSF fees only when there were "not sufficient funds" in the account to pay for the transaction in question.  Nowhere did the Account Contract state that ACU would create an

artificial system by which it would deduct pending debit card transactions for purposes of determining whether sufficient funds existed when assessing an overdraft or NSF fee. Defendant also promised that once it determined an account had an insufficient balance to cover an item, it would either pay it, subject to an overdraft fee, or return it unpaid, subject to an NSF fee. Regarding the NSF fees, further, they would be charged per "item" and not "per occurrence."

78. Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

79. Defendant breached the express terms of the Account Contract by, *inter alia*, assessing overdraft fees and NSF fees when there were sufficient funds in the account to cover the transaction or transactions at issue. Defendant also breached the Account Agreement by breaking its promise to charge an NSF fee for an item it returned unpaid by charging repeated NSF fees, multiple times, for a single item.

80. Additionally, the implied covenant of good faith and fair dealing are elements of every contract. Under the implied covenant, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. The parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

81. ACU has breached the implied covenant of good faith and fair dealing in the Account Contract through its abusive overdraft and NSF fee policies and practices as alleged herein. Instead of exercising any discretion that it has in good faith and consistent with Plaintiffs' and Class members' reasonable expectations, ACU abused that discretion to assess overdraft and NSF fees and take money out of their checking accounts without their permission and contrary to their reasonable expectations that they would not be charged multiple NSF fees

for the same item.

82.     By exercising its discretion to enrich itself and gouge its customers as it did, ACU consciously and deliberately frustrated the agreed common purposes of the contract and reasonable expectations of the Plaintiffs and Class members, thereby depriving them of the benefit of their bargain.

83.     To the extent the Account Contract does not explicitly bar the policy described herein, ACU exploited any contractual discretion to the detriment of accountholders and breached good faith and fair dealing when it used the policy.  The allegations that ACU has contractual discretion are made in the alternative to the allegations that the overdraft and NSF fee practices are expressly in breach of the contracts.

84.     As a proximate result of Defendant's breach of the Account Contract, Plaintiffs and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

85.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

86.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

87.     The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an unfair, deceptive, or abusive act or practice.  Consumer Financial Protection Bureau, *Bulletin 2013-07*, at p. 2 (July 10, 2013) (defining unfair, deceptive, or abusive acts or practices based on the FTC balancing test as: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to

consumers or to competition") [4], Consumer Financial Protection Bureau, *Supervisory Highlights*, at p. 9 (Winter 2015) ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").

88.     Because Plaintiffs and the Class members paid the erroneous overdraft and NSF fees assessed by Defendant, Plaintiffs and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiffs and the Class members seek relief as set forth in the Prayer below.

## **FOURTH CAUSE OF ACTION**

### **(Money Had and Received)**

89.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

90.     Defendant has obtained money from Plaintiffs and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

91.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and the Class members, and thus, this money should be refunded to Plaintiffs and the Class members. Therefore, Plaintiffs and the Class members seek relief as set forth in the Prayer.

---

[4] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf.

**FIFTH CAUSE OF ACTION**

**(Violation of Electronic Fund Transfers Act (Regulation E)**

**12 C.F.R. § 1005 *et seq*.  (authority derived from 15 U.S.C. § 1693 *et seq*.))**

92.      The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

93.      By charging overdraft fees on ATM and nonrecurring transactions, ACU violated Regulation E, 12 C.F.R. §§ 1005 *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act [15 U.S.C. §§1693 *et seq*., the "EFTA"]," 12 C.F. R. § 1005.1(b).

94.      Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. 12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id*. (emphasis added).  The description "shall be clear and readily understandable."  12 C.F.R. § 205.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated writing of its overdraft practices that is accurate, non-misleading, and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

95.      The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, and 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of

30

Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S.Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).) Numerous credit unions and banks, when utilizing an overdraft fee regime which assesses overdraft fees in a manner in which the financial institutions create an artificially lower balance by placing holds on pending debit card transactions or deposits, affirmatively disclose this hold to be placed in pending debit card transactions or deposits in their Opt-In Contracts. To the extent that Defendant argues it was not allowed to deviate from supposed suggested form language such that it was required to use a description of its overdraft fees which was inaccurate, Plaintiffs will demonstrate not only that this is contrary to the law and common sense, but it is also contrary to the language used by numerous other financial institutions in their Opt-In Contracts which affirmatively disclose that holds would be placed on pending debit card transactions and/or deposits when the financial institution does so in assessing whether to impose overdraft fees, as already partially set forth in Paragraph 42 of this complaint.

96.     ACU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. ACU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but ACU pays it anyway, when in fact ACU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

97.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions, ACU has harmed Plaintiffs and the Class.

98.     Due to ACU's violation of Regulation E, 12 C.F.R. § 1005.17, Plaintiffs and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and

costs of suit, pursuant to 15 U.S.C.A. § 1693m.

## SIXTH CAUSE OF ACTION

### (Violation of 815 ILCS §§ 505/1 et seq.,

### The Illinois Consumer Fraud and Deceptive Business Practices Act)

99.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

100.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq*., provides protection to consumers by mandating fair competition in commercial markets for goods and services.  The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices including using deception, fraud, false pretenses, false promises, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act." 815 ILCS § 505/2.

101.     The ICFA applies to Defendant's acts as described herein because it applies to transactions involving the sale of goods or services to consumers.

102.     Defendant is a "person" as defined by section 505/1(c) of the ICFA.

103.     Plaintiffs and each of the Class members are "consumers" as defined by section 505/1(e) of the ICFA.  Plaintiffs and each Class member are natural persons who primarily for personal use, or for that of a member of their households, purchased banking account services from Defendant.

104.     The actions and/or omissions of Defendant in relation to its overdraft and NSF fee practice were unfair and deceptive acts and practices prohibited by the ICFA.  Specifically, ACU engaged in an unfair and deceptive practice of assessing overdraft and NSF fees when there was enough money in its customers' accounts to pay for the transactions in question, in direct contradiction of its promises to those customers, affecting Plaintiffs and members of the Classes. ACU failed to inform its customers as to what the lesser, artificial available balance was, or how it differed from the real balance in the account (the amount of money in the account without

32

taking into account holds), and by concealing this information from its customers, ACU was able to increase its profits due to the unlawful assessment overdraft and NSF fees. ACU was capable of explaining the difference in these balances to its customers but opted not to do so because misrepresenting how its overdraft practice worked and confusing customers was more profitable.

105.    Specifically, Defendant failed to disclose in its contracts and through other disclosures that it used the artificial available balance to assess overdraft and NSF fees, and that it assessed repeated NSF fees on single items. These were deceptive acts, omissions, and/or practices because they were designed to mislead customers and drive up the number of assessed overdraft and NSF fees.

106.    Moreover, in misrepresenting the actual nature of its overdraft program, ACU failed to obtain the informed consent of the enrollees to the program. This deliberate misrepresentation precludes ACU from assessing any overdraft fees on ATM and non-recurring debit transactions pursuant to Regulation E. This unlawful taking constitutes unfair and deceptive practices in violation of the ICFA.

107.    Defendant's deceptive actions and omissions were in the conduct of trade or commerce.

108.    As a proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs and the Class members have been damages in an amount to be proven at trial and seek relief as set forth in the Prayer below.

109.    Had Plaintiffs and Class members known the actual facts or legal implications of those acts, they would have avoided the overdraft fees. Therefore, a causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiffs and the members of the Class.

## **PRAYER**

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1.      For an order certifying this action as a class action;

2.      For compensatory damages on all applicable claims and in an amount to be

proven at trial;

    3.        For punitive damages under the ICFA;

    4.        For an order requiring Defendant to disgorge, restore, and return all monies

wrongfully obtained together with interest calculated at the maximum legal rate;

    5.        For an order enjoining the wrongful conduct alleged herein;

    6.        For costs;

    7.        For pre-judgment and post-judgment interest as provided by law;

    8.        For attorneys' fees under the Electronic Fund Transfer Act, the common fund

doctrine, and all other applicable laws; and

    9.        For such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs and the Class members demand a trial by jury on all issues so triable.


Dated: September 5, 2019                 Respectfully Submitted,


                                /s/ *Emily J. Kirk*_____
                                Emily J. Kirk
                                Illinois State Bar No. 6275282
                                **McCune Wright Arevalo, LLP**
                                101 West Vandalia Street, Suite 200
                                Edwardsville, IL 62025
                                Telephone:  (909) 557-1275
                                Facsimile:  (909) 557-1275
                                Email: ejk@mccunewright.com

                                Richard D. McCune, CA Bar No. 132124*
                                David C. Wright, CA Bar No. 177468 *
                                **McCune Wright Arevalo, LLP**
                                3281 E. Guasti Road, Suite 100
                                Ontario, CA  91761
                                Telephone: (909) 557-1250
                                Facsimile: (909) 557-1275
                                Email: rdm@mccunewright.com
                                          dcw@mccunewright.com

                                Taras Kick, CA Bar No. 143379*
                                Roy K. Suh, CA Bar No. 283988*
                                **THE KICK LAW FIRM, APC**
                                815 Moraga Drive
                                Los Angeles, California 90049

Telephone: (310) 395-2988
Facsimile: (310) 395-2088
Email: Taras@kicklawfirm.com
       Roy@kicklawfirm.com

*Pro Hac Vice* applications to be submitted.

Attorneys for Plaintiffs,
Alicia M. Page, Carmel Cooper and
Cindy Muniz, and the Putative Classes