# EXHIBIT C

KeyCite citing references available

2018 WL 4374076
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Matthew DOMANN, individually and on behalf of
all others similarly situated, Plaintiff,
v.
SUMMIT CREDIT UNION, Defendant.

18-cv-167-slc
|
Signed 09/13/2018

**Attorneys and Law Firms**

Douglas P. Dehler, Laura Jean Lavey, O'Neil, Cannon, Hollman, DeJong & Laing S.C., Milwaukee, WI, Richard Dale McCune, Jr., McCune Wright Arevalo, LLP, Ontario, CA, for Plaintiff.

Stuart M. Richter, Katten Muchin Rosenman LLP, Los Angeles, CA, William Warren Ehrke, Crivello Carlson, S.C., Milwaukee, WI, for Defendant.

OPINION AND ORDER

STEPHEN L. CROCKER, Magistrate Judge

**\*1** Plaintiff Matthew Domann has filed a proposed class action in which he alleges that his credit union, defendant Summit Credit Union, misled him (and similarly situated customers) about its overdraft fee policy. *See* Complaint, dkt. 1. In particular, Domann argues that SCU used a method of calculating his balance that deviated from the method described in its contracts with Domann, leading SCU to charge him excess overdraft fees. In this putative class action, Domann brings claims against SCU for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, money had and received, violation of Regulation E of the Electronic Fund Transfers Act (EFTA), and violation of the Wisconsin Deceptive Trade Practices Act.

Defendant SCU has filed a motion (dkt. 9) to dismiss the First Cause of Action (breach of contract based on SCU's "Opt-In" form); Second Cause of Action (breach of contract based on the Membership Agreement); Fifth Cause of Action (unjust enrichment); Sixth Cause of Action (money had and received); and Seventh Cause of Action (violation of EFTA (Regulation E) ).

For the reasons that follow, I am granting defendant's motion.

**I. BACKGROUND**

Overdraft fees have attracted the attention of regulators and the media in recent years.[1] In 2009, the Federal Reserve adopted Regulation E, a set of rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." Electronic Fund Transfers, 74 Fed. Reg. 59,033-01 (Nov. 17, 2009) (codified at 12 C.F.R. § 205.1). Regulation E "require[s] financial institutions to secure a customer's 'affirmative consent' before charging overdraft fees," which must be obtained through an opt-in notice. This opt-in notice must contain a "brief description of the financial institution's overdraft service" and be "substantially similar" to the Fed's Model Form A-9. 12 C.F.R. § 1005.17(d).

Overdraft fees are tied to the customer's account balance. Financial institutions primarily use two methods to calculate an account holder's checking account balance: the "ledger" balance and the "available" balance. As described by the Consumer Financial Protection Bureau ("CFPB"),

> [a] ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared.
> CFPB, Winter 2015 Supervisory Highlights, Section 2.3.[2]

Domann v. Summit Credit Union, Slip Copy (2018)

**\*2** The following example illustrates the distinction:

> If a member has a $100 ledger balance but uses his debit card to buy dinner for $40, then there is a pre-authorization hold on his account (at the request of the restaurant), and his available balance (the money he has left to use) is $60.00. In other words, the $40, which the member just spent, is no longer *available* for use. His ledger balance is still $100 until the restaurant charge is submitted and posted to his account. On the credit side, if he deposits an out-of-the-state check in the amount of $5,000 a hold will be placed on all but $200. In this example, his available balance is $200 and his ledger balance is $5,000, even though the check may never clear.

> SCU's Br. in Supp., dkt. 11, at 3.

Not surprisingly, "[u]sing the available balance method often leads to more frequent overdrafts because there is less money available in the account due to holds and pending transactions." *Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230, at *1 (N.D. Ga. Nov. 6, 2017). Many account holders who have been subjected to overdraft charges based on "available balance" calculations not only feel blindsided by this, they feel that this practice is a breach of their contract with their credit union or bank. A series of virtually identical lawsuits has been filed across America challenging this practice. *See, e.g., Walker v. People's United Bank*, 305 F. Supp. 3d 365 (D. Conn. 2018); *Walbridge v. Ne. Credit Union*, 299 F. Supp. 3d 338 (D.N.H. 2018); *Tims v. LGE Cmty. Credit Union*, No. 1:15-CV-4279-TWT, 2017 WL 5133230 (N.D. Ga. Nov. 6, 2017); *Smith v. Bank of Hawaii*, No. CV 16-00513 JMS-RLP, 2017 WL 3597522 (D. Haw. Apr. 13, 2017); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991 (N.D. Cal. Mar. 21, 2017)*; Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009 (D. Nev. June 22, 2016); *Wodja v. Washington State Employees Credit Union*, 2016 WL 3218832 (W.D. Wash. June 9, 2016); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848 (W.D. Mich. 2016); *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

The instant case is at least the fifth time lead counsel for both sides have squared off against each other in this type of a lawsuit. In the previous four cases, the defendant institution filed a motion to dismiss, winning two (*Tims* and *Chambers* ) and losing two (*Walbridge* and *Ramirez* ), although plaintiffs' counsel's batting average defeating dismissal motions is close to perfect in the other lawsuits.

## II. PLAINTIFF'S ALLEGATIONS

Plaintiff Matthew Domann is a resident of Portage, Wisconsin and was a member of SCU at all times relevant to the allegations in the complaint. SCU is a state-chartered, Wisconsin-based credit union and is a "financial institution" within the meaning of Regulation E.

SCU offers its consumer banking customers a checking account. One of the features of this checking account is a debit card, which the account holder can use to purchase goods and services. SCU checking account holders can also write checks, withdraw money from ATMs, schedule Automated Clearing House (ACH) transactions, and perform other debit transactions from the account.

**\*3** On February 9, 2017, Domann was charged a $25 overdraft fee on a debit card payment of $4.63, which was made when Domann's ledger balance was $85.51. This is because SCU uses the "actual balance" rather than the "ledger balance" method when it determines whether an account holder has sufficient funds in his account to cover a transaction. Domann claims that by assessing him an overdraft fee on a positive ledger balance, SCU breached both its standard membership agreement (which he refers to as the "Account Agreement") and the Regulation E Opt In Agreement.[3] According to Domann, these documents promise to use the "ledger balance" method of calculating whether the member's account contains available funds to cover a transaction, but SCU actually uses the "available balance" method. In addition, Domann alleges, SCU violated Regulation E by failing to describe SCU's actual overdraft practice.

Domann brings this class action to assert claims in his own right, and in his capacity as the class representative of all other persons similarly situated. The "class" is composed of three separate classes, only two of which are relevant to this motion. The "Positive Balance Class" includes

> All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transactions

during the period beginning six years preceding the filing of this Complaint and ending on the date the Class is certified.

The "Regulation E Class" includes

All United States residents who have or have had accounts with SCU who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning August 15, 2010 and ending on the date the Class is certified.

SCU now moves to dismiss the breach of contract claims for failure to state a claim, arguing that the Account and Opt-In Agreements, construed together, unambiguously state that SCU would use the available balance method in assessing overdraft fees. SCU moves to dismiss the equitable claims on the ground that they cannot be maintained where Domann has conceded that an express contract controls the parties' relationship. SCU moves to dismiss the Regulation E claim on the ground that it is untimely.

### III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### IV. DISCUSSION

#### A. Breach of Contract

**\*4** Domann's first two counts allege that SCU breached both the Opt-In Agreement and the Account Agreement by imposing overdraft fees based on his available balance instead of his ledger balance. In Wisconsin, a complaint states a claim for breach of contract when it alleges: "(1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages." *Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶ 11, 289 Wis. 2d 795, 807, 714 N.W.2d 582, 588, *aff'd sub nom. Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, ¶ 11, 297 Wis. 2d 606, 724 N.W.2d 879.[4]

SCU insists that plaintiff's claims fail because the contract cannot reasonably be read as providing that SCU would use the ledger balance method in assessing overdraft fees. "If the terms of the contract are plain and unambiguous, it is the court's duty to construe the contract according to its plain meaning even though a party may have construed it differently." *Woodward Commc'ns, Inc. v. Schockley Commc'ns Corp.*, 2001 WI App 30, ¶ 9, 240 Wis.2d 492, 498, 622 N.W.2d 756, 759-760. Thus, if a contract is unambiguous and the plaintiff's claims are unmerited under its terms, then dismissal of the complaint is appropriate under Fed. R. Civ. P. 12(b)(6). *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 991 (7th Cir. 1991) (terms of a written contract prevail over pleadings). On the other hand, if the contract is facially ambiguous, then dismissal is not appropriate. *Dawson v. General Motors Corp.*, 977 F.2d 369, 372 (7th Cir. 1992).

Whether a contract is ambiguous is a question of law. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998). "A contract is ambiguous when its terms are reasonably susceptible to more than one interpretation." *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). Under Wisconsin law, "[t]he general

rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Pronschinske Trust Dated March 21, 1995 v. Kaw Valley Companies, Inc.*, 899 F.3d 470, 473 (7th Cir. 2018), quoting *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis. 2d 1, 485 N.W.2d 217, 220 (1992). Moreover, the court must give contract terms their plain or ordinary meaning. *Id.,* citing *Huml v. Vlazny*, 293 Wis.2d 169, 716 N.W.2d 807, 820 (2006). Further, the court is to interpret the contract in a way that avoids absurd results. *Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 525 5 (7th Cir. 2008), citing *Kabes v. Sch. Dist.,* 270 Wis.2d 502, ¶ 11 (Ct. App. 2004); *see also Chapman v. B.C. Ziegler & Co.,* 2013 WI App 127, ¶ 2, 351 Wis. 2d 123, 128, 839 N.W.2d 425, 427.

### 1. Opt In Agreement

The Opt In Agreement, officially titled "Debit Card Overdraft Coverage Consent," is a single-page, double-sided form through which a SCU member chooses to have certain overdrafts paid by SCU and to incur a fee for that service. Dkt. 12, Exh. 1. SCU's form mirrors in all material respects the A-9 Model Consent Form for Overdraft Services (§ 205.17). The Opt In Agreement states: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." The Opt In Agreement explains that there are two kinds of protection: standard practices for protection as part of the SCU account and other overdraft protection plans that would link with another account, such as a savings account or a line of credit. The Opt In Agreement pertains to the standard practices.

**\*5** The Opt In Agreement does not define or explain what is meant by the phrase "when you do not have enough money in your account to cover a transaction." Domann argues that the plain meaning of this phrase is that an overdraft would occur only when there was not enough money in the account, as shown by the ledger balance, to cover the transaction. SCU argues that the Opt In Agreement is part of the Account Agreement and must be read in conjunction with that Agreement. When the documents are read together, SCU argues, the plain meaning of "enough money" is the available balance.

Standing alone, the Opt In Agreement does not sufficiently define or explain the term "enough money" to put account holders on notice that "enough money" means the available balance. As Domann points out, the Opt In Agreement does not mention or explain the available balance in any way, nor does it contain any language

alerting the consumer that holds placed on funds earmarked for transactions that have not yet been settled or deposits that have not yet cleared can reduce the amount of money that is otherwise available for the consumer to use. This stands in contrast to the Opt In Agreement at issue in *Chambers*, 222 F. Supp. 3d at 10, a case cited by SCU, which specifically used the term "available balance" and included examples to illustrate what "not enough money in your account" meant, such as when the account holder "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available." Moreover, the Opt In Agreement in this case does not specifically reference the Account Agreement.

All of this being so, I agree with SCU that the Opt In Agreement must be construed together with the Account Agreement. As SCU notes, in Wisconsin, instruments executed at the same time between the same contracting parties in the course of the same transaction generally will be construed together. *Wipfli v. Bever*, 37 Wis. 2d 324, 326, 155 N.W.2d 71, 72 (1967); *Harris v. Metro. Mall*, 112 Wis. 2d 487, 496, 334 N.W.2d 519, 523 (1983) (same). Although Domann has not alleged when he entered into the respective agreements, he has not attempted to distinguish these cases on the ground that he executed the Opt In Agreement and the Account Agreement at separate times. Moreover, even if the agreements were not executed simultaneously, there would be no need for the overdraft coverage provided for in the Opt In Agreement were it not for the existence of a corresponding account established through the Account Agreement. *Accord Walbridge*, 299 F. Supp. at 343–44 ("Although the Agreements are separate, they are arguably linked with respect to an account holder's overdraft protection."); *Smith*, 2017 WL 3597522, at *6 ("Simply stated, a customer cannot 'opt-in' to overdraft protection for an account that does not exist."). Accordingly, I find that the language of the Opt In Agreement must be construed together with the Account Agreement for purposes of the breach of contract claims.

### 2. Account Agreement

Customers at SCU are provided with a Membership Guide that covers the parties' rights and responsibilities concerning the account. Dkt. 12, Exh. 2. The Membership and Account Agreement, which is the first of three agreements or disclosures that constitute the Membership Guide, is 11 pages long and contains 34 sections. SCU points to a number of provisions in the Membership Guide that it says communicate the use of available

Domann v. Summit Credit Union, Slip Copy (2018)

balance, rather than ledger balance, as the trigger for potential overdraft fees. First, the "Withdrawal Restrictions" section of the Account Agreement provides:

> **\*6 a. Withdrawal Restrictions.** We will pay checks or drafts, permit withdrawals, and make transfers from *available* funds in your account. The *availability* of funds in your account may be delayed as described in our Funds Availability Policy Disclosure. We may also pay checks or drafts, permit withdrawals, and make transfers from your account from insufficient *available* funds if you have established an overdraft protection plan or, if you do not have such a plan with us, according to our overdraft payment policy.

> *Id.*, p. 5, ¶ 11 (emphases added).

Second, two paragraphs later, the Account Agreement's "Overdrafts" Section provides:

> **a. Payment of Overdrafts.** If, on any day, the *available* funds in your share or deposit account are not sufficient to pay the full amount of a check, draft, transaction, or other item, plus any applicable fee, that is posted to your account, we may return the item or pay it, as described below. The Credit Union's determination of an insufficient *available account balance* may be made at any time between presentation and the Credit Union's midnight deadline with only one review of the account required. We do not have to notify you if your account does not have sufficient *available* funds in order to pay an item. Your account may be subject to a charge for each item regardless of whether we pay or return the item.

> *Id.*, p. 6, ¶ 12 (emphases added).

Third, in the "Fund Transfers" section, the Account Agreement specifies that SCU is "not obligated to execute any order to transfer funds out of your account if the amount of the requested transfer plus applicable fees exceeds the *available funds* in your account." *Id.*, p.4, ¶ 9 (emphasis added).

Finally, SCU points to its "Funds Availability Policy Disclosure," a one-and-a half-page document contained within the Membership Guide and referred to explicitly in the "Withdrawals" section set out above, which explains that not all funds deposited by check will be "available" immediately for use. *Id.*, pp. 11-12. This policy explains that in some cases

> [f]unds may not be available until the second business day after the day of your deposit. However, the first $200.00 of your deposit will be available on the first

business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the same business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available.

> *Id.* at 12.

When these provisions are read in context and as a whole, argues SCU, the only reasonable way to interpret the contract is that SCU will assess overdrafts based on the member's available balance, rather than the ledger balance.

I agree. As an initial matter, the term "available" is used to modify the term "funds" or "account balance" several times throughout the Account Agreement, including three times in the "Overdrafts" section. If this term meant "all of the funds" in the member's account, as Domann urges, then the adjective "available" would be meaningless and unnecessary. Such a construction would violate the rule that "a construction which gives effect to every word of a contract should be preferred to one which results in surplusage." *McCullough v. Brandt*, 34 Wis. 2d 102, 106, 148 N.W. 2d 718 (1967) (citation omitted). The word "available" has meaning only if it denotes something other than "all of the funds" or "actual balance."

The conclusion that "available" means something other than "actual" is not only supported by the rules of contract construction, but it is spelled out in the contract itself. In particular, the "Withdrawals" section—which appears before and refers to the overdrafts policy—refers explicitly to the Funds Availability Policy. By its express terms, this policy informs the member that the entirety of funds deposited into the account will not necessarily be "available to you on the same business day that we receive your deposit." Giving this section its plain reading, it conveys clearly that there may be a difference between the actual balance on a member's account and the amount of funds that are "available" for the member to use. Thus, although it is true that the Account Agreement does not have a glossary or expressly define the term "available account balance" or "available funds," the Funds Availability Policy makes clear that the word "available" has a specific meaning and that funds "available" in a customer's account may be a subset of the dollars shown on the ledger balance.

**\*7** Domann points out that other federal district courts have denied motions to dismiss after concluding that the relevant agreements were ambiguous as to whether the actual or available balance would be used to determine if an account was in overdraft. *See, e.g., Walker*, 305 F. Supp. 3d at 371; *Walbridge*, 299 F. Supp. 3d at 346;

*Smith*, 2017 WL 3597522, at *5; *Ramirez*, 2017 WL 1064991, at *5; *Gunter*, 2016 WL 3457009, at *3; *Wodja*, 2016 WL 3218832 at *3; *Pinkston-Poling*, 227 F. Supp. 3d at 855. Having read and considered these cases, I do not find that their reasoning compels a different result. Many of the account agreements at issue in these cases did not contain (or the court did not mention) a Funds Availability Policy like the one referenced in Domann's Account Agreement. In fact, several of these cases did not use the term "available" at all.

Although the courts in *Walbridge* and *Ramirez* found ambiguity in spite of a Funds Availability Disclosure, neither case convinces me that I should do the same here. In *Walbridge*, 299 F. Supp. 3d 338, the court discounted the funds availability policy because it "was not linked to the Opt In Agreement or to the parts of the Account Agreement that discussed overdrafts." *Id.* at 346. However, the "overdrafts" section of the account agreement at issue in *Walbridge* did not use the term "available funds" or "available account balance," but instead merely used the term "insufficient funds." *Id.* at 344. In this case, by contrast, SCU's "overdrafts" section uses the term "available" multiple times, and the section appears within the Account Agreement only two paragraphs after the "withdrawals" section, which contained a specific reference to the Funds Availability Policy.

*Ramirez*, 2017 WL 1064991, is more on point, but I respectfully disagree with the court's analysis leading to a finding of ambiguity. The *Ramirez* court appears to have given short shrift to the inconsistency between the language of the Funds Availability Policy—which clearly signifies that not all funds shown on an account holder's ledger balance are "available"—and the plaintiff's insistence that the term "available balance" as used elsewhere in the account agreement could reasonably mean ledger balance.

I am more persuaded by the decisions in *Chambers,* 222 F.Supp.3d 1, and *Tims*, 2017 WL 5133230, in which the courts found the existence of funds availability disclosures to be fatal to the plaintiff's claim that her bank breached a promise to assess overdraft fees only on transactions that overdrew her ledger balance. Relying on the language of the funds availability disclosure, these courts found that "[w]hen the account agreement refers to 'available' funds, it must be referring to a subset of funds unencumbered by such restrictions—exactly the type of restrictions that can create a divergence between the actual and available balances in the first place." *Chambers*, 222 F. Supp. 3d at 11 (citation omitted); *Tims*, 2017 WL 5133230 at *4 (quoting *Chambers* ). Both

courts found that, when the funds availability disclosure was read in the context of the agreements as a whole, the agreements could only be reasonably interpreted as providing for use of the available balance method, not the ledger balance method, for assessing overdrafts. Reading Domann's contract in a similar fashion, I reach the same conclusion here.

As a final observation, I note that Domann makes much of the fact that the Funds Availability Policy explains only that funds might not be available when a hold is placed on a deposit, without also informing the member that funds might also be reduced as a result of holds placed on funds earmarked for pending transactions. Complaint, ¶ 36; Plt.'s Br., dkt. 23, at 14. Accepting this as true, the fact that SCU omitted relevant information from its account contract concerning holds on pending transactions does not mean that SCU promised to use the ledger balance when assessing overdrafts, which is what Domann must show to proceed on his breach of contract claims.

**\*8** To be sure, the Account Agreement–and the "Overdrafts" section in particular–could have been written more clearly to explain how the "available balance" method works and its potential impact on overdraft charges. But the question presented to the court is not whether SCU could have or should have explained its procedures more clearly, the question is whether the terms as written reasonably can be understood as a promise by SCU to use a member's actual or "ledger" balance when assessing overdraft fees. The contract at issue cannot reasonably be read this way. Accordingly, Domann's breach of contract claims will be dismissed.

**B. Unjust Enrichment and Money Had and Received**
SCU moves to dismiss Domann's equitable claims for unjust enrichment and money had and received (the Fifth and Sixth Causes of Action) on two grounds: first, the two claims are indistinguishable, *see Meyer v. The Laser Vision Institute*, 290 Wis. 2d 764, 778 (Ct. App. 2006) (stating unjust enrichment and money had and received are same cause of action); second, neither claim can be maintained because the parties entered into a written contract addressing the same subject matter. Domann acknowledges that he cannot recover on both a contract theory and an unjust enrichment theory but contends that he may plead these theories in the alternative. Br. in Opp., dkt. 23, at 28.

Domann is correct, but only to a point. A party *can* plead

quasi-contract and contract claims in the alternative, but only in limited situations. As the court explained in *U.S. ex rel. Roach Concrete, Inc. v. Veteran Pac., JV*, 787 F. Supp. 2d 851, 859 (E.D. Wis. 2011), one of the cases cited by plaintiff:

> Where a plaintiff asserts a breach of contract claim and fails to allege any facts from which it could at least be inferred that the contract on which that claim is based might be invalid, the plaintiff is precluded from pleading in the alternative claims that are legally incompatible with the contract claim. This is but an application of the rule that "[a] plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits...." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (quoting *Kolupa v. Roselle Park Dist.*, 438 F.3d 713, 715 (7th Cir. 2006) ).

In Wisconsin, "[t]he doctrine of unjust enrichment does not apply where the parties have entered into a contract." *Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis. 2d 653, 671, 553 N.W. 2d 257, 265 (Ct. App. 1996) (citing *Continental Cas. Co. v. Wis. Patients Comp. Fund*, 164 Wis. 2d 110, 118, 473 N.W. 2d 584, 587 (Ct. App. 1991) ).

Throughout his complaint, Domann asserts that he entered into "binding" contracts with SCU in which SCU promised to do certain things that it did not do. Domann's claims for unjust enrichment and money had and received are not based upon an alternative theory under which there is no express contract; to the contrary, both counts incorporate by reference all of the breach of contract allegations. Complaint, dkt. 1, at ¶¶ 88, 92. Domann's allegations that the parties' relationship is governed by the terms of express, written contracts are thus incompatible with his quasi-contract theories. As a result, those claims must be dismissed. *Accord Thekan v. Revane*, 1998 WL 692324, *1, 222 Wis. 2d 624, 587 N.W. 2d 457 (Table) (unpublished disposition) (upholding trial court's dismissal of plaintiff's alternative unjust enrichment claim where plaintiff brought breach of express contract claim covering same subject); *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (same) (applying similar Illinois law).

**C. EFTA Claim**
**\*9** Finally, SCU moves to dismiss Count 7, in which Domann alleges that SCU violated Regulation E of EFTA, 12 C.F.R. § 1005.17, by not accurately describing

SCU's overdraft service in the Opt In Agreement. SCU moves to dismiss the claim on the grounds that the claim is untimely.

Generally, 15 U.S.C. § 1693m imposes civil liability on an institution that fails to comply with the provisions of EFTA. 15 U.S.C. § 1693m(a). EFTA claims must be brought "within one year from the date of the occurrence of the violation." § 1693m(g). Domann does not allege facts to show when he signed the Opt In Agreement. He does allege, however, that he was charged overdraft fees, based on the Opt In Agreement, on four occasions in 2017: February 9, February 10, November 7 (his business account), and December 7. Domann filed his complaint on March 9, 2018, within one year of his November and December 2017 overdraft fees but more than one year after he was assessed the February 2017 overdraft fees.

SCU argues that an EFTA violation "occurs" (and starts the one-year clock) when the *first* overdraft fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E, whereas Domann argues that a one-year clock begins anew with *each* improper overdraft fee. The bulk of authority is on SCU's side. Although the Seventh Circuit has not addressed the precise issue, most district courts that have considered the EFTA statute of limitations have concluded that the limitation period is triggered when a financial institution makes a first unauthorized transfer or charges an overdraft fee, rejecting the application of a "continuing violation" theory. *See, e.g., Walbridge*, 299 F. Supp. 3d at 350 (overdraft fee); *Wheeler v. Native Commerce Studios, LLC*, 2018 WL 447716, at *1–*2 (W.D. Mich. Jan. 17, 2018) (unauthorized transfer); *Whittington v. Mobiloil Federal Credit Union*, 2017 WL 6988193, *2–*4 (E.D. Texas, Sept. 14, 2017) (overdraft fee) (citing and discussing cases); *Harvey v. Google*, 2015 WL 9268125, at *3 - *4 (N.D. Calif. Dec. 21, 2015) (unauthorized transfer); *Repay v. Bank of America, N.A.*, 2013 WL 6224641, *4–*5 (N.D. Ill. Nov. 27, 2013) (recurring transfer). In *Harvey*, 2015 WL 9268125, at *4, the court explained the reasoning behind this rule:

> Although the consumer is financially injured with each transfer, the basis of the wrongful conduct is the failure to obtain proper authorization in the first instance. The EFTA claim based on such conduct is fully consummated when the first unauthorized transfer is made.

*Domann v. Summit Credit Union, Slip Copy (2018)*

Domann attempts to distinguish these cases on the ground that an overdraft fee is nonrecurring, unlike the recurring transfers at issue in some of the cases cited above. He finds support for his position in *Smith*, 2018 WL 1662107 at *5, in which the court saw a distinction between preauthorizing a series of transfers and opting in to an overdraft service, explaining:

> In the first instance, a consumer gives express permission for a series of recurring transfers from his or her account. But in the second instance a consumer merely opts in to a service, perhaps with no intention of ever using it, and he or she does not agree to any specific fee or charge, let alone a series of them.

The *Smith* court saw this as a reason to treat each overdraft fee separately that triggered a new one-year limitations period. *Id.*

**\*10** With all due respect, the reasoning of *Smith* is not persuasive. As a general rule, a statute of limitations begins to run when the plaintiff has "a complete and present cause of action" upon which the plaintiff "can file suit and obtain relief." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195, 201 (1997). "Customarily, that is true when the defendant breaches a duty (here a duty imposed by statute) and the claimant is injured." *Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009). Here, Domann alleges that SCU violated the EFTA by failing "to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program ...". Complaint, dkt. 1, ¶ 99. Thus, the alleged wrongful conduct is based on a single omission: the failure of SCU's opt-in contract to explain that SCU would use the "available" balance in the account rather than the "ledger" balance when assessing overdrafts.

I accept that Domann was not *injured* by this conduct until he was first assessed an overdraft fee based on an insufficient available balance. *Accord Wike*, 566 F.3d at 593 (finding that one year limitations period for alleged violation of EFTA's restriction on "preauthorized electronic fund transfers" occurred when first recurring transfer took place, not when payee arranged it).

However, there is no basis to find that a new cause of action accrued with each new overdraft fee. Domann does not allege that it was improper *per se* for SCU to charge him an overdraft fee, but only that SCU misled him about the circumstances under which it would charge such a fee. Domann was aware–or should have been aware–that he had been misled when the first overdraft charge took place on February 9, 2017. At that time, his EFTA claim based on the alleged Regulation E violation was fully consummated. It did not begin anew with subsequent overdraft charges.

Taking a different tack, Domann contends that, pursuant to the discovery rule, the statute of limitations did not start to run until he met with his attorney in December 2017. Under federal law, the discovery rule "starts the statute of limitations running only when the plaintiff learns that he[has] been injured, and by whom." *United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010), citing *United States v. Kubrick*, 444 U.S. 111 (1979); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). Although a plaintiff does not need to negate a statute of limitations defense in his complaint, he must ultimately show that "even with the exercise of reasonable diligence [he] could not have known of the purported injury" in time to file a timely complaint. *Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994).

Domann asserts that he could not discover before meeting with his lawyer that SCU was using the "available balance" method in assessing overdrafts because that fact was not disclosed in his account agreements. Br. in Opp., dkt. 23, at 26-27. This argument is unpersuasive. In the complaint, Domann alleges that he was charged an overdraft when his account had a positive ledger balance, and his EFTA claim is based on the premise that SCU's Opt-In Agreement said SCU would *not* assess overdraft fees when there was a sufficient positive ledger balance to cover the withdrawal or debit. On the basis of these allegations, then, Domann should have known when he was charged his first overdraft on a positive ledger balance that SCU was *not* using the ledger balance method to assess overdraft fees. At the very least, Domann would have had reason upon receiving the overdraft charge to review his account statement and account documents to find out what SCU's overdraft policy was and whether SCU was violating it. Thus, I agree with other courts that have found that, with reasonable diligence, plaintiff could have discovered his injuries when he received his first overdraft charge either by viewing his online account or looking at his bank statement.[5] *Whittington*, 2017 WL 6988193, *13 (rejecting application of discovery rule); *Walbridge*, 299

F. Supp. 3d at 351 (plaintiff failed to explain why he could not have discovered that fees were improperly charged); *Harvey*, 2015 WL 9268125, *4 (rejecting plaintiff's EFTA claim as untimely where she failed to view her bank statements and discover improper fees).

**\*11** Finally, Domann argues that, because he did not realize until he met with counsel in December 2017 that SCU's assessment of a single overdraft was "part of a systematic practice" that harmed an entire class of plaintiffs, he should be entitled to the exception announced in *Goodhand v. United States*, 40 F.3d 209 (7th Cir. 1994). In *Goodhand*, 40 F.3d at 212-13, the Seventh Circuit adopted a "trivial injury" exception for claims brought under the Federal Tort Claims Act, holding that where an injury is reasonably initially thought to be too slight to warrant the expense, inconvenience and uncertainties of litigation, the running of the statute of limitations is suspended until the injury is discovered to be serious. Domann cites no case extending this rule—which applies to personal injuries—to consumer class actions. The reason for this lack of authority is obvious: taken to its logical conclusion, Domann's argument would effectively suspend the limitations period for all putative class actions until the date on which a potential class representative met with class counsel and learned the "scope" of the harm. Nothing in *Goodhand* supports such an enormous extension of a limited exception to the ordinary discovery rule.

In sum, with reasonable diligence Domann would have known of his injury when he received his first overdraft fee on February 9, 2017. Because he did not file his lawsuit until more than one year later, the EFTA claim is untimely.

ORDER

IT IS ORDERED THAT defendant's Motion to Dismiss plaintiff's First, Second, Fifth, Sixth and Seventh Causes of Action under F. R. Civ. P. 12(b)(6) is GRANTED.

**All Citations**

Slip Copy, 2018 WL 4374076

Footnotes

1    For a thorough review of this history, see *Chambers v. NASA Federal Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016).

2    Matters outside the pleading cannot be considered unless the motion is treated as one for summary judgment, and the parties are given "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008). However, there is "a narrow exception to the Rule 12(d) instructions that permits a district court to take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment." *Doss*, 551 F.3d at 640. Judicial notice of the CFPB's report is warranted because it is a report of an administrative body. *See Radaszewski v. Maram*, 383 F.3d 599, 600 (7th Cir. 2004)(taking judicial notice of administrative findings in public record); *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998)("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper."). Accordingly, plaintiff's unopposed request for judicial notice, dkt. 24, is granted as to this report. The other documents attached to plaintiff's request may be appropriate for judicial notice as well, but they are irrelevant to the motion to dismiss.

3    Plaintiff did not attach copies of these documents to his complaint, but defendant has submitted copies with its motion to dismiss. Dkt. 12, Exhs. 1 and 2. The court may consider these documents in ruling on the dismissal motion. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.").

4    The parties appear to agree that Wisconsin law applies. This is consistent with Section 33 of the Account Agreement, which states that the contract is governed by the laws "of the state in which the Credit Union's main office is located."

5    In reaching this conclusion, I have relied solely on the complaint and not on either version of Domann's account statement submitted by the parties. *See* Dkt. 12, exh. 3 and Dkt. 19.

**Domann v. Summit Credit Union, Slip Copy (2018)**

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Appeal Filed

Appeal Filed by RUBY LAMBERT v. NAVY FEDERAL CREDIT UNION, 4th Cir., September 12, 2019

2019 WL 3843064
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Alexandria Division.

Ruby LAMBERT, individually and on behalf of all
others similarly situated, Plaintiff,
v.
NAVY FEDERAL CREDIT UNION, Defendant.

Civil No. 1:19-cv-103-LO-MSN
|
Signed 08/14/2019

**Attorneys and Law Firms**

Andrew Joseph Guzzo, Casey Shannon Nash, Kristi Cahoon Kelly, Kelly Guzzo PLC, Fairfax, VA, for Plaintiff.

Don Bradford Hardin, Jr., Davis Wright Tremaine LLP, Washington, DC, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Liam O'Grady, United States District Judge

**\*1** This matter comes before the Court on Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 19). The Motion is fully briefed, and the Court heard oral argument on May 24, 2019. For the reasons stated below, and for good cause shown, Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 19) is hereby **GRANTED.**

**I. BACKGROUND**

Plaintiff Ruby Lambert alleges that Defendant Navy Federal Credit Union charges multiple nonsufficient fund fees for multiple attempts to process a single payment request in violation of contractual language implying that only a single nonsufficient fund fee would ever be charged for a payment request, no matter how many times that payment request is declined for nonsufficient funds.

Plaintiff's contract with Navy Federal states that Navy Federal "may" assess "[a] fee" "for each returned debit item." Navy Fed. Credit Union Important Disclosures (hereinafter "Important Disclosures") at 4. Plaintiff's insurer, Mutual of Omaha, attempted to automatically deduct Plaintiff's insurance payment from her Navy Federal account (with Plaintiff's prior authorization) using an Automated Clearing House ("ACH") debit request. That request was rejected due to insufficient funds, and Plaintiff was charged a nonsufficient fund fee. Mutual of Omaha again submitted an ACH debit request for the same payment two days later. Navy Federal again rejected the request due to insufficient funds and charged Plaintiff with another nonsufficient fund fee. Plaintiff challenges Navy Federal's assessment of the second nonsufficient fund fee, as she views Mutual of Omaha's original payment request and subsequent reprocessing attempt as involving the same "debit item." Plaintiff has brought two claims against Navy Federal: (1) breach of contract and the covenant of good faith and fair dealing under Virginia law, and (2) violation of North Carolina's Unfair and Deceptive Trade Practices Act.

Defendant Navy Federal Credit Union has moved to dismiss both claims on preemption grounds and for failure to state a valid claim.

**II. LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While "detailed factual allegations" are not required, Rule 8

does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Id.* In evaluating whether a complaint states a plausible claim to relief, "although a court must accept as true all factual allegations contained in [the] complaint, such deference is not accorded to legal conclusions stated therein." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).

### III. ANALYSIS

#### A. Plaintiff's Claims Are Partially Preempted.

**\*2** Defendant Navy Federal Credit Union argues Plaintiff's claims are preempted by the National Credit Union Administration's ("NCUA") regulations implementing the Federal Credit Union Act ("FCUA") and Truth in Savings Act ("TISA"). State law claims may be preempted by Congress "either expressly through the statute or regulation's language or impliedly through its aim and structure." *Whittington v. Mobiloil Fed. Credit Union*, 2017 WL 6988193, at \*6 (E.D. Tex. Sept. 14, 2017) (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).

The relevant implementing regulations of the FCUA and TISA are contained in 12 C.F.R. parts 701 and 707, respectively. The FCUA's implementing regulations state:

> A Federal credit union may, consistent with this section, parts 707 and 740 of this subchapter, other federal law, *and its contractual obligations*, determine the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account. *State laws regulating such activities are not applicable to federal credit unions.*

12 C.F.R. § 701.35(c) (emphasis added). By its terms, § 701.35 "expressly provides that [federal credit unions] are authorized to determine, *free from state regulation*, the

types of *disclosures, fees or charges*" for their account offerings. 49 Fed. Reg. 46552-01, 46552 (Nov. 27, 1984) (emphasis added); *see also* 50 Fed. Reg. 4636-01, 4636 (Feb. 1, 1985) ("This final rule provides that policies with respect to disclosures, fees or charges ... shall be determined by [a federal credit union's] member-elected board of directors, free from regulatory restrictions."). Similarly, the TISA implementing regulations require federal credit unions to provide disclosures regarding "[t]he amount of any fee that may be imposed in connection with the account... and the conditions under which the fee may be imposed," 12 C.F.R. § 707.4(b)(4), and expressly preempt any "[s]tate law requirements that are *inconsistent* with the requirements of the TISA and [its implementing regulations]," 12 C.F.R. § 707.1(d) (emphasis added).

Consistent with the language and purpose of these regulations, it is well established that state state claims regarding a federal credit union's failure to disclose certain fee practices or any perceived unfairness in the fee practices themselves are preempted. *See, e.g., Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 725 (9th Cir. 2012) (finding that claims alleging the defendant's practice of posting debit-card transactions in high-to-low order was unfair were preempted because they would "prevent[ ] or significantly interfere[ ] with a national bank's federally authorized power to choose a posting order"); *id.* at 726 (finding failure to disclose claim against a bank preempted because "[i]mposing liability for the bank's failure to sufficiently disclose its posting method leads to the same result as mandating specific disclosures"); *Whittington*, 2017 WL 6988193, at \*9 (finding that the plaintiff's "attempts to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them" were preempted); *id.* at \* 10 ("[A]ny claims based on [Mobiloil Federal Credit Union's] alleged failure to make certain disclosures are preempted.").

On the other hand, it is equally well established that true breach of contract and affirmative misrepresentation claims are not federally preempted, even if the result of those claims may affect a federal credit union's fee disclosures. *See, e.g., Gutierrez*, 704 F.3d at 726 (finding that the plaintiff's claims "based on Wells Fargo's misleading statements about its posting method" under the fraudulent prong of California's Unfair Competition Law were not preempted because that law "does not impose disclosure requirements but merely prohibits statements that are likely to mislead the public"); *Whittington*, 2017 WL 6988193, at \*10–11 (finding a claim alleging a credit union affirmatively misrepresented that it assesses overdraft fees only when a customer has

overdrawn his or her account not preempted); *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 610 (D.S.C. 2015) ("[B]reach of contract claims *not* premised on unfairness or bad faith theories but on genuine disputes about the terms of the contract and the parties' compliance therewith," are not preempted because "their impact on the bank's exercise of its powers is only *incidental.*" (emphasis in original)); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1025 (E.D. Ark. 2015) (finding that the plaintiffs' breach of contract and breach of the implied covenant of good faith and fair dealing claims were not preempted because the plaintiffs merely sought "to hold [the defendant bank] to the terms of its contracts"); *Murr v. Capital One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 583 (E.D. Va. 2014) (rejecting the argument that the plaintiff's fraud claim was preempted by the National Banking Act because holding the defendant liable for fraud under state law would be "tantamount to imposing greater disclosure requirements").

**\*3** Here, Plaintiff alleges that Navy Federal does not assess fees as disclosed in its contract and that its actual fee assessment practice is unfair. To the extent Plaintiff's claims allege only that Navy Federal has failed to comply with the express terms of the parties' contract or affirmatively misrepresented its fee practices, Plaintiff's claims are not preempted under the affirmative misrepresentation and true breach of contract line of cases. While federal credit unions have the discretion to determine fee practices and disclosures free from state regulation inconsistent with the FCUA, the TISA, and their implementing regulations, federal credit unions must still comply with the terms of their contracts related to fee practices and not affirmatively misrepresent those practices. To the extent Plaintiff challenges a perceived failure to disclose, the specific language used in the disclosure, or the fairness of the fee practice itself, however, those arguments are clearly preempted.

### B. The Complaint Fails to State a Claim for Breach of Contract.

Although Plaintiff's breach of contract claim is not entirely preempted, the Court finds that it must be dismissed for failure to state a claim because the contract unambiguously gives Navy Federal the contractual right to impose fees in the way that it did.

Contracts must be construed as a whole without placing undue emphasis on isolated terms, *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 822 S.E.2d 351, 356 (2019), or adding additional terms, *Squire v. Va. Hous. Dev. Auth.*,

287 Va. 507, 758 S.E.2d 55, 60 (2014). When the terms of a contract are "clear and unambiguous," courts are required to construe those terms "according to their plain meaning." *Golding v. Floyd*, 261 Va. 190, 192, 539 S.E.2d 745, 736 (2001). "The fact that one may hypothesize opposing interpretations of the same contractual provision does not necessarily render the contract ambiguous because ... a contract is not ambiguous simply because the parties to the contract disagree about the meaning of its language." *Erie*, 822 S.E.2d at 356 (internal quotation marks omitted) (quoting *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 179, 788 S.E.2d 237 (2016)). Instead, "conflicting interpretations reveal an ambiguity only where they are reasonable." *Id.* at 355. "If the text of the agreement is unambiguous, then the court is without authority to resort to extrinsic evidence," such as public confusion, "in interpreting its meaning." *Schneider v. Cont'l Cas. Co.*, 989 F.2d 728, 732 (4th Cir. 1993).

While Plaintiff disagrees with Navy Federal's interpretation of "[a] fee may be assessed ... for each returned debit item," the Court agrees with Navy Federal that the provision is unambiguous and matches Navy Federal's practice.

Both parties agree that an "item" is a request or invitation for payment. In disclosing the order in which transactions are posted to a member's account, the contract lists all of the following as types of "items": "all money coming in (credits, deposits, etc.); ATM withdrawals; debit card transactions, also called Point of Sale (POS); *Automated Clearing House (ACH) debits*; and checks written." Important Disclosures at 3 (emphasis added). Thus, it is clear from the contract that ACH debit requests, such as the two submitted by Plaintiff's insurer, qualify as "debit items." The contract also warns Navy Federal Credit Union members that "[a]n ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance premium, utility bills, or car payment," *id.* at 9, as happened when Plaintiff's insurer submitted the second request for payment.

Plaintiff argues, however, that two ACH debit requests made by the same merchant, in the same amount, for the same purpose, are the same "debit item." In other words, Plaintiff argues that her insurer merely resubmitted the same "debit item" when it requested payment for the second time, rather a new debit item. In support of her interpretation, Plaintiff analogizes her insurer's requests for payment to a "check[ ] that you have written but that ha[s] not yet cleared your account," which the disclosures refer to as a single item, *id.* at 5.

Lambert v. Navy Federal Credit Union, Slip Copy (2019)

**\*4** Plaintiff's interpretation is unreasonable in light of the contract as a whole. When Plaintiff was charged the initial nonsufficient funds fee, it was because her insurer's request for payment (the "debit item") was returned. The contract specifies that "Navy Federal may *return* debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account" and assess "[a] fee" for the "*returned* debit item." *Id.* at 4 (emphasis added); *see also id.* at 5 ("If we do not pay an overdraft, your transaction will be declined and/or your check/ACH will be *returned*, unpaid." (emphasis added)). Plaintiff's insurer's first ACH debit request was not in the midst of being processed like a "check[ ] that you have written but that ha[s] not yet cleared your account," but rather was rejected just as a bounced check would be. Navy Federal also did not keep Plaintiff's insurer's unsuccessful first ACH request and attempt to reprocess the request on its own. It returned the request and waited for Plaintiff's insurer to submit another request for payment, which Navy Federal was then obligated to process.

If a check was rejected and a second check was submitted by the same merchant, in the same amount, for the same purpose, and the second check was also rejected, the contract clearly gives Navy Federal Credit Union the right to charge another fee. *Id.* at 4 ("A fee will be assessed ... for each refused check."). The analogous provision for debit items therefore also gives Navy Federal the right to charge a fee for each presentment of an ACH electronic request for payment, even if the request is by the same merchant, in the same amount, and for the same purpose.[†] Thus, rather than support Plaintiff's position, the contract's check provisions support Navy Federal's interpretation of the contract and position that the contract is unambiguous. When Plaintiff's insurer "re-presented" the request for payment, it was a new ACH debit item - just as a second check would be a new check even if it was by the same merchant, in the same amount, for the same purpose - and was therefore eligible for a fee when it was returned for nonsufficient funds.

Further, the sentence in dispute must be read in conjunction with the sentence immediately before it. The first sentence states: "Navy Federal may return debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account." *Id.* at 4. The next sentence warns: "A fee may be assessed in the amount shown on Navy Federal's current Schedule of Fees and Charges for each returned debit item." *Id.* (italics removed). Taken together, these sentences clearly provide that Navy Federal may return a debit item, such as an ACH debit, if

there is not enough money in the account (the first sentence), and, if there is a return, Navy Federal may charge the member a fee for that returned debit transaction (the second sentence).

Plaintiff disagrees, arguing that "returned debit *item*" in the second sentence must mean something different than "returned debit" in the first sentence. At the hearing, Plaintiff conceded that without the inclusion of "item" in the second sentence, Plaintiff would not have a claim. Yet, the Court finds that the use of "item" does not render the sentence ambiguous. As noted above, other provisions of the contract demonstrate that an "item" includes various types of transactions that would either add or subtract money from the account. The contract merely uses "debit" as an adjective to modify "item," just as "returned" is used as an adjective to modify "debit item." Thus, "debit item" clearly refers to a transaction that attempts to withdraw money from the account, such as an ACH debit request, and the inclusion of "item" in "returned debit item" does not render the contract ambiguous.

**\*5** In conclusion, when the terms of the contract are read together and in context, the contract unambiguously provides that "each" time Navy Federal Credit Union "returns" a request for payment (a "debit item") for insufficient funds, a nonsufficient fund fee may be assessed without regards to whether the returned debit item was a re-presentment of a previously rejected request. As a result, Navy Federal Credit Union did not breach the contract when it assessed the second nonsufficient fund fee for Plaintiff's insurer's second ACH debit request. Because "[t]he Complaint's allegations make clear that no breach [of contract] occurred," the breach of contract claim must be dismissed for failure to state a claim. *Hanback v. DRHI, Inc.*, 94 F. Supp. 3d 753, 761 (E.D. Va. 2015).

### C. **The Complaint Fails to State a Claim for Breach of the Covenant of Good Faith and Fair Dealing.**

Plaintiff's breach of the covenant of good faith and fair dealing claim must also be dismissed for similar reasons.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 51 (E.D.N.Y. 2014). The implied covenant prevents a party from exercising "contractual *discretion* in bad faith, even when such discretion is vested solely in that party," but it "does not prevent a

Lambert v. Navy Federal Credit Union, Slip Copy (2019)

party from exercising its explicit contractual *rights*." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 542 (4th Cir. 1998) (emphasis in original). The relevant case law establishes that "(1) where a party has a clear contract right, even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly; (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) (citations omitted).

Courts have "explicitly rejected attempts to characterize the decision whether to exercise an accrued right as a matter of 'contractual discretion.' " *Id.* at 468. At the same time, however, courts have held that the implied covenant applies where the accrual of a contractual right depends on a party's exercise of contractual discretion rather than on objective facts. *Id.* at 469. In other words, "[a] party to a contract can flip a coin to decide whether to exercise an accrued right, but cannot flip a coin to determine whether a right has accrued." *Id.*

In this case, Navy Federal's right to charge a fee depended on the existence of an objective fact: whether a debit item had been returned for nonsufficient funds. Thus, although the contract stated that Navy Federal "may" rather than "will" assess a fee for each returned debit item, Navy Federal had the contractual right to assess the challenged fee and, unlike in the cases cited by Plaintiff, had not exercised any contractual discretion in bad faith to cause that right to accrue.[3] Plaintiff has also not plausibly alleged that Navy Federal exercised its contractual right to charge the fee dishonestly.

Accordingly, Plaintiffs' breach of the covenant of good faith and fair dealing claim must be dismissed because Navy Federal honestly exercised its contractual *right* to charge Plaintiff a nonsufficient fund fee for her insurer's second request for payment. *Va. Vermiculite*, 156 F.3d at 542 ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that... the duty of good faith does not prevent a party from exercising its explicit contractual *rights*....." (emphasis in original)); *Riggs Nat'l Bank of Wash., D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994) ("An implied duty of good faith cannot be used to override or modify explicit contractual terms."); *Wilkins v. United States*, 2016 WL 2689042, at \*4 (E.D. Va. May 9, 2016) (dismissing implied covenant claim where the defendant "had the contractual right... to engage in the actions alleged in the Complaint"); *Bennett v. Bank of Am., N.A.*, 2012 WL 1354546, at \*11 (E.D. Va. Apr. 18, 2012) (dismissing implied covenant claim where the defendant bank exercised its contractual rights and it was not plausibly alleged that the bank "exercise[d] its

contractual *discretion* in bad faith" (alteration and emphasis in original)); *Albayero v. Wells Fargo Bank, N.A.*, 2011 WL 4748341, at \*6 (E.D. Va. Oct. 5, 2011) (dismissing implied covenant claim where "the actions taken by Defendants merely amounted to an exercise of their contractual rights").

### D. The Complaint Fails to State a Claim Under the North Carolina Unfair and Deceptive Trade Practices Act.

**\*6** Finally, Plaintiffs' North Carolina Unfair and Deceptive Trade Practices Act ("NC UDTPA") claim must be dismissed pursuant to the contract's choice-of-law provision.

The contract specifies that "Navy Federal accounts are maintained and governed in accordance with federal law and the laws of the Commonwealth of Virginia, as amended." Important Disclosures at 7. The language of this provision, which is included in a separate "Governing Laws" section, is sufficiently broad to preclude Plaintiff's NC UDTPA claim because the claim (a) concerns how Navy Federal "maintain[s]" Plaintiff's "accounts" and interprets the account agreement, and (b) asserts identical allegations as Plaintiff's breach of contract claims. *Run Them Sweet, LLC v. CPA Glob. Ltd.*, 224 F. Supp. 3d 462, 465–69 (E.D. Va. 2016) (Ellis, J.); *Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 653–54 (E.D. Va. 2004) (Ellis, J.); *see also Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) ("Where a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims," courts should apply the clause as such.).

Plaintiff has also failed to show that enforcing the choice-of-law provision in this case "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 2014 U.S. Dist. LEXIS 41411, at \*13, 2014 WL 1248075 (E.D. Va. March 26, 2014) (quoting Restatement (Second) of Conflict of Laws § 187(2) (1971)). Although North Carolina's UDTPA permits claims against credit unions while Virginia's analogue statute does not, "the enforcement of a choice-of-law provision that would apply a narrower consumer protection or deceptive trade practices statute does not amount to a violation of a fundamental public policy of another, more interested jurisdiction." *Canon U.S.A., Inc. v. Cavin's Bus. Sols., Inc.*, 208 F. Supp. 3d 494, 505 (E.D.N.Y. 2016) (dismissing NC UDTPA claim pursuant to a choice-of-law provision); *see also, Run*

*Them Sweet*, 224 F. Supp. 3d at 469 (dismissing a claim brought under California's unfair and deceptive trade practices statute pursuant to a Virginia choice-of-law provision because "there is no indication" that doing so "violates California public policy"). North Carolina's UDTPA also does not have an antiwaiver provision that would indicate dismissing a NC UDTPA claim pursuant to a choice-of-law provision would violate North Carolina's policy. *G.P.P., Inc v. Guardian Prot. Prods., Inc.*, 2015 WL 3992878, at *18 (E.D. Cal. June 30, 2015) (dismissing a NC UDTPA claim pursuant to a choice-of-law provision because the parties did not "identify a choice-of-law exclusion or waiver provision in the statute"); *see also Volvo Const. Equip. N. Am., Inc v. CLMEquip. Co.*, 386 F.3d 581, 608-09 (4th Cir. 2004) (noting that a fundamental policy analysis generally focuses on whether there is an anti-waiver provision in the statute or other statutory language suggesting the legislature intended the statute to embody fundamental policy, and finding that a choice-of-law provision barred a state law claim brought under a statute that had neither). To the contrary, the North Carolina Supreme Court has held that parties *can* waive their rights under North Carolina's UDTPA. *See Ussery v. Branch Banking & Trust Co.*, 368 N.C. 325, 777 S.E.2d 272, 281 (2015); *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 437 S.E.2d 374, 381 n.6 (1993). Thus, dismissing Plaintiff's

NC UDTPA claim pursuant to the choice-of-law provision would not violate North Carolina's fundamental policy.

**\*7** Accordingly, Plaintiffs North Carolina Unfair and Deceptive Trade Practices Act claim will be dismissed pursuant to the contract's choice-of-law provision.[3]

## IV. CONCLUSION

For the reasons stated above, and for good cause shown, Defendant's Motion to Dismiss for Failure to State a Claim (Dkt. 19) is hereby **GRANTED.** Finding that amendment would be futile, Plaintiff's Complaint is hereby **DISMISSED WITH PREJUDICE.**

It is **SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 3843064

Footnotes

1   The use of "refused" before check but "returned" before "debit item" is inconsequential. When a check is refused, it may not always be returned. For example, Navy Federal Credit Union may not mail a bounced check back to the member or payment requester. By contrast, the parties have represented that when electronic transactions, such an ACH debits, are rejected, they are returned via the same electronic transmission method, such as the ACH network.

2   In the cases Plaintiff relies upon, the breach of implied covenant claims survived motions to dismiss because the banks exercised their contractual discretion to post debit items in any order to maximize the accrual of their right to charge overdraft fees. *See, e.g., Gutierrez*, 622 F. Supp. 2d at 954; *In re HSBC Bank*, 1 F. Supp. 3d at 51–52.

3   In *Lloyd v. Navy Federal Credit Union*, the United States District Court for the Southern District of California found the Virginia choice-of-law provision at issue unenforceable as to the plaintiff's California consumer protection statutory claims because enforcing the provision would violate California's public policy. 2018 WL 1757609, at *5–6 (S.D. Cal. Apr. 12, 2018). The holding in *Lloyd* was based on (a) California's fundamental public policy in favor of class actions, which the California statutes permit but the Virginia statutes do not, and (b) the express anti-waiver provision in one of the California consumer protection statutes at issue, which stated that waivers are unenforceable as contrary to public policy. *Id.* at *5. Because NC's UDTPA does not have an anti-waiver provision or any statement that the ability to bring suits against a credit union is a fundamental policy of the state, *Lloyd* does not apply to this case.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.                    6

KeyCite Yellow Flag - Negative Treatment

Disagreed With by Smith v. Bank of Hawaii, D.Hawai'i, April 5, 2018

2017 WL 6988193

Only the Westlaw citation is currently available.

United States District Court, E.D. Texas.

Jillian L. WHITTINGTON, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

MOBILOIL FEDERAL CREDIT UNION, Defendant.

CIVIL ACTION NO. 1:16-CV-482

|

Signed 09/14/2017

**Attorneys and Law Firms**

William Craft Hughes, Deola Ali, Jarrett Lee Ellzey, Jr., Hughes Ellzey LLP, Houston, TX, Karen Lee Spivey, Pate & Spivey LLP, Beaumont, TX, for Plaintiff.

Andrew J. Demko, Stuart M. Richter, Katten Muchin Rosenman LLP, Los Angeles, CA, Emily Lauren Rochy, Katten Muchin Rosenman, LLP, Houston, TX, for Defendant.

**MEMORANDUM AND ORDER**

MARCIA A. CRONE, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the court is Defendant Mobiloil Federal Credit Union's ("MCU") Motion to Dismiss Plaintiff's Original Class Action Complaint and Brief in Support and Verified Plea in Abatement (#12), wherein MCU seeks the dismissal of all of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and the doctrines of preemption and statute of limitations. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the motion should be granted in part and denied in part.

I. Background

Plaintiff Jillian L. Whittington ("Whittington"), on behalf of herself and all others similarly situated, accuses MCU, a federally-chartered credit union, of providing its customers with misleading, false, and incomplete information regarding its overdraft fee system and deceiving its customers with "misleading and false information" concerning its overdraft program, while concealing the "racket" with unconscionable terms in its Membership and Account Agreement ("MAA"). MCU offers a "Pay Privilege" service that permits it to cover any payments from its members' accounts when there are insufficient funds and to assess overdraft fees. MCU also offers a "Pay Privilege Plus" service, which covers overdrafts through ATM and debit card transactions, as well as additional overdraft protection via a link to a member's savings account or line of credit from which MCU can transfer the amount necessary to cover an overdraft.

Whittington became a member of MCU in 2013. In 2014, she learned of various irregularities in her account with MCU and determined that MCU had charged her numerous overdraft fees—fees which Whittington describes as improper and unconscionable. As a result, she filed this putative class action on November 22, 2016, asserting claims for fraud, breach of express warranty, and unjust enrichment as well as violations of the Texas Deceptive Trade Practices Act ("DTPA"), and Regulation E of the Electronic Funds Transfer Act.[1]

Whittington complains that: (1) MCU failed to disclose "material facts" in the MAA, and/or the Opt-In form used by MCU (titled as "What You Need to Know About Overdrafts and Overdraft Fees"),[2] and (2) MCU's policies and practices (as set forth in the MAA and the Opt-In form) in managing its accounts, paying overdrafts, and assessing overdraft fees are unconscionable. She alleges:

MCU employs a sophisticated electronic system to automate its Overdraft Fees. This system manipulates the number of overdrafts and thus the amount of Overdraft Fees charged to each customer.... MCU's overdraft system does not exist in isolation. It finds support in specific contractual terms that MCU customers must "agree" to in order to bank with MCU. First, the customer must agree that MCU may determine her "insufficient available account balance" "at any time" with "only one (1) review required." Second, MCU says it may rearrange transactions in a

customer's account "in any order we choose." And third, MCU says it "does not have to notify you if your account does not have sufficient funds to pay an overdraft."

**\*2**

\* \* \*

[O]perating under the specious right to rearrange transactions "in any order [it] chooses," MCU disregards the posting of a customer's credits/deposits, aggregates her debits, then conducts its "only one" account balance review when her account is thereby reduced to a shortfall/overdrawn in order to assess multiple-transaction Overdraft Fees on the account. This is shown even if her account is not overdrawn in fact, or overdrawn for that day had her posted credits/deposits been considered in MCU's account balance review. This approach to Overdraft Fee assessment is improper in multiple ways. First, the aggregation of debits for the purpose of multiplying Overdraft Fees is unjustified. Second, MCU explicitly promotes/ represents its overdraft practice as follows: "[i]f, on any day, the available funds in your [account] are not sufficient to pay the full amount of a check, draft, transaction, or other item posted to your transaction plus any applicable fee ("overdraft"), we may pay or return the overdraft." This representation is false and misleading considering how MCU's overdraft system actually operates, *i.e.* a dynamic, fee-optimized system that does not look to the "day" but to an opportunistic moment after an improper aggregation of debits, and then repeatedly "chooses" to disregard credits/deposits in order to depress a customer's available funds and promote an overdraft. This is a deceptive and unconscionable practice because even if the overdraft system does not violate the highlighted terms per se, it intentionally misleads the customer on how the system operates, *i.e.* it promises a "daily" balance system but operates a dynamic system optimized to charge a fee at any point, and not just by the day. MCU could have disclosed that its system looks at "any time," but such disclosure would alert the customer to the dynamic risk of the system. MCU's deliberate misrepresentation of how its fee system functions is fraudulent.

\* \* \*

Aside from the multiplication of fees from improper debit aggregation, largest-item-first sequencing, or disregard of posted credits/deposits, MCU's manipulation of Plaintiff and class members' available funds also deprives them of accurate account balance information which causes them to incur even more Overdraft Fees.

MCU covers overdrafts through a number of programs. Some of these involve a link to a savings account. When a customer overdraws her checking account, MCU may transfer money from the linked account to cover the shortfall. For this transfer, MCU charges a "Transfer Fee." Because the Transfer Fee is lower than an Overdraft Fee, MCU markets the linked account transfer programs as "less expensive." For comparison, Plaintiff's statements show that the Transfer Fee is $5.50 per transfer, while the Overdraft Fee and NSF fees are $30.00 per incident. But like other overdraft "protection" programs it offers, MCU uses the linked account service to improperly escalate its Overdraft Fees to customers' injury. In a typical fee scheme of this type, MCU transfers a token amount (often less than a dollar) from the customer's account, charges the customer $5.50 in Transfer Fee, and then charges the customer another $30.00 in Overdraft Fee because the transferred amount will not cover the original overdraft. To the Customer, the transfer merely escalates a $30 overdraft into $35.50, even though the transfer pays down/reduces the amount of overdraft and consequently any commercial risk the original overdraft posed to MCU.

**\*3** In addition to these allegations, Whittington avers that MCU used the MAA's "Order of Payment" provision in combination "with other purported contractual terms"—which Whittington describes as unconscionable provisions set in boilerplate fashion to bewitch the customer—to "disguise its fee-optimized system that repeatedly injures Plaintiff and class members." According to Whittington, MCU promised an "any day" overdraft regime but implemented a "dynamic, maximum-fee-moment system that disregards a customer's available funds and also ignores her daily-balance."

Whittington also complains that MCU deviates substantially from prevailing industry standards, stating "[f]or example, [that] [MCU] fails to follow the 'best practices' for overdraft programs set forth in the 'Joint Guidance on Overdraft Protection Programs' ... issued collectively by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration...." Specifically, MCU reportedly "fails to follow the injunction to 'Clearly disclose program fees' " and merely discloses that it charges "a fee."

In response to Whittington's complaint, MCU filed the instant motion to dismiss. Therein, MCU moves for the

dismissal of all of Whittington's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). MCU argues that Whittington's: DTPA, fraud, and unjust enrichment claims are preempted by the Federal Credit Union Act and regulations promulgated by the National Credit Union Administration; DTPA and fraud claims are preempted by the Truth in Savings Act; and EFTA and DPTA claims are time-barred. MCU additionally asserts, for various reasons, that Whittington fails to state plausible claims for EFTA violations, fraud, and unjust enrichment. Finally, MCU filed a verified plea in abatement, requesting that this case be abated until requisite notice is provided under the DTPA.

## II. Analysis

### A. FED. R. CIV. P. 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960, 122 S.Ct. 2665, 153 L.Ed.2d 839 (2002). It is not a procedure for resolving contests about the facts or the merits of a case. *See* 5B CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2004 & Supp. 2015). In ruling on such a motion, the court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Warren v. Chesapeake Expl., L.L.C.*, 759 F.3d 413, 415 (5th Cir. 2014); *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (noting that at the 12(b)(6) stage, the court must construe all facts in favor of the non-moving party); *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir.), *cert. denied*, 567 U.S. 936, 133 S.Ct. 32, 183 L.Ed.2d 678 (2012). Nevertheless, "the plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Ramming*, 281 F.3d at 161 (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *accord In re La. Crawfish Producers*, 772 F.3d 1026, 1029 (5th Cir. 2014); *Gibson v. Tex. Dep't. of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 233 (5th Cir. 2012).

**\*4** Generally, the court may not look beyond the four corners of the plaintiff's pleadings. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see Wilson*, 667 F.3d at 595. The court may, however, consider matters that are outside the pleadings if those materials are matters of public record. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (citing *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995)); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir.), *cert. denied*, 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). The court may also consider "documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). Moreover, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated on other grounds by Twombly*, 550 U.S. at 563, 127 S.Ct. 1955).

Furthermore, "a complaint that shows relief to be barred by an affirmative defense, such as the statute of limitations, may be dismissed for failure to state a cause of action." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *accord Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *La Porte Constr. Co. v. Bayshore Nat'l Bank of La Porte*, 805 F.2d 1254, 1255 (5th Cir. 1986). Thus, "a complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." *Frame v. City of Arlington*, 657 F.3d 215, 241 (5th Cir. 2011), *cert. denied*, 565 U.S. 1200, 132 S.Ct. 1561, 182 L.Ed.2d 168 (2012); *see Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 141 (5th Cir. 2007); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002), *cert. denied*, 537 U.S. 1200, 123 S.Ct. 1287, 154 L.Ed.2d 1041 (2003); *Davis v. Dallas Cty.*, 541 F.Supp.2d 844, 856 (N.D. Tex. 2008) (plaintiff's noncompliance with the applicable statute of limitations "may support dismissal under Rule 12(b)(6)

where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like."). The limitations defense, however, must be clear on the face of the complaint. *Carbe v. Lappin*, 492 F.3d 325, 328 n.9 (5th Cir. 2007); *China Nat'l Bldg. Material Inv. Co., Ltd. v. BNK Int'l, LLC*, No. A-14-CA-701-SS, 2015 WL 363275, at *4 (W.D. Tex. Jan. 27, 2015) ("While the court can consider a statute of limitations argument on a Rule 12(b)(6) motion to dismiss, such a motion cannot be granted unless the limitations defense is clear on the face of the complaint.") (quoting *Seghers v. El Bizri*, 513 F.Supp.2d 694, 707 (N.D. Tex. 2007)). "Where the issue of limitations requires a determination of when a claim begins to accrue, the complaint should be dismissed only if the evidence is so clear that there is no genuine factual issue and the determination can be made as a matter of law." *Askanase v. Fatjo*, 828 F.Supp. 465, 469 (S.D. Tex. 1993) (citing *Sisselton-Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 591 (9th Cir.), *cert. denied*, 498 U.S. 824, 111 S.Ct. 75, 112 L.Ed.2d 48 (1990)). "Although defendants bear the burden of pleading and proving affirmative defenses, where facts alleged in plaintiff's pleadings make clear that a claim is barred, dismissal under Rule 12(b)(6) may be granted." *Williams v. De-Valdenbro*, No. 4:13-CV-960, 2014 WL 4640745, at *2 (S.D. Tex. Sept. 10, 2014) (quoting *In re Dynegy, Inc. Secs. Litig.*, 339 F.Supp.2d 804, 819 (S.D. Tex. 2004)); *see also Jones*, 549 U.S. at 215, 127 S.Ct. 910; *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003), *cert. denied*, 540 U.S. 1161, 124 S.Ct. 1173, 157 L.Ed.2d 1206 (2004).

**\*5** "[A] motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted.' " *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)); *accord Leal*, 731 F.3d at 410. "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in [her] behalf, the complaint states any valid claim for relief." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 601 (1969)); *accord Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (noting that at the 12(b)(6) stage the court's task "is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not evaluate the plaintiff's likelihood of success"); *Leal*, 731 F.3d at 410. "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.' " *Ramming*, 281 F.3d at 161-62 (quoting *Tel-Phonic Servs.,*

*Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992)).

A Rule 12(b)(6) motion to dismiss must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Accordingly, a district court should not dismiss a complaint for failure to state a claim unless a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570, 127 S.Ct. 1955; *accord Leal*, 731 F.3d at 410; *Wilson*, 667 F.3d at 595; *Turner*, 663 F.3d at 775; *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Coleman v. Sweetin*, 745 F.3d 756, 763 (5th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); *Thompson*, 764 F.3d at 503; *Harold H. Huggins Realty, Inc.*, 634 F.3d at 796. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955); *Gibson*, 700 F.3d at 233. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S.Ct. 1937. In other words, to state a cognizable cause of action, the complaint must allege sufficient facts to "nudge" the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955; *Leal*, 731 F.3d at 410. Generally, at the 12(b)(6) stage, a plaintiff is simply required to inform the defendant of the factual basis of his complaint in order to avoid dismissal for failure to state a claim. *See Johnson v. City of Shelby*, ––– U.S. ––––, 135 S.Ct. 346, 346-47, 190 L.Ed.2d 309 (2014) (citing FED. RULE CIV. P. 8(a)(2)); *Groden v. City of Dallas*, 826 F.3d 280, 283 (5th Cir. 2016).

B. Federal Preemption
The Supremacy Clause of the United States Constitution empowers Congress to enact laws that supersede state law by means of an express provision in a federal statute or by implication. *See* U.S. CONST. art. VI; *Arizona v. United States*, 567 U.S. 387, 398-99, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d

352 (2000); *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005). "Federal regulations have no less preemptive effect than federal statutes." *Planned Parenthood of Houston & Se. Tex.*, 403 F.3d at 336 (citing *Fid. Fed. Sav. & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). When determining whether a federal statute or regulation preempts state law, "the purpose of Congress is the ultimate touchstone." *Hughes v. Talen Energy Mktg., LLC*, ––– U.S. ––––, 136 S.Ct. 1288, 1297, 194 L.Ed.2d 414 (2016); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010).

**\*6** Congress can show preemptive intent either expressly through the statute or regulation's language or impliedly through its aim and structure. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008); *Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 529-30 (5th Cir. 2012); *Franks Inv. Co. LLC*, 593 F.3d at 407. "Implied preemption may take two forms: field preemption and conflict preemption." *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200 (5th Cir. 2013); *Franks Inv. Co. LLC*, 593 F.3d at 407. Field preemption occurs when federal law is so pervasive that it leaves no room for state supplementation. *Janvey*, 712 F.3d at 200; *accord Franks Inv. Co. LLC*, 593 F.3d at 407. Conflict preemption occurs where state law "actually conflicts" with federal law. *Janvey*, 712 F.3d at 200. State law "actually conflicts" with federal law in two circumstances: (1) where it is impossible for a private party to comply with both state and federal law; and (2) where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes of the objectives of Congress. *Crosby*, 530 U.S. at 372-73, 120 S.Ct. 2288; *Janvey*, 712 F.3d at 200.

Federally-chartered financial institutions, however, remain subject to "state laws of general applicability ... so long as these laws do not 'prevent or significantly interfere' " with the entity's exercise of its powers. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007) (discussing preemption in the national banking context); *accord Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012) ("Despite the broad scope of the [National Bank Act], ... national banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of

the [National Bank Act].' ").

### 1. Credit Unions, the Federal Credit Union Act, and the Truth in Savings Act

In the case at bar, MCU argues that Whittington's state law claims under the DTPA, for fraud, and for unjust enrichment are preempted by the Federal Credit Union Act ("FCUA") and the Truth in Savings Act ("TISA") as well as their implementing regulations.

The FCUA, enacted in 1934, "authorized the creation of federally-chartered credit unions and created the [National Credit Union Administration ("NCUA") ] to supervise those federally-chartered credit unions." *Credit Union Nat'l Ass'n v. Nat'l Credit Union Admin.*, 57 F.Supp.2d 294, 299 (E.D. Va. 1995), *aff'd*, 188 F.3d 228 (4th Cir. 1999); *see Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1220 (10th Cir. 2014), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 949, 190 L.Ed.2d 830 (2015); *see also* 12 U.S.C. §§ 1751, 1752a. To this end, Congress provided the NCUA with the power to "prescribe rules and regulations for the administration of this chapter." 12 U.S.C. § 1766(a). In accordance with its authority to administer the FCUA, the NCUA promulgated various regulations relevant to the case at bar. *See* 12 C.F.R. § 701.1 *et seq.*

Similarly, as part of the Federal Deposit Insurance Corporation Improvement Act, Congress enacted TISA and delegated to the NCUA the authority to promulgate regulations for credit unions "taking into account [their] unique nature." 12 U.S.C. § 4311. TISA's purpose is to "require the clear and uniform disclosure of ... (1) the rates of interest which are payable on deposit accounts by depository institutions; and (2) the fees that are assessable against deposit accounts, so that consumers can make a meaningful comparison between the competing claims of depository institutions with regard to deposit accounts." 12 U.S.C. § 4301. Among the regulations promulgated by the NCUA is 12 C.F.R. § 707.11, which sets forth various disclosure requirements for overdraft services, including the mandate that credit unions disclose "[t]he fee or fees for the payment of each overdraft." § 707.11(b)(1)(I).

**\*7** As the agency tasked to administer the FCUA and TISA, the NCUA's regulations, as well as their interpretation, are given "controlling weight." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1985); *ExxonMobil*

*Pipeline Co. v. U.S. Dep't of Transp.*, No. 16-60448, 867 F.3d 564, 584(5th Cir., 2017) (Graves, J., concurring) ("It is well-settled that an agency's interpretation of its own regulation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' ") (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)). The rule of deference also applies to the agency's considered opinions as set forth in interpretive letters and amicus briefs. *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 210, 131 S.Ct. 871, 178 L.Ed.2d 716 (2011) (deferring to Federal Reserve Board amicus brief because "there is no reason to suspect that the position the Board takes in its amicus brief reflects anything other than the agency's fair and considered judgment"); *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256-57, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (according deference to an interpretive letter from the Office of the Comptroller of the Currency).

### 2. Whittington's DTPA and Unjust Enrichment Claims

MCU first argues that Whittington's DTPA and unjust enrichment claims are preempted by the FCUA and its implementing regulations. The DTPA proscribes "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," TEX. BUS. & COM. CODE § 17.46(a), and allows a consumer to maintain an action against a defendant who undertakes an unconscionable action or course of action and causes the consumer economic or mental anguish damages, TEX. BUS. & COM. CODE § 17.50. To recover for unjust enrichment, a party must show that "one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

According to MCU, 12 C.F.R. § 701.35(c) preempts Whittington's DTPA and unjust enrichment claims because they are based on a theory of unconscionability. Section 705.35(c) provides:

> A Federal credit union may, consistent with this section, parts 707 and 740 of this subchapter, other federal law, and its contractual obligations, determine the types of fees or charges and

> other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account. State laws regulating such activities are not applicable to federal credit unions.

12 C.F.R. § 701.35(c). As is clear from the aforementioned text, any state laws that attempt to regulate a federal credit union's authority to determine "the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account" are expressly preempted. *Id.*; *see* 49 Fed. Reg. 46552-01, 46552 (Nov. 27, 1984) (proposing to add § 701.35(c) to counter state laws requiring certain disclosures and "purporting to specify the form and content of [federal credit union] disclosures regarding deposit availability and service fees charges and, in some cases, purporting to establish time periods in which drafts (checks, etc.) deposited into an FCU account must be credited and available for withdrawal").

In promulgating 12 C.F.R. § 701.35(c), the NCUA explained that the proposed regulation "expressly provides that [federal credit unions] are authorized to determine, free from state regulation, the types of disclosures, fees or charges, time for crediting of deposited funds, and all other matters associated with the establishment, maintenance or closing of a share, share draft, or share certificate account." 49 Fed. Reg. 46552-01. When the regulation became final, the NCUA stated that "[t]his final rule provides that policies with respect to disclosures, fees or charges, time for crediting of deposited funds, and other matters affecting the opening, maintaining or closing of a share, share draft or share certificate account, shall be determined by [a federal credit union's] member-elected board of directors, free from regulatory restrictions." 50 Fed. Reg. 4636-01, 4636 (Feb. 1, 1985). Consistent with these declarations, the NCUA has applied the share account regulation to preempt various state laws that attempt to affect the account fees a federal credit union may charge. *See, e.g.*, NCUA Op. Letter 07-0743 (Aug. 7, 2007) (opining that a Georgia law prohibiting federal credit unions from charging a fee for cashing checks is preempted), available at https://www.ncua.gov/Legal/OpinionLetters/OL2007-0743.pdf; NCUA Op. Letter 04-0259 (Mar. 12, 2004) (citing § 701.35(c) and finding preempted a Connecticut statute prohibiting federal credit unions from assessing fees against member share accounts based on inactivity or dormancy), available at

http://www.ncua.gov/Legal/OpinionLetters/OL2004-0259 .pdf; NCUA Op. Letter 97-0508 (July 7, 1997) (noting, in the context of assessment of overdraft fees, that "state laws regulating matters affecting the opening, maintaining and closing of a share draft account are not applicable to an FCU," although finding the NCUA's interpretation of the issue not to be contrary to Minnesota law), available at https://www.ncua.gov/Legal/OpinionLetters/OL1997-050 8.pdf.

**\*8** In addition to the NCUA's interpretive letters, the Ninth Circuit's opinion in *Gutierrez v. Wells Fargo Bank, N.A.*, is instructive. 704 F.3d 712 (9th Cir. 2012). In *Gutierrez*, the court considered whether the National Bank Act ("NBA") preempted Plaintiffs' claims challenging its overdraft fee assessment practices of posting debit card transactions in order from the highest to the lowest dollar amount in violation of California's Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, which prohibits "unfair, unlawful, or fraudulent business practices." *Id.* There, Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), operated a high-to-low posting order as a means to maximize and collect overdraft fees. *Id.* at 717. This sequencing method caused a dramatic increase in the number of plaintiffs' overdrafts, which, in turn, resulted in an increase in their assessment of overdraft fees. *Id.* Plaintiffs filed a class action lawsuit under California's UCL challenging Wells Fargo's practices as unfair and fraudulent. *Id.* Wells Fargo raised federal preemption as a defense, citing the NBA, which vests nationally chartered banks with "all such incidental powers as shall be necessary to carry on the business of banking." *Id.* at 718.

The Ninth Circuit determined that the NBA preempted Plaintiffs' attempt, through the UCL's "unfair" prong, to find the resequencing of Plaintiffs' debit card transactions from high to low (thereby reducing the balance more quickly to increase overdraft fees) unlawful. *Id.* at 725-26. In so holding, the court explained that the Office of the Comptroller of the Currency ("OCC") considers "high-to-low posting and associated overdraft fees to be a 'pricing decision authorized by Federal law' within the power of a national bank." *Id.* at 724 (citing OCC Interpretive Letter No. 916, 2001 WL 1285359, at \*2 (May 22, 2001)) ("[A] bank's authorization to establish fees pursuant to 12 C.F.R. § 7.4002(a) necessarily includes the authorization to decide *how* they are computed.") (emphasis added). As a result, the court found that such claims were preempted. *Gutierrez*, 704 F.3d at 724-25.

*Gutierrez* also addressed preemption under the UCL's

"fraudulent" prong. *Id.* at 726. It concluded that the UCL "cannot impose liability based on the bank's failure to disclose its chosen posting method," because 12 C.F.R. § 7.4007(b)(3) authorizes a national bank "to exercise its deposit-taking powers without regard to state law limitations concerning ... disclosure requirements." *Id.* (citing *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037-38 (9th Cir. 2008)). Accordingly, the court held that a bank's "failure to sufficiently disclose its posting method leads to the same result as mandating specific disclosures," both of which are "tantamount to state regulation of disclosure requirements." *Id.*

Nonetheless, the Ninth Circuit held that the UCL's prohibition against "misleading statements" was not preempted, reasoning that the law "does not impose disclosure requirements, but merely prohibits statements that are likely to mislead the public." *Id.* at 726. Hence, it stated, "As a non-discriminating state law of general applicability that does not 'conflict with federal law, frustrate the purposes of the [NBA] or impair the efficiency of the national banks to discharge their duties,' the [UCL's] prohibition on misleading statements under the fraudulent prong of the statute is not preempted by the [NBA]." *Id.*

Whittington's principal argument is that the manner in which MCU manages overdrafts and assesses overdraft fees is unfair and unconscionable. Indeed, Whittington bases her DTPA claims on MCU's alleged "failure to disclose information concerning the overdraft programs, its furnishing of misleading and false information, and its fee assessment practices and manipulation of customers' available funds amount." She also complains of MCU's methodology in determining when an account has an insufficient available balance, including the fact that only one review is required, as well as MCU's policy that it may post transactions "in any order [it] choose[s]," MCU's policy that it does not have to notify a member of an overdrawn account, and MCU's reported obfuscation of its fees. With regard to her unjust enrichment claim, Whittington points to the same conduct supporting her DTPA claim; namely, MCU's alleged improper aggregation and reordering of debits, and its improper disregard of deposits or credits to contrive an overdraft.

**\*9** Similar to the plaintiffs in *Gutierrez*, Whittington attempts to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them. Whittington essentially asks the court to declare that the manner in which MCU operates its overdraft program is unconscionable and unlawful. To grant her request would amount to *de facto* regulation of the activities outlined in § 701.35(c). Put another way,

such challenges significantly interfere with MCU's authority to determine the types of fees or charges and other matters affecting the opening, maintaining, and closing of a share, share draft or share certificate account. 12 C.F.R. § 701.35(c). Because Whittington's DTPA and unjust enrichment claims based on MCU's allegedly unconscionable banking practices improperly attempt to regulate MCU's activities under § 701.35(c), they are preempted.

This result is consistent with the reasoning articulated in *Gutierrez* as well as other authorities. *See* NCUA Op. Letters 07-0743, 04-0259, 97-0508; *see also Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197-98 (11th Cir.) (holding that a state statute which disallowed banks from charging non-customers for cashing checks, and an unjust enrichment claim relying on the same facts, were both preempted because they significantly reduced the bank's discretion in deciding how to charge fees), *cert. denied*, 565 U.S. 883, 132 S.Ct. 253, 181 L.Ed.2d 146 (2011); *Rose*, 513 F.3d at 1038 (opining that the plaintiff's California UCL claims of failure to make disclosures relating to "convenience checks" were preempted by the NBA); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F.Supp.3d 593, 612-17 (D.S.C. 2015) (finding that consumers' state law claims were preempted as they related to high-to-low transaction posting and intentionally honoring transactions into overdraft and stating that the court "could not mandate, on fairness and good faith grounds, the manner in which [the defendant bank] posts its transactions"); *Montgomery v. Bank of Am. Corp.*, 515 F.Supp.2d 1106, 1113 (C.D. Cal. 2007) ("[T]o the extent plaintiff contends that defendants' conduct constitutes unfair or deceptive business practices pursuant to the UCL and the [California Consumer Legal Remedies Act], these claims are in conflict with the NBA and the regulations promulgated thereunder."). In short, Whittington's DTPA and unjust enrichment claims based on the theory that MCU's overdraft practices are unconscionable are preempted.[3]

### 3. Whittington's Fraud Claim

MCU next asserts that Whittington's third cause of action, common law fraud, is preempted by TISA, 12 C.F.R. § 707.1, and other regulations. Section 707.1 provides in relevant part:

(a) Authority. This regulation is issued by the [NCUA] to implement the [TISA]....

(b) Purpose. The purpose of this part is to enable credit union members and potential members to make informed decisions about accounts at credit unions. This part requires credit unions to provide disclosures so that members and potential members can make meaningful comparisons among credit unions and depository institutions.

\* \* \*

(d) Effect on state laws. State law requirements that are inconsistent with the requirements of the TISA and this part are preempted to the extent of the inconsistency.

12 C.F.R. § 707.1.

In support of her fraud claim, Whittington avers that MCU did not disclose certain information associated with its overdraft practices. Specifically, she alleges that MCU failed to disclose: material features of its overdraft fee programs, policies, and practices; its debit aggregation practice; that it would charge an overdraft fee and a transfer fee for the same transaction while contemporaneously marketing the transfer fee as less expensive; that it would initiate and charge fully for token transfers; its manner of determining a customer's available funds; its "systematic" disregard of a customer's same-day credit/deposit transactions; and the dollar amount of an overdraft fee (instead "burying it beneath scores of unrelated fees in such a roundabout and evasive manner that amounts to no disclosure at all"). According to Whittington, MCU fails to disclose the fees to a customer as part of the subscription process, despite requiring every customer to "sign away her right to be informed" whenever it charges an overdraft fee.

**\*10** Whittington further alleges that certain of MCU's contractual terms (*e.g.*, "any time," "in any order we choose," and "only one review required") were intentionally used to mislead customers. These provisions, she asserts, are false because, for example, "MCU does not make the determination of a customer's available funds at 'any time' but at a particular, pre-programmed and fee-optimizing time in all instances." She claims that MCU deliberately withheld information as to these material features of the overdraft programs to induce customers into participating in the overdraft programs.

MCU counters that because Whittington's allegations of fraud invoke state law to dictate what disclosures a federal credit union must make and how to make them, her claim is preempted. The court agrees. A federal credit union's disclosure requirements with regard to share accounts are set forth in 12 C.F.R. § 707.4, entitled "Account Disclosures." Section 707.11, contains

additional disclosure requirements for overdraft services. 12 C.F.R. § 707.11. Notably, "[a] term in a share account agreement discussing the credit union's right to pay overdrafts" is excepted, 12 C.F.R. § 707.11(b)(2)(ix) along with "[a]n opt-out or opt-in notice regarding the credit union's payment of overdrafts or provision of discretionary overdraft services," 12 C.F.R. § 707.11(b)(2)(xii).

Whittington's theory of recovery would essentially require MCU to make disclosures that are not required by TISA. Thus, her attempt to use state law to force additional disclosures or require that disclosures be made in a particular manner is impermissible. *See Gutierrez*, 704 F.3d at 726 (stating, in the national banking context, "[t]he requirement to make particular disclosures falls squarely within the purview of federal banking regulation[s] and is expressly preempted" and "[i]mposing liability for the bank's failure to sufficiently disclose its posting method leads to the same result as mandating specific disclosures"); *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554, 557 (9th Cir. 2010) (finding plaintiffs' claim that the bank "engaged in 'fraudulent' practices by failing to disclose actual costs of its underwriting and tax services" was expressly preempted by the OCC regulation addressing state disclosure requirements in real estate transactions). Consistent with these authorities, any claims based on MCU's alleged failure to make certain disclosures are preempted.

Nonetheless, as the parties appear to agree, any claim that MCU made a direct misrepresentation may not be preempted. MCU's argument for dismissal as to such claims, therefore, is that Whittington simply does not identify any misrepresentations; rather, she merely alleges fully-disclosed practices that she views as unconscionable or illegal. On this point, the court partially disagrees.

Throughout her complaint, Whittington castigates MCU for employing unconscionable overdraft programs and making misleading statements, citing various provisions in the MAA (*e.g.*, the right to post transactions "in any order we choose;" to determine "insufficient available account balance" "at any time" with "only one (1) review required"); and MCU ("does not have to notify you if your account does not have sufficient funds to pay an overdraft"). As MCU correctly points out, these practices were fully disclosed to Whittington and, for the reasons stated previously, they are preempted.

Aside from the aforementioned provisions, however, Whittington identifies other instances she alleges constitute misrepresentations. For example:

**\*11** MCU explicitly promotes/represents its overdraft practice as follows: "[i]f, on any day, the available funds in your [account] are not sufficient to pay the full amount of a check, draft, transaction, or other item posted to your transaction plus any applicable fee ("overdraft"), we may pay or return the overdraft." This is a deceptive ... practice because even if the overdraft system does not violate the highlighted terms *per se*, it intentionally misleads the customer on how the system operates, *i.e.* it promises a "daily" balance system but operates a dynamic system optimized to charge a fee at any point, and not just by the day.

Additionally, Whittington complains that MCU markets the linked account transfer program as "less expensive," when, in practice, when combined with MCU's overdraft program, the customer pays a higher fee. Finally, Whittington alleges that MCU regularly misleads its customers as to their actual account balance. As MCU acknowledges, direct misrepresentations are not preempted. *See Gutierrez*, 704 F.3d at 727 (affirming the district court's holding that the plaintiff's claim for violation of the "fraudulent prong" of the UCL by making misleading misrepresentations with regard to its posting method is not preempted and stating that "the state cannot dictate to the Bank how it can or cannot operate, but it can insist that, however the Bank chooses to operate, it do so free from fraud and other deceptive business practices") (quotations omitted); *Martinez*, 598 F.3d at 555 ("[V]arious district courts have held that the Act does not preempt a claim of express deception asserted under state law.") (collecting cases); *see also Barzelis v. Flagstar Bank, F.S.B.*, 784 F.3d 971, 975 (5th Cir. 2015) (recognizing, in a case brought pursuant to the Home Owners' Loan Act, that claims such as fraud and intentional misrepresentation generally rely on an "applicable duty not to misrepresent material facts," and, therefore, normally are not preempted).

Furthermore, to the extent Whittington's cause of action for fraud is based on the allegation that MCU assessed overdraft fees despite sufficient available funds, that claim is not preempted.[4] *See In re TD Bank, N.A.*, 150 F.Supp.3d at 610, 619 (opining, in the context of a claim brought under a consumer protection statute, that "federal preemption does not apply to the sufficient funds theory"); *White v. Wachovia Bank, N.A.*, 563 F.Supp.2d 1358, 1367-68 (N.D. Ga. 2008) (finding no preemption of claim brought under consumer protection statute where plaintiffs claimed that the bank "charged overdraft fees when there was actually money in the account sufficient to pay their drafts," explaining that "Georgia contract and tort law does no more than incidentally affect [the bank's] deposit-taking powers."). Indeed, the sufficient funds theory amounts to a species of fraudulent

misrepresentation. Here, MCU's overdraft program is designed to cover overdrafts; thus, MCU essentially represents to its subscribing members that it will assess an overdraft fee *only* when accounts do not have sufficient available funds to cover various debits. By the same token, when MCU assesses an overdraft fee, it necessarily represents to its customer that his or her account is overdrawn. If, as Whittington alleges, such a fee is charged despite the availability of sufficient funds, MCU's representations are false.

In sum, with the exception of claims based on the sufficient funds theory and direct misrepresentations by MCU as outlined above, Whittington's claims under the DTPA and for unjust enrichment are preempted by the FCUA, as her attempts to characterize certain practices as unconscionable and, therefore, unlawful amounts to improper regulation of MCU's activities. Her fraud claims are similarly preempted by TISA to the extent they are rooted in MCU's alleged failure to disclose certain information governed by TISA's disclosure requirements; however, they are not preempted where they are based upon affirmative misrepresentations and the sufficient funds theory.

### C. Electronic Funds Transfer Act ("EFTA")

**\*12** EFTA provides "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693. It protects consumers with accounts "established primarily for personal, family, or household purposes." *Frey v. First Nat'l Bank Sw.*, 602 Fed.Appx. 164, 165 (5th Cir. 2015) (citing 15 U.S.C. § 1693a(2)); *Pinkston-Poling v. Advia Credit Union*, No. 1:15-CV-1208, 227 F.Supp.3d 848, 2016 WL 7473309, at *2 (W.D. Mich. Dec. 29, 2016) (citing *Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008)).

EFTA authorizes the Federal Reserve to implement regulations "to assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." *Chambers v. NASA Fed. Credit Union*, No. 15-2013, 222 F.Supp.3d 1, 5 (D.D.C., 2016) (quoting Electronic Fund Transfers, Final Rule, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009)); *see* 15 U.S.C. § 1693b; 12 C.F.R. § 205. The implementing regulations, collectively known as Regulation E, require financial institutions to obtain a customer's affirmative consent or

opt-in before charging overdraft fees on ATM or one-time debit card transactions. *See* 12 C.F.R. § 1005.17(b). Such consent must be in writing or, if the customer agrees, electronically, segregated from all other information, describing the institution's overdraft service. 12 C.F.R. § 1005.17(b)(1)(I). The opt-in notice must also be "substantially similar" to a model form, Model Form A-9, developed by the Federal Reserve. The institution's notice must include a brief description of the overdraft service and must, among other things, disclose the dollar amount of any fees or charges assessed by the institution. 12 C.F.R. § 1005.17(d).

Generally, 15 U.S.C. § 1693m imposes civil liability on an institution that fails to comply with the provisions of EFTA. 15 U.S.C. § 1693m(a); *Gunter v. United Fed. Credit Union*, No. 3:15-CV-00483, 2016 WL 3457009, at *3 (D. Nev. June 22, 2016). An EFTA claim, however, must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). The timeliness of an EFTA claim, therefore, depends upon when the occurrence of the alleged violation took place. *Id.*

In this instance, MCU seeks the dismissal of Whittington's EFTA claim on the basis that it is time-barred. Whittington alleges that MCU violated EFTA by failing to: "truthfully and accurately" provide the conditions under which overdraft fees are assessed; provide overdraft service subscribers, including Whittington, with an appropriate and timely confirmation of consent; and use a notice form "substantially similar" to the Federal Reserve's Model Form A-9. Whittington also avers that MCU's notice did not include the dollar amount of any fees or charges assessed. She identifies 12 C.F.R. § 1005.17(b)(1), (d)(1), and (d)(2) as the bases for her EFTA claim.[5]

**\*13** MCU maintains that an EFTA claim accrues when the *first* overdraft fee is charged after an alleged failure to obtain proper authorization pursuant to Regulation E. Whittington, however, contends that each improper overdraft fee is actionable as a separate harm. The court disagrees.

In determining the accrual date of an EFTA claim in the context of a § 1693e violation, the Sixth Circuit found the date of the first noncompliant transfer out of a series of transfers to begin the running of the limitations period. *Wike v. Vertrue, Inc.*, 566 F.3d 590, 595-96 (6th Cir. 2009). In *Wike*, the plaintiff claimed that the defendant violated EFTA by setting up a monthly debit on her account based on oral, but not written, authorization. *Id.* at 594-95. The court acknowledged that as a general rule,

a "statute of limitations begins to run 'when the plaintiff has a complete and present cause of action' and thus 'can file suit and obtain relief.' " *Id.* at 593 (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997)). This occurs, the court explained, "when the defendant breaches a duty ... and the claimant is injured." *Id.* Thus, a "consumer is injured only if, and only when, funds are withdrawn from her account." *Id.* In keeping with this reasoning, the court pinned the accrual date on when the plaintiff first suffered harm; that is, the date of the first noncompliant transfer out of a series of transfers. *Id.* at 594-96.[6]

A similar result obtains here. Whittington's EFTA claim is based on MCU's not having authorization to charge her overdraft fees because she either did not sign or was not provided a valid opt-in form. Her claim, therefore, stems from MCU's alleged wrongful omission (wrongful in light of MCU's statutory and regulatory duty to disclose certain information). MCU reportedly breached that duty at or near the time Whittington become a member of MCU in 2013. She was not injured, however, until MCU assessed a purportedly improper overdraft fee. Indeed, as averred by Whittington, the first instance of improper overdraft fees occurred in July 2014 and the first instance of improper transfer fees occurred on October 18, 2014, both more than two years prior to the filing of the instant complaint. Moreover, if Whittington was not aware of an opt-in form at all prior to receiving one six months before filing suit, then, as MCU points out, she was on notice that MCU was charging her overdraft fees without authorization. At that juncture, Whittington could have, but did not, investigate whether her husband, a joint account holder, had provided such authorization. Accordingly, Whittington's EFTA claim accrued in either July or October 2014.

Further, neither the continuing violation doctrine nor the discovery rule saves Whittington's claims. First, the continuing violation doctrine does not resurrect an otherwise untimely suit where, as here, "a single event gives rise to continuing injuries." *Clark v. City of Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003); *see Interamericas Invs., Ltd. v. Bd. of Governors of the Fed. Reserve Sys.*, 111 F.3d 376, 382 (5th Cir. 1997) ("A continuing violation applies where the conduct is ongoing, rather than a single event."). Second, when the discovery rule applies, the limitations period does not begin to run until the plaintiff discovers (or reasonably should discover) that she has been injured. *Pretus v. Diamond Offshore Drilling, Inc.*, 571 F.3d 478, 482 (5th Cir. 2009); *see Young v. United States*, 727 F.3d 444, 447 (5th Cir. 2013) (stating that, under the discovery rule,

courts consider when the plaintiff discovers or, in the exercise of reasonable diligence should have discovered, the fact of the injury and its cause). If Whittington had exercised due diligence, she would have discovered her injuries either by viewing her online MCU account or looking at her bank statements. *See Harvey v. Google, Inc.*, No. 15-CV-03590, 2015 WL 9268125, *4 (N.D. Cal. Dec. 21, 2015) (rejecting plaintiff's EFTA claim as untimely where she failed to view her bank statements and discover improper fees); *Repay v. Bank of Am., N.A.*, No. 12CV10228, 2013 WL 6224641, at *4-5 (N.D. Ill. Nov. 27, 2013) (declining to apply the continuing violation theory to the plaintiff's EFTA claim where it was based on a single omission, the failure to obtain written authorization for certain transfers).

### D. DTPA—Statute of Limitations

**\*14** MCU likewise seeks the dismissal of Whittington's DTPA claims on the basis that they are time-barred. A DTPA claim must be commenced "within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." TEX. BUS. & COM. CODE § 17.565; *see OneBeacon Ins. Co. v. Don's Bldg. Supply, Inc.*, 496 F.3d 361, 364 n.5 (5th Cir. 2007); *Gonzales v. Sw. Olshan Found. Repair Co., LLC*, 400 S.W.3d 52, 57 (Tex. 2013); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex. 1999). In its motion, MCU presumes that Whittington's DTPA claims are all predicated on "unconscionable" policies. It argues, therefore, that because Whittington opted in to MCU's overdraft programs in 2013, she was aware, or reasonably should have been aware of MCU's "unconscionable" policies, as it explicitly set forth the complained-of policies in the MAA, which is attached to Whittington's complaint. All such unconscionability-based claims, however, are preempted.

Thus, Whittington is left with DTPA claims based on express misrepresentations and the sufficient funds theory. Generally, in Texas, "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)); *see Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 202 (Tex. 2011); *Holland v. Thompson*, 338 S.W.3d 586,

593 (Tex. App.—El Paso 2010, pet. denied); *Envtl. Procedures, Inc. v. Guidry*, 282

As with Whittington's EFTA claims, any remaining DTPA claims fail. Her claims are rooted in MCU's alleged misrepresentations in the MAA and other documents and its failure to disclose sufficiently specific information regarding its overdraft fee programs and practices. Each of the alleged misrepresentations was disclosed to Whittington in the MAA and other materials at the time she became a member of MCU 2013. Similarly, MCU's alleged omissions (*i.e.*, providing Whittington a deficient opt-in form and MAA) occurred in 2013. The limitations clock begins to run once the plaintiff knows or should know the nature of his or her injury and the likelihood that it was caused by the wrongful acts of another, even if the plaintiff does not yet know the specific cause of the injury, the party responsible for it, the full extent of it, or the chances of avoiding it. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 93 (Tex. 2004); *Childs v. Haussecker*, 974 S.W.2d 31, 40 (Tex. 1998); *Sw. Olshan Found. Repair Co., LLC v. Gonzales*, 345 S.W.3d 431, 437 (Tex. App.—San Antonio 2011, no pet.), *aff'd on other grounds*, 400 S.W.3d 52 (Tex. 2013); *Pirtle v. Kahn*, 177 S.W.3d 567, 571 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Knowledge of facts, conditions, or circumstances that would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action is sufficient for limitations purposes. *Sw. Olshan Found. Repair Co., LLC*, 2010 WL 160888, at *4. Because the first purportedly improper overdraft fee was assessed in July 2014 and the first allegedly improper transfer fee occurred on October 18, 2014, Whittington reasonably should have become aware of her injury and investigated to remedy the situation within two years thereafter. A simple review of her monthly statements or online account activity would have revealed the alleged impropriety of the overdraft and/or transfer fees assessed. Nonetheless, she did not file suit until November 22, 2016, more than two years later, and outside the DTPA's statute of limitations.[7] Accordingly, Whittington's DTPA claims are time-barred.

E. Rule 9(b) of the Federal Rules of Civil Procedure
**\*15** MCU also challenges Whittington's fraud-based claims as insufficiently pleaded. Rule 9(b) of the Federal Rules of Civil Procedure provides that in order to state a claim for fraud in federal court, the plaintiff must state with particularity the circumstances constituting the fraud. *See* FED. R. CIV. P. 9(b); *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017); *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Therefore, instead of the "short and plain statement of the claim" required by Rule 8(a) of the Federal Rules of Civil Procedure, Rule 9(b) imposes a heightened standard of pleading for averments of fraud. *See* FED. R. CIV. P. 9(a), 9(b); *Grubbs*, 565 F.3d at 185; *United States ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 872-73 (5th Cir. 2008); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008).

The Fifth Circuit applies Rule 9(b) to fraud complaints "with 'bite' and 'without apology' " but also recognizes that Rule 9(b) "supplements but does not supplant Rule 8(a)'s notice pleading." *Grubbs*, 565 F.3d at 185 (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). Therefore, Rule 9(b) "requires only simple, concise, and direct allegations of the 'circumstances constituting fraud,' which after [*Twombly*, 550 U.S. at 563, 127 S.Ct. 1955] must make relief plausible, not merely conceivable, when taken as true." *Grubbs*, 565 F.3d at 186. Generally, this means the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir.), *cert. denied*, 558 U.S. 873, 130 S.Ct. 199, 175 L.Ed.2d 125 (2009) (quoting *Williams*, 112 F.3d at 177); *accord Grubbs*, 565 F.3d at 186; *Dorsey*, 540 F.3d at 339; *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

Contrary to MCU's assertions, Whittington satisfies the heightened pleading standard. The only fraud-based claims remaining are express misrepresentations and those falling within the sufficient funds theory. Whittington's complaint contains multiple pages of bank statement excerpts she contends demonstrate MCU's fraudulent activities; namely, assessing overdraft fees on other than a daily basis and when Whittington's account was not overdrawn. It also includes allegations that MCU acted deliberately and describes in detail the circumstances constituting fraud. In accordance with the Supreme Court's directive that a plaintiff's allegations be accepted as true, the court is compelled to deny MCU's request for dismissal pursuant to Rule 9(b) in this instance. *See Hernandez v. Mesa*, ─── U.S. ───, 137 S.Ct. 2003, 2005, 198 L.Ed.2d 625 (2017) (acknowledging that courts must accept plaintiff's

allegations as true when determining a motion to dismiss); *Stanfield v. Boston Sci. Corp.*, 166 F.Supp.3d 873, 877 (S.D. Tex. 2015) (stating that Rule 12(b) is not a procedure for resolving contests about the merits of a case).

**F.** Unjust Enrichment
MCU also moves for dismissal of Whittington's unjust enrichment claims on the basis that there is a contract (the MAA) between MCU and Whittington. Having determined that Whittington's unconscionability-based unjust enrichment claims are preempted, the question becomes whether her remaining unjust enrichment claim (predicated on the sufficient funds theory) survives.

**\*16** "Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits." *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied) (citing *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.—San Antonio 2004, pet. denied)). "The aim of the equitable doctrine of unjust enrichment is to redistribute benefits unfairly held by one party at the expense of the other in a situation not covered by contract...." *Neel v. HECI Expl. Co.*, 942 S.W.2d 212, 220 (Tex. App.—Austin 1997, writ granted), *rev'd in part on other grounds*, 982 S.W.2d 881, 892 (Tex. 1999). The unjust enrichment doctrine falls under the measure of damages known as restitution or quasi-contract. *Bank of Am., N.A. v. Prize Energy Res., L.P.*, 510 S.W.3d 497, 514 (Tex. App.—San Antonio 2014, pet. denied); *Burlington N. R.R. Co. v. Sw. Elec. Power Co.*, 925 S.W.2d 92, 96-97 (Tex. App.—Texarkana 1996, no writ), *aff'd*, 966 S.W.2d 467 (Tex. 1998) (citing *LaChance v. Hollenbeck*, 695 S.W.2d 618, 620 (Tex. App.—Austin 1985, writ ref'd n.r.e.)). Generally, a claim for unjust enrichment is unavailable where a "valid, express contract covers the subject matter of the parties' dispute...." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *see Miga v. Jensen*, 299 S.W.3d 98, 102 (Tex. 2009).

Whittington pleads the existence of the MAA and attached it to her complaint. Although she elected not to assert a breach of contract claim, she initially alleged

(then abandoned) a claim for breach of an express warranty contained in the MAA. In support of her unjust enrichment claim, Whittington points to a single paragraph in the MAA wherein MCU acknowledges that its "Pay Privilege" service is a "non-contractual courtesy." A review of the entire MAA, however, confirms that it is a contract between the parties. Indeed, the first paragraph reveals it to be an "Agreement" that covers both the member's and MCU's "rights and responsibilities." The Pay Privilege paragraph explains that the service is "non-contractual" in the sense that it "requires no account holder action" and that MCU could provide the protection "at [its] sole discretion." Consequently, neither party could be contractually liable for any failure to request, pay for, or provide the benefits under the service. Nonetheless, in the event MCU provides the overdraft services, it is required to abide by the terms set forth in the MAA. Because there is a contract between the parties governing MCU's overdraft services and any overdraft fees assessed, as well as the fact that her claims are limited to whether MCU made affirmative misrepresentations and whether fees were assessed despite sufficient available funds, Whittington cannot maintain a claim for unjust enrichment.

**III.** Conclusion
Consistent with the foregoing analysis, Whittington's unconscionability-based DTPA and unjust enrichment claims are preempted by the FCUA, and her remaining unjust enrichment claim fails due to the existence of a contract covering the subject matter of the claim. Whittington's remaining DTPA claims as well as her claim based on EFTA are time-barred.[8]

**\*17** Additionally, Whittington's fraud claims are preempted by TISA to the extent they are rooted in MCU's alleged failure to disclose information governed by TISA's disclosure requirements; however, they are not preempted and are sufficiently pleaded where they are based upon affirmative misrepresentations and the sufficient funds theory.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6988193

Footnotes

1     In her response to the instant motion to dismiss, Whittington states that she "will drop the Fourth Cause of Action"—breach of

express warranty. Because Whittington is unopposed to the dismissal of this claim, it is dismissed.

2    Whittington asserts that she did not receive an opt-in form upon becoming a member of MCU. Instead, she claims that she received an opt-in form approximately six months prior to filing suit against MCU. MCU responds that Whittington's husband, a joint account holder, executed the opt-in agreement in 2013.

3    It is unclear whether Whittington's DTPA and unjust enrichment claims are predicated on more than "unconscionability," as the complaint includes allegations that MCU furnished "misleading and false information." She also claims that MCU wrongfully assessed overdraft fees despite the availability of sufficient funds ("the sufficient funds theory"). These claims, however, while not preempted, are time-barred when brought pursuant to the DTPA, as discussed in Section II.D.

4    Whittington specifically alleges that "customer accounts may not be overdrawn at the time MCU charges the overdraft fees," and she provides examples of overdraft fees assessed when her account was not overdrawn.

5    Section 1005.17(b)(1) states that a "financial institution holding a consumer's account shall not assess a fee or charge ... pursuant to the institution's overdraft service," unless it:

> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
> (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;
> (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and
> (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

12 C.F.R. § 1005.17(b)(iv) (emphasis added).
Sections (d)(1) and (d)(2) dictate the content and format of the notice required in paragraph (b)(1):
(d) Content and format. The notice required by paragraph (b)(1)(i) of this section shall be substantially similar to Model Form A–9 set forth in appendix A of this part, include all applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph.
(1) Overdraft service. A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.
(2) Fees imposed. The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.
12 C.F.R. § 1005.17(d)(1) & (2).

6    *But see Diviacchi v. Affinion Grp., Inc.*, No. 14-10283, 2015 WL 3631605, at *7-8, 10 (D. Mass. Mar. 11, 2015) (opining that each transfer of funds without proper authorization constituted a separate violation of § 1693e and, thus, each noncompliant transfer was independently actionable even though each one related to an enrollment in a benefits package that occurred years prior).

7    Moreover, the continuing tort theory does not save Whittington's claims. *See McCartney v. CitiFinancial Auto Credit, Inf.*, No. 4:10-CV-424, 2010 WL 5834802, at *7 (E.D. Tex. Dec. 14, 2010) (declining to apply the continuing tort theory to DTPA claims), *report and recommendation adopted*, No. 4:10-CV-424, 2011 WL 675386 (E.D. Tex. Feb. 16, 2011); *see also Peacock v. AARP, Inc.*, 181 F.Supp.3d 430, 437 (S.D. Tex. 2016) (same).

8    Because Whittington's DTPA claims are preempted or time-barred, the court need not reach MCU's argument regarding abatement under Section 17.505 of the Texas Business and Commerce Code.

---

**End of Document**               © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**H** KeyCite history available

780 Fed.Appx. 171 (Mem)
This case was not selected for publication in West's
Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also U.S.Ct. of App. 5th Cir.
Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Jillian L. WHITTINGTON, individually and on
behalf of all others similarly situated, Plaintiff -
Appellant
v.
MOBILOIL FEDERAL CREDIT UNION,
Defendant - Appellee

No. 18-41101
|
FILED October 15, 2019

Appeal from the United States District Court for the
Eastern District of Texas, USDC No. 1:16-CV-482

**Attorneys and Law Firms**

John William Frazee, Counsel, Jarrett L. Ellzey, William
Craft Hughes, Hughes Ellzey, L.L.P., Houston, TX, for
Plaintiff - Appellant

Stuart M. Richter, Andrew J. Demko, Katten Muchin
Rosenman, L.L.P., Los Angeles, CA, Emily Travis,
Katten Muchin Rosenman, L.L.P., Houston, TX, Eric
Thomas Werlinger, Katten Muchen Rosenman, L.L.P.,
Washington, DC, for Defendant - Appellee

Before HIGGINBOTHAM, DENNIS, and HO, Circuit
Judges.

**Opinion**

PER CURIAM:[*]

**\*172** AFFIRMED. *See* 5TH CIR. R. 47.6.

**All Citations**

780 Fed.Appx. 171 (Mem)

Footnotes

[*]    Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under
       the limited circumstances set forth in 5th Cir. R. 47.5.4.

---

End of Document                                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Goldberg v. 401 North Wabash Venture LLC, Not Reported in F.Supp.2d (2010)

Blue Sky L. Rep. P 74,842

KeyCite history available

2010 WL 1655089
United States District Court,
N.D. Illinois,
Eastern Division.

Jacqueline GOLDBERG, Plaintiff,
v.
401 NORTH WABASH VENTURE LLC and
Trump Chicago Managing Member, LLC,
Defendants.

No. 09 C 6455.
|
April 22, 2010.

**Attorneys and Law Firms**

Shelly Byron Kulwin, Jeffrey R. Kulwin, Kulwin, Masciopinto & Kulwin, LLP, Chicago, IL, for Plaintiff.

Stephen Novack, Devra Rachel Hirshfeld, John F. Shonkwiler, Novack and Macey LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** Plaintiff, Jacqueline Goldberg, filed a complaint ("Complaint") against 401 North Wabash Venture LLC ("401 North Wabash") and Trump Chicago Managing Member, LLC ("Trump") asserting claims for breach of contract and violations of the Illinois Condominium Act ("Condo Act"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Interstate Land Sales Full Disclosure Act ("ILSA"), and the Illinois Securities Act ("ISA").[1] Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion"), which the Court grants in part and denies in part for the following reasons.

**LEGAL STANDARD**

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As the Seventh Circuit recently explained, this "[r]ule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir.2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.E.2d 1 (2002)). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests ." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.E.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); *Justice v. Town of Cicero,* 577 F.3d 768, 771 (7th Cir.2009) (court construes complaint in light most favorable to plaintiff, drawing all reasonable inferences in plaintiff's favor). Further, in deciding the Motion, the Court can consider exhibits attached to the Complaint. *See Reger Dev., LLC v. National City Bank,* 592 F.3d 759, 764 (7th Cir.2010); *Hecker v. Deere & Co.,* 556 F.3d 575, 582–83 (7th Cir.2009); *Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO v. Exelon Corp.,* 495 F.3d 779, 782 (7th Cir.2007).

**BACKGROUND**

Goldberg v. 401 North Wabash Venture LLC, Not Reported in F.Supp.2d (2010)

Blue Sky L. Rep. P 74,842

**\*2** As alleged in her Complaint, Plaintiff, Jacqueline Goldberg, entered into agreements ("Purchase Agreements") with Defendants to purchase two hotel condominium units ("HCUs") at Trump International Hotel and Tower ("Trump Tower"), located at 401 North Wabash in Chicago, Illinois. (R. 1–1, Compl. at ¶ 1.) Defendant 401 North Wabash's managing member is Defendant Trump, and its principal business has been constructing Trump Tower and marketing HCUs. (*Id.* at ¶¶ 5–6.)

Trump Tower is a ninety-two-story building that consists of private condominium residences, HCUs, a health club, meeting rooms, ballrooms, public parking, parking for the condominium residences, retail space, restaurants, concierge desk, and lobby, among other things. (*Id.* at ¶¶ 8–9.) There are approximately 339 HCUs in Trump Tower, about 55% of which the Trump Defendants had sold between 2003 and September 2009. (*Id.* at ¶ 11.)

Prior to entering into the Purchase Agreements with Plaintiff, the Trump Defendants provided her with various written materials, including documents entitled (1) Trump International Hotel Owner Use and Rental, (2) Frequently Asked Questions ("FAQ"), (3) Project Overview, (4) Property Reports, and (5) Amended Property Reports. (*Id.* at ¶¶ 14–17, 20.) The FAQ provided, among other things, that:

• "The hotel program will be managed through a specialized computer reservation system that assigns 'rotation points' to guestrooms as they are occupied. The hotel rooms with the least number of rotation points are the next to be rented in the system."[2]

• "When an owner, or the designated guest of an owner, occupies their personal guestroom, the reservation system does not assign any points for that night. Therefore, you are encouraged to stay in your personal guestroom since the reservation system will make up for the 'vacancy' of the room after your departure."

(*Id.* at ¶¶ 18–19.)

Additionally, the Trump Defendants represented to Plaintiff that:

• At no additional cost beyond the monthly assessment, each HCU owner would have a membership with the Trump Tower's health club, which the owner could use at any time. (*Id.* at ¶¶ 21, 29.)

• Each HCU owner would own a percentage of the common elements, including Trump Towers' meeting/function rooms, laundry facilities, storage areas, and ballrooms. Accordingly, the Condominium Association would receive a share of revenues, estimated to be roughly $5 million per year, generated from the meeting rooms and ballrooms. (*Id.* at ¶¶ 21, 28, 32, 36.)

• When HCU owners rented their units, they would be entitled to receive the gross revenue from the rental, which consisted of the rental rate, less a per-use fee, HCU monthly costs, credit-card fees, and travel-agent fees. (*Id.* at ¶ 21.)

• Plaintiff entered into the first of the Purchase Agreements, to purchase HCU 2238 for $1,239,500, on August 2, 2006, paying an earnest money deposit at that time of $114,950. (*Id.* at ¶¶ 50, 54.) Plaintiff entered into the second of the Purchase Agreements, to purchase HCU 2240 for $971,687, on August 8, 2006, paying an earnest money deposit at that time of $92,668.70. (*Id.* at ¶¶ 51, 55.) The Purchase Agreements provided Plaintiff with (1) an interest in the common elements of meeting/function rooms, storage rooms, laundry facilities, and ballrooms; and (2) a membership in the Trump Tower health club that entitled Plaintiff to use the health club at any time. (*Id.* at ¶¶ 52–53, 56–57.) Furthermore, the Purchase Agreements provided,

**\*3** Seller reserves the right, in its sole and absolute discretion, to modify the Condominium Documents, together with the Articles of Incorporation of the Association and the Statement of Record required by the Interstate Land Sales Full Disclosure Act (the 'HUD Report'), provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents, the HUD Report and any such other documents, as the case may be, when and if such notice or approval is required by law.[3]

(R. 1–12, Exs. L, M, Purchase Agreements at § 4(a).) By April 2009, Plaintiff had paid to the Trump Defendants a total of about $516,487.40 toward the purchase of her HCUs. (R. 1–1, Compl. at ¶ 72.)

The October 1, 2007, and October 25, 2007, Property Reports, which Plaintiff received in October and November 2007, provided that HCU owners would no longer own a percentage of the meeting/function rooms, ballrooms, storage areas, and laundry facilities. (*Id.* at ¶¶ 39, 41, 73–74.) They further provided that HCU owners' health club memberships would only entitle them to use the health club when they occupied their HCU. (*Id.* at ¶ 41.) None of these changes was approved by 75% of the HCU owners. (*Id.* at ¶ 43.) Also in October 2007, the Trump Defendants issued to Plaintiff an HCU Rental

Agreement, which provided that:

> • Owners' use of their HCU would have an adverse impact on their HCU's priority in the rental-reservation allocation.
>
> • Each time owners rented their HCU, they would be charged an administrative fee of 3% of the gross room rental fee, a $6–per–night–reservation fee, and a $30–pernight–marketing cost.
>
> • Trump Tower's Hotel Manager would have "sole discretion" to allocate HCU rental reservations.

(*Id.* at ¶ 47.)

On June 3, 2009, the Trump Defendants agreed with Plaintiff not to proceed with the closings on her HCUs. (*Id.* at ¶ 75.) Plaintiff filed her Complaint on September 10, 2009, alleging that Defendant 401 North Wabash breached the Purchase Agreements (Count V) and that Defendants violated § 22 of the Condo Act (Count I), § 2 of the ICFA (Count II), §§ 1703 and 1709 of the ILSA (Count III), and §§ 5, 8, and 13 of the ISA (Count IV).

## ANALYSIS

### I. Illinois Condominium Act

Plaintiff alleges that Defendants violated the Condo Act by (1) failing to disclose the information contained in the October 2007 Property Reports prior to sale, and (2) making material changes in the October 2007 Property Reports without approval by seventy-five percent of the HCU buyers in Trump Tower. The Condo Act provides in relevant part:

> All of the information required by this Section which is available at the time shall be furnished to the prospective buyer before execution of the contract for sale. Thereafter, no changes or amendments may be made in any of the items furnished to the prospective buyer which would materially affect the rights of the buyer or the value of the unit

without obtaining the approval of at least 75% of the buyers then owning interest in the condominium. If all of the information is not available at the time of execution of the contract for sale, then the contract shall be voidable at option of the buyer at any time up until 5 days after the last item of required information is furnished to the prospective buyer, or until the closing of the sale, whichever is earlier. Failure on the part of the seller to make full disclosure as required by this Section shall entitle the buyer to rescind the contract for sale at any time before the closing of the contract and to receive a refund of all deposit moneys paid with interest thereon at the rate then in effect for interest on judgments.

**\*4** 765 Ill. Comp. Stat. § 605/22.

The Condo Act's purpose "is 'to prevent prospective purchasers from buying a unit without being fully informed and satisfied with the financial stability of the condominium as well as the management and rules and regulations which affect the unit.' " *Mikulecky v. Bart,* 355 Ill.App.3d 1006, 1012, 825 N.E.2d 266, 272, 292 Ill.Dec. 10, 16 (Ill.App.Ct.2004) (quoting *Nikolopulos v. Balourdos,* 245 Ill.App.3d 71, 77, 185 Ill.Dec. 278, 614 N.E.2d 412 (1993)); *see also Giacomazzi v. Urban Search Corp.,* 86 Ill.App.3d 429, 435, 407 N.E.2d 621, 626, 41 Ill.Dec. 123, 128 (Ill.App.Ct.1980). Accordingly, "where an initial sale or offering for a sale is made, the seller must make full disclosure of and provide copies to prospective buyers of certain information...." *Borys v. Josada Builders, Inc.,* 110 Ill.App.3d 29, 30, 441 N.E.2d 1263, 1265, 65 Ill.Dec. 749, 751 (Ill.App.Ct.1982). "[I]f this information is not available at the time the contract for sale is executed, then the contract is voidable at the option of the buyer up until five days after the last item of required information is furnished to the prospective buyer, or until the closing of the sale, whichever is earlier." *Id.* at 30–31, 441 N.E.2d at 1265, 65 Ill.Dec. at 751. "If a seller fails to make full disclosure as required by [Section 22], then the buyer is entitled to rescind the contract and receive a refund of all deposit moneys paid plus interest." *Id.* at 31, 441 N.E.2d at 1265, 65 Ill.Dec. at 751. "The remedy of rescission due to the seller's failure to disclose is provided to the prospective buyer only as a remedy

Goldberg v. 401 North Wabash Venture LLC, Not Reported in F.Supp.2d (2010)

Blue Sky L. Rep. P 74,842

prior to closing." *Luster v. Jones,* 70 Ill.App.3d 1019, 1033, 388 N.E.2d 1029, 1038, 27 Ill.Dec. 66, 75 (Ill.App.Ct.1979); *Johnson v. Nationwide Indus., Inc.,* 450 F.Supp. 948, 954 (N.D.Ill.1978).

**A. Non–Disclosure**

Defendants argue that Plaintiff's non-disclosure claim fails because: (1) Plaintiff contractually agreed that she had received all disclosures that the Condo Act required, (2) the claim is implausible because it does not allege that the undisclosed information was available at the time Plaintiff entered into the Purchase Agreements, and (3) the claim is time-barred. Plaintiff responds that (1) there is no authority for the proposition that information must have been available at the time she signed the Purchase Agreements for the Condo Act to have required disclosure, and (2) her pleading burden should be relaxed "since she has not yet had an opportunity to conduct discovery on her claims." (R. 31, Resp. Br. at 11–12.)

Plaintiff's first argument is belied by the Condo Act's plain language, which provides that "[a]ll of the information required by this Section *which is available at the time* shall be furnished to the prospective buyer before execution of the contract for sale." 765 Ill. Comp. Stat. Ann. § 605/22 (emphasis added). Additionally, it would, of course, be difficult to disclose information that is not available.

**\*5** Furthermore, Plaintiff's Condo Act claim does not allege that the purportedly-undisclosed information was available at the time that she entered into the Purchase Agreements.[4] Indeed, in entering into the Purchase Agreements, Plaintiff "acknowledge[d] that Seller delivered to [her] prior to [her] execution of this Purchase Agreement a copy of ... all other items required by Section 22 of the [Condo] Act.... [She] acknowledges that [she] has had the opportunity to review [them]." (R. 1–12, Exs. L, M, Purchase Agreements at § 4(a).) Plaintiff's allegation that Defendants violated the Condo Act by failing to earlier disclose the information contained in the October 2007 Property Reports and the HCU Rental Agreement does not save her claim because, without an allegation or reasonable inference that the purportedly-undisclosed information was available at the time that Plaintiff entered into the Purchase Agreements, the Complaint "do[es] not permit the court to infer more than the mere possibility of misconduct." *Iqbal,* 129 S.Ct. at 1950.

As to Plaintiff's second argument, the Supreme Court has

roundly rejected her contention that the pleading requirements are relaxed when a plaintiff has not yet had an opportunity to conduct discovery. *See Iqbal,* 129 S.Ct. at 1954 ("Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise."); *Twombly,* 550 U.S. at 559, 127 S.Ct. at 1967 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." (internal quotation and citation omitted)). The Seventh Circuit has echoed the Supreme Court, holding that a plaintiff's "argument that the exact details of the contract will become clear during discovery runs counter to the holding of *Twombly,* which dictates that the complaint itself must contain sufficient factual detail to describe the parameters of the contract before discovery may commence." *Bissessur v. Indiana Univ. Bd. of Trs.,* 581 F.3d 599, 603 (7th Cir.2009); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009) ("The Court's specific concern in *Bell Atlantic* was with the burden of discovery imposed on a defendant by implausible allegations perhaps intended merely to extort a settlement that would spare the defendant that burden."). As such, the Court will not excuse the deficiency of the failure-to-disclose claim on the grounds that Plaintiff has not yet had the benefit of discovery.

Finally, Defendants argue that Plaintiff did not rescind the Purchase Agreement within the Condo Act's five-day provision, and Plaintiff responds that the five-day provision does not apply because "[t]he information was available to the Trump Defendants before Plaintiff signed her Purchase Agreements." (R. 31, Resp. Br. at 13.) The Condo Act does contain a time limitation that "the contract shall be voidable at option of the buyer at any time up until 5 days after the last item of required information is furnished to the prospective buyer, or until the closing of the sale, whichever is earlier." 765 Ill. Comp. Stat. § 605/22. That provision only applies, however, "[i]f all of the information is not available at the time of execution of the contract for sale." *Id.* Plaintiff's argument assumes that the information was available at the time Plaintiff entered into the Purchase Agreements. As explained above, however, there is no inference or allegation in the Complaint that the information was available at that time.

**B. Amendment**

**\*6** Plaintiff's improper-amendment claim fares no better.

Defendants argue that the amendment claim fails because there is no statutory remedy under the Condo Act for a failure to obtain approval for the amendment, and Plaintiff responds that Defendants' interpretation would render meaningless the Condo Act's purpose of encouraging full disclosure. (R. 31, Resp. Br. at 12.) A close examination of the Condo Act reveals that there is no statutory remedy for failing to obtain approval for the amendment from 75% of the HCU owners.

Under Illinois law, "[t]he most fundamental rule of statutory construction is to give effect to the intent of the legislature." *King v. First Capital Fin. Servs. Corp.,* 215 Ill.2d 1, 26, 828 N.E.2d 1155, 1169, 293 Ill.Dec. 657, 671 (Ill.2005). "The best evidence of legislative intent is the language used in the statute itself and that language must be given its plain and ordinary meaning." *Id.* "When the statute's language is clear, it will be given effect without resort to other aids of statutory construction." *Metzger v. DaRosa,* 209 Ill.2d 30, 35, 805 N.E.2d 1165, 1167, 282 Ill.Dec. 148, 150 (Ill.2004). " 'Under the guise of construction, a court may not supply omissions, remedy defects, annex new provisions, substitute different provisions, add exceptions, limitations, or conditions, or otherwise change the law so as to depart from the plain meaning of language employed in the statute.' " *King,* 215 Ill.2d at 26, 828 N.E.2d at 1169, 293 Ill.Dec. at 671 (quoting *In re Marriage of Beyer,* 324 Ill.App.3d 305, 309–10, 257 Ill.Dec. 406, 753 N.E.2d 1032 (Ill.2001)).

Where—as here—an Illinois statute does not contain specific language granting a private right of action, a court may nevertheless determine that such a right is implied in the statute. *See Metzger,* 209 Ill.2d at 35, 805 N.E.2d at 1167, 282 Ill.Dec. at 150. Specifically, courts may imply a private right of action in an Illinois statute if: "(1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute.' " *Id.* (quoting *Fisher v. Lexington Health Care, Inc.,* 188 Ill.2d 455, 460, 243 Ill.Dec. 46, 722 N.E.2d 1115 (1999)); *Cuyler v. United States,* 362 F.3d 949, 954–55 (7th Cir.2004) (noting the Illinois Supreme Court's "increasing reluctance to imply private rights of action" (quoting *Fisher v. Lexington Health Care, Inc.,* 188 Ill.2d 455, 464, 243 Ill.Dec. 46, 722 N.E.2d 1115 (1999)); *Jandeska v. Prarie Int'l Trucks, Inc.,* 383 Ill.App.3d 396, 893 N.E.2d 673, 677, 323 Ill.Dec. 401, 405 (Ill.App.Ct.2008).

The Condo Act does not include an implied right of action

for violations of its amendment provision. As an initial matter, there does not appear to be any authority recognizing such a right. Furthermore, such a remedy is not necessary because the Condo Act already provides remedies to further its purpose. As Plaintiff correctly notes, the Condo Act's purpose is to encourage full disclosure. *See Mikulecky,* 355 Ill.App.3d at 1012, 825 N.E.2d at 271, 292 Ill.Dec. at 16. Here, alternative remedies exist to further that purpose. Indeed, the Condo Act contains two separate remedies for violating the Act: (1) the contract is voidable if all of the information is not available at the time that the sales contract is executed, and (2) a buyer can rescind the contract at any time before closing if the seller discloses information that was available before the sales contract was executed.

**\*7** As the Illinois Supreme Court has noted, " '[w]here a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions.' " *Metzger,* 209 Ill.2d at 44, 805 N.E.2d at 1172, 282 Ill.Dec. at 155 (quoting *Burke v. 12 Rothschild's Liquor Mart, Inc.,* 148 Ill.2d 429, 442, 170 Ill.Dec. 633, 593 N.E.2d 522 (19992)). This maxim of statutory construction, known as *expressio unius est exclusio alterius,* "is based on logic and common sense. It expresses the learning of common experience that when people say one thing they do not mean something else. The maxim is closely related to the plain language rule in that it emphasizes the statutory language as it is written." *Metzger,* 209 Ill.2d at 44, 805 N.E.2d at 1172, 282 Ill.Dec. at 155. Ultimately, the Illinois Supreme Court "has implied a private right of action under a statute 'only in cases where the statute would be ineffective, as a practical matter, unless such an action were implied." *Id.* at 39, 805 N.E.2d at 1170, 282 Ill.Dec. at 153. The Condo Act, which plaintiffs have used to pursue claims for dozens of years, would not be ineffectual without the remedy that Plaintiff now seeks. Had the Illinois legislature intended to provide a separate remedy under Section 22's amendment provision, it could have done so. Because it did not, and because it did not intend to include a separate remedy for such violations, the Court will not read an implied remedy into the statute.

## II. Consumer Fraud and Deceptive Businesses Practices Act

Defendants next argue that Plaintiff fails to state an ICFA claim because the Complaint does not allege that any of Defendants' statements to Plaintiff—which, Defendants argue, were non-actionable contractual promises or estimated budgets—were false when made. Defendants

premise this argument on a misreading of the Complaint, and Plaintiff has adequately stated an ICFA claim.

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.,* 201 Ill.2d 403, 417, 775 N.E.2d 951, 960, 266 Ill.Dec. 879, 888 (Ill.2002); *Rockford Mem'l Hosp. v. Havrilesko,* 368 Ill.App.3d 115, 121, 858 N.E.2d 56, 61, 306 Ill.Dec. 611, 616 (Ill.App.Ct.2006). "It eliminated many of the common-law fraud elements, creating a new cause of action that affords consumers broad protection." *Havrilesko,* 368 Ill.App.3d at 121, 858 N.E.2d at 61, 306 Ill.Dec. at 616; *Miller v. William Chevrolet/Geo, Inc.,* 326 Ill.App.3d 642, 654–55, 762 N.E.2d 1, 11, 260 Ill.Dec. 735, 745 (Ill.App.Ct.2001) ("The Act offers 'a clear mandate to the Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief to consumers.' " (quoting *Totz v. Continental DuPage Acura,* 236 Ill.App.3d 891, 901, 177 Ill.Dec. 202, 602 N.E.2d 1374, 1380 (Ill.App.Ct.1992))). "It is to be liberally construed to effect its purposes." *Havrilesko,* 368 Ill.App.3d at 121, 858 N.E.2d at 61, 306 Ill.Dec. at 616; *Thacker v. Menard, Inc.,* 105 F.3d 382, 386 (7th Cir.1996).

**\*8** "To prevail on a claim for damages under the ICFA, [a plaintiff] must prove: (1) a deceptive act or practice by [the defendant]; (2) that the act or practice occurred in the course of conduct involving trade or commerce; (3) that [the plaintiff] intended [the plaintiff] to rely on the deception; and (4) that actual damages were proximately caused by the deception." *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006) (citing *Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 850 (Ill.2005); *Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 164 (Ill.2002)); *Thacker,* 105 F.3d at 386; *Demitro v. General Motors Acceptance Corp.,* 388 Ill.App.3d 15, 19, 902 N.E.2d 1163, 1168, 327 Ill.Dec. 777, 782 (Ill.App.Ct.2009). Plaintiff is correct that, generally speaking, actions brought under the ICFA are subject to Rule 9(b)'s heightened pleading requirements because they involve averments of fraud. *See Duggan v. Terzakis,* 275 F.Supp.2d 968, 973 (N.D.Ill.2003) (noting that courts must "evaluate Rule 9(b)'s particularity requirement in light of the purposes of: (1) protecting defendants' reputations from harm, (2) minimizing strike suits and fishing expeditions, and (3) providing defendants with adequate notice" (internal quotations omitted)); *Neff v. Capital Acquisitions & Mgmt. Co.,* 238 F.Supp.2d 986,

994 (N.D.Ill.2002); *but see Strohmaier v. Yemm Chevrolet,* 211 F.Supp.2d 1036, 1043 (N.D.Ill.2001) (Rule 9(b) does not apply to ICFA claims that are not based on fraudulent acts). Defendants did not challenge the ICFA claim on Rule 9(b) grounds in their opening brief. Even if they did, however, as explained below the Complaint specifies what misstatements and omissions Defendants made, when they made them, how they made them, and in what documents they made them.

Defendants argue that the Court should dismiss the ICFA count because it does not allege that Defendants made a false or misleading statement or omission. (R. 34, Reply Br. at 6.) For an omission to be actionable under the ICFA, "the plaintiff must establish that the fact concealed was known to the defendant at the time of the concealment." *Havrilesko,* 368 Ill.App.3d at 122, 858 N.E.2d at 62, 306 Ill.Dec. at 617. The ICFA count alleges that Defendants made several false statements and omissions "to fraudulently induce [Plaintiff] to purchase [her] units." (R. 1–1, Compl. at ¶¶ 88–90.) Specifically, the Complaint alleges that Defendants concealed, suppressed, or failed to reveal that: (1) as a condition of her participation in the HCU Rental Reservation Program, Defendants failed to reveal that they were going to require Plaintiff to contractually agree that (a) "each use of her HCUs would adversely affect her ability to rent her HCUs through the Trump Defendants' HCU Rental Reservation Program" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56a), (b) she would be responsible for paying "additional previously undisclosed daily charges" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56b), (c) Defendants would "have complete discretion on how to allocate HCU rental opportunities" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56c), and (d) she would have "to pay for all damages to her unit caused by any guests [who rented her unit] ... as well as all charges ... incurred by such guests for which they failed to pay" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56g); (2) Defendants "were going to remove the Hotel Meeting/Function Rooms, Ballrooms, storage areas and laundry facilities from the common elements" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56e); (3) Defendants "were going to keep all rental fees and commissions generated by the Trump Tower Meeting/Function Rooms and Ballrooms" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56e); and (4) Plaintiff's health-club membership "would only entitle [her] to use it when she was actually occupying her unit" (*id.* at ¶ 89, 306 Ill.Dec. 611, 858 N.E.2d 56f). These allegations satisfy the deceptive-act element.[5] *See Havrilesko,* 368 Ill.App.3d at 122, 858 N.E.2d at 62, 306 Ill.Dec. at 617; *Miller,* 326 Ill.App.3d at 655, 762 N.E.2d at 12, 260 Ill.Dec. at 746. While Defendants note that the Purchase Agreements allowed Defendants to modify certain documents, Defendants

point to no provision in those agreements that would allow Defendants to misrepresent, omit, or conceal information.

**\*9** Furthermore, Defendants are correct that breaches of contractual promises, without more, are not actionable under the ICFA. *See Shaw v. Hyatt Int'l Corp.,* 461 F.3d 899, 901 (7th Cir.2006). Indeed, as the Seventh Circuit teaches, "a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract." *Id.* (quoting *Avery,* 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d at 844); *Dahm v. First Am. Title Ins. Co.,* No. 06 C 5031, 2008 WL 1701901, at \*5 (N.D.Ill. Apr.9, 2008). The Complaint, however, alleges more than Defendants' failure to abide by its contractual promises. As summarized above, the Complaint alleges that Defendants fraudulently induced Plaintiff to enter into the Purchase Agreements by making various materially false statements and omissions. Ultimately, "[a]llegations that a party gave false information to a potential purchaser of real property implicates consumer protection concerns and states a claim under the Act." *Peter J. Hartmann Co. v. Capital Bank & Trust Co.,* 296 Ill.App.3d 593, 605, 694 N.E.2d 1108, 1117, 230 Ill.Dec. 830, 839 (Ill.App.Ct.1998) (compiling cases); *Siegel v. The Levy Org. Dev. Co., Inc.,* 153 Ill.2d 534, 544, 607 N.E.2d 194, 199, 180 Ill.Dec. 300, 305 (Ill.1992).

Finally, the Complaint alleges that Defendants' conduct was not only deceptive, but also unfair (R. 1–1, Compl. at 92), and unfair conduct is actionable under the ICFA. *See Robinson,* 201 Ill.2d at 417, 775 N.E.2d at 960, 266 Ill.Dec. at 888; *Demitro,* 388 Ill.App.3d at 19, 902 N.E.2d at 1168, 327 Ill.Dec. at 782; *Havrilesko,* 368 Ill.App.3d at 121, 858 N.E.2d at 62, 306 Ill.Dec. at 617. "In determining whether conduct is unfair, courts consider whether the practice offends public policy, whether it is oppressive, and whether it causes consumers substantial injury." *Demitro,* 388 Ill.App.3d at 20, 902 N.E.2d at 1168, 327 Ill.Dec. at 782. " 'All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.' " *Id.* (quoting *Robinson,* 201 Ill.2d at 418, 266 Ill.Dec. 879, 775 N.E.2d 951). Defendants have not argued that the Complaint's unfairness allegations are deficient.

### III. Interstate Land Sales Full Disclosure Act

Defendants' attack on the ILSA claim fails for one of the same reasons that its attack on the ICFA claim fails: the premise—that Plaintiff has not alleged that Defendants knew their statements were false when made—is factually inaccurate. Furthermore, the Complaint adequately pleads its fraud-based ILSA claim with particularity.

"The ILSA is designed to ensure that a land buyer, prior to purchase, is informed of facts which would enable a reasonably prudent individual to make an informed decision about purchasing the property." *Shirley v. Mann,* No. 90 C 0008, 1993 WL 13666177, at \*6 (N.D.Ill. Oct.25, 1993); *Stein v. Paradigm Mirasol, LLC,* 586 F.3d 849, 853 (11th Cir.2009); *Degirmenci v. Sapphire–Fort Lauderdale, LLLP,* 642 F.Supp.2d 1344, 1349 (S.D.Fla.2009); *Burns v. Duplin Land Dev., Inc.,* 621 F.Supp.2d 292, 301 (E.D.N.C.2009). It is to be broadly construed to effectuate its purpose. *See Olsen v. Lake Country, Inc.,* 955 F.2d 203, 205 (4th Cir.1992); *Burns,* 621 F.Supp.2d at 301. " 'In addition to setting up specific disclosure regulations, the [ILSA] also contains a general anti-fraud provision that makes it illegal to obtain money or property in connection with a development by means of a material false statement or any omission of a material fact necessary to make the statement made not misleading.' " *Sewell v. D'Alessandro & Woodyard, Inc.,* 655 F.Supp.2d 1228, 1255 (M.D.Fla.2009) (quoting *Rice v. Branigar Org.,* 922 F.2d 788, 791 n. 4 (11th Cir.1991)). Rule 9(b)'s heightened pleading requirements apply to ILSA actions. *Degirmenci,* 642 F.Supp.2d at 1352; *Sewell,* 655 F.Supp.2d at 1256.

**\*10** Section 1709 of the ILSA "allows a purchaser to bring an action at law or in equity for sales made in violation of § 1703." *Tait v. 430 Hibiscus, L.P.,* No. 08–80806–CIV, 2009 WL 455439, at \*2 (S.D.Fla. Feb.23, 2009); *Shirley,* 1993 WL 13666177, at \*6. Section 1703 of the ILSA prohibits fraud in connection with property sales. *See* 15 U.S.C. § 1703. To prove a claim under Section 1709, "plaintiffs must first show that they qualify for ILSA protection. Second, plaintiffs must show that defendants made an untrue statement of material fact in, or omitted from, their property report in violation of § 1703(a)(1) or in their dealings with purchasers in violation of § 1703(a)(2)." *Shirley,* 1993 WL 13666177, at \*6. "Plaintiffs need not prove that defendants intended to defraud or deceive or that plaintiffs relied on the property report," but "need only [ ] show that the misrepresentation or omission existed in the property report at the time the property was sold." *Id.*

As explained above, the Complaint alleges that Defendants made several material misstatements and omissions in connection with the sale of HCUs. The

Complaint specifies what those misstatements and omissions are, when they were made, and in what documents they were made. The Complaint therefore adequately alleges an ILSA claim. *See id.*

## IV. Illinois Securities Act

Defendants next argue that Plaintiff's ISA claim fails as a matter of law because it is time-barred and because Plaintiff did not allege that she satisfied the ISA's notice requirement. The ISA's objective "is to protect innocent persons who may be induced to invest their money in speculative enterprises over which they have little control.' " *Klein v. George G. Kerasotes Corp.,* 500 F.3d 669, 672 (7th Cir.2007) (quoting *People v. Bartlett,* 294 Ill.App.3d 435, 228 Ill.Dec. 845, 690 N.E.2d 154, 156 (Ill.App.Ct.1998)). It "is 'paternalistic in character and should be liberally construed to better protect the public' from the fraud, dishonesty, incompetence and irresponsibility of persons selling securities." *Aste v. Metropolitan Life Ins. Co.,* 312 Ill.App.3d 972, 976, 728 N.E.2d 629, 633, 245 Ill.Dec. 547, 551 (Ill.App.Ct.2000); *Lucas v. Downtown Greenville Investors Ltd. P'ship,* 284 Ill.App.3d 37, 49, 671 N.E.2d 389, 398, 219 Ill.Dec. 475, 484 (Ill.App.Ct.1996). The ISA "provides express civil remedies for improper ... transactions in securities: sales are voidable if the aggrieved party acts within six months of learning about the impropriety and within three years of the original sale; equitable relief is another option." *First City Sec., Inc. v. Shaltiel,* 44 F.3d 529, 534 (7th Cir.1995).

### A. Statute of Limitations

Pointing to language in the ISA that "no action shall be brought for relief under this section ... after 3 years from the date of sale," Defendants argue that the statute of limitations bars Plaintiff's ISA claim. (R. 34, Resp. Br. at 12 (quoting 815 Ill. Comp. Stat. 5/13D).) Defendants omit any reference, however, to the latter part of Section 13D, which allows for equitable tolling of the statute when a plaintiff neither knew nor reasonably should have known of the alleged violation. *See* 815 Ill. Comp. Stat. 5/13D; *Klein,* 500 F.3d at 672; *Ferguson v. Roberts,* 11 F.3d 696, 704 (7th Cir.1993); *Lucas,* 284 Ill.App.3d at 46, 671 N.E.2d at 396, 219 Ill.Dec. at 482. Equitable tolling is highly fact dependent and cannot be determined at this early stage of the litigation. *See Resiser v. Residential Funding Corp.,* 380 F.3d 1027, 1030 (7th Cir.2004).

Accordingly, the Court will not dismiss the ISA claim on statute-of-limitations grounds at this stage.

### B. Notice

**\*11** The ISA's six-month-notice rule " 'is not a statute of limitations, but rather, an equitable feature built into the statute to protect against stale claims. Its purpose is to prevent purchasers, who have sufficient knowledge of the remedy available to them, from waiting the entire statute of limitations to decide whether the elect recision.' " *766347 Ontario Ltd. v. Zurich Capital Mkts. Inc.,* 249 F.Supp.2d 974, 988 (N.D.Ill.2003) (quoting *Martin v. Orvis Bros. & Co.,* 25 Ill.App.3d 238, 246, 323 N.E.2d 73, 79 (1974)). "[T]he time for notice begins to run not from the time of knowledge of the underlying facts, but rather from the time of knowledge that those facts give rise to a right of recision." *Reshal Assocs., Inc. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1236 (N.D.Ill.1990) (Rovner, J.) (compiling cases). " 'Knowledge that a sale of securities is voidable is a mixed question of law and fact.' " 766347 Ontario, 249 F.Supp.2d at 988 (quoting *Fewell v. Kozack,* No. 98 C 2924, 1999 WL 966447, at \*8 (N.D.Ill. Oct.19, 1999)).

While Plaintiff alleges that she provided Defendants with written notice of her decision to pursue remedies under the ISA (R. 1–1, Compl. at ¶ 107), she has not alleged *compliance* with the six-month-notice requirement. This alone is grounds for dismissal. *See Denten v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 887 F.Supp. 176, 180–81 (N.D.Ill.1995); *Kleban v. S. Y.S. Rest. Mgmt., Inc.,* 912 F.Supp. 361, 369 n. 3 (N.D.Ill.1995); *Endo v. Albertine,* 812 F.Supp. 1479, 1496 (N.D.Ill.1993); *Wislow v. Wong,* 713 F.Supp. 1103, 1107 (N.D.Ill.1989). Accordingly, the Court dismisses Plaintiff's ISA count without prejudice.

## V. Breach of Contract

"Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.' " *Reger Dev., LLC v. National City Bank,* 592 F.3d 759, 764 (7th Cir.2010); *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.,* 491 F.3d 625, 631 (7th Cir.2007). Courts "construe contracts by giving their unambiguous terms clear and

ordinary meaning, in an effort to determine the parties' intent." *Reger Dev.,* 592 F.3d at 764 (citing *Reynolds v. Coleman,* 173 Ill.App.3d 585, 123 Ill.Dec. 259, 527 N.E.2d 897, 902 (1988); *Harrison v. Sears, Roebuck & Co.,* 189 Ill.App.3d 980, 137 Ill.Dec. 494, 546 N.E.2d 248, 253 (1989)). Furthermore, courts "do not look at any one contract provision in isolation; instead [they] read the document as a whole." *Reger Dev.,* 592 F.3d at 764 (citing *Martindell v. Lake Shore Nat'l Bank,* 15 Ill.2d 272, 154 N.E.2d 683, 689 (1958)).

Count V alleges that Defendant 401 North Wabash breached the Purchase Agreements by modifying the definition of "common elements" in violation of Section 22 of the Condo Act—and therefore breaching Section 4 of the Purchase Agreements—by failing to obtain the consent of 75% of the buyers then owning HCU interests. The relevant provision of the Purchase Agreements provides:

> ***12** Seller reserves the right, in its sole and absolute discretion, to modify the Condominium Documents, together with the Articles of Incorporation of the Association and the Statement of Record required by the Interstate Land Sales Full Disclosure Act (the 'HUD Report'), provided that Seller shall notify Purchaser or obtain the Purchaser's approval of any changes in the Condominium Documents, the HUD Report and any such other documents, as the case may be, when and if such notice or approval is required by law.

(R. 1–12, Exs. L, M, Purchase Agreements at § 4(a).)

Defendant 401 North Wabash argues that Plaintiff's breach-of-contract claim attempts to bring a private cause of action for a violation of the Condo Act, and that Defendant furthermore had sole discretion to modify the definition of "common elements." There would be no issue were Plaintiff merely asking the Court to enforce the parties' contractual agreement that Defendant 401 North Wabash would abide by Section 22 of the Condo Act by obtaining *Plaintiff's* approval before modifying the definition of "common elements." But Section 22 contains no such requirement, and Plaintiff points to no provision that would have required Defendant 401 North Wabash to obtain her approval before making the modification. *See* 765 Ill. Comp. Stat. § 605/22 (specifying that "no changes or amendments may be made in any of the items furnished to the prospective buyer which would materially affect the rights of the buyer or the value of the unit *without obtaining the approval of at least 75% of the buyers then owning interest in the condominium*" (emphasis added)). Without more, the breach-of-contract count fails to state a claim upon which relief can be granted.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss, and Counts I, IV, and V are dismissed without prejudice. Plaintiff has leave to file an amended complaint on or before May 7, 2010, consistent with this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1655089, Blue Sky L. Rep. P 74,842

Footnotes

1    The Court previously dismissed Deutsche Bank Trust Company Americas and the only count in which that party was named as a defendant, Count VI, which sought to state a claim for constructive trust. (*See* R. 33, 2/10/10 Minute Order.)

2    There was an exception to the rotation-points system if a renter requested a particular HCU. (*Id.* at ¶ 21, 154 N.E.2d 683.)

3    The "Condominium Documents" included the "Condominium Declaration, By–Laws, Budget, Floor Plans and such other documents required by Chapter 13–72 of the Municipal Code of Chicago and Section 22 of the [Condo] Act." (R. 1–12, Exs. L, M, Purchase Agreements at § 4(a).)

**Goldberg v. 401 North Wabash Venture LLC, Not Reported in F.Supp.2d (2010)**

Blue Sky L. Rep. P 74,842

4       While that allegation appears in later Counts in the Complaint, the Condo Act claim does not incorporate those allegations by reference. (*See* R. 1–1, Compl. at 16.)

5       Because these allegations adequately state an ICFA claim, the Court will not address Defendants' attack on the meeting-room allegations.

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite history available

2015 WL 6407762
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

APS Express, Inc., Plaintiff,
v.
Sears Holdings Corporation, Sears Holdings
Management Corporation, and Innovel Solutions,
Inc., formerly known as Sears Logistics Services,
Inc., Defendants.

Case No. 15–cv–03275
|
Signed October 20, 2015

### Attorneys and Law Firms

Nathanial Lee Martinez, William Craig Stokley, Palter Stokley Sims PLLC, Dallas, TX, Norman Benjamin Berger, Michael D. Hayes, Whyte Hirschboeck Dudek, Chicago, IL, for Plaintiff.

David James Doyle, Richard Thomas Kienzler, Freeborn & Peters, LLP, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

SHARON JOHNSON COLEMAN, United States District Judge

**\*1** Plaintiff APS Express, Inc. ("APS") filed a nine count complaint against Sears Holdings Corporation ("Sears Holdings") and its subsidiaries, Sears Holdings Management Corporation ("Sears Management") and Innovel Solutions, Inc., formerly known as Sears Logistics Services, Inc. ("Sears Logistics"), collectively "Sears." APS's claims arise out of Sears' alleged failure to prevent its truck drivers from stealing and reselling appliances to which APS maintains it had a contractual right. Sears moves to dismiss all the claims brought against it under Rule 12(b)(6). For the reasons stated below, the Court grants the motion in part and denies in part.

### Background

The following facts taken from the Complaint are accepted as true for purposes of ruling on the motion to dismiss now before the Court. Sears is the owner of online and brick-and-mortar retail stores that sell, among other goods, home appliances. Dkt. 5, ¶¶ 12–13. When a customer purchases an appliance from Sears, Sears offers to remove the customer's old appliance and dispose of it in compliance with environmental safety regulations. *Id.,* ¶¶ 14–15. While Sears itself effectuates the removal of old appliances from customers' homes ("haul-away services"), it retained to APS to recycle or dispose of the appliances ("recycling services"). *Id.,* ¶¶ 11, 21–28; Dkt. 28–2 at 5; 28–4 at 6. In order to provide recycling services, APS placed trailers at Sears' distribution centers for receipt of the appliances collected from haul-away services. Dkt. 5, ¶ 22. APS periodically transported the trailers to APS's facilities and then recycled some of the appliances and sold others to wholesale appliance dealers. *Id.,* ¶¶ 23–26. Based on the fact that the profit APS made off of the resalable appliances exceeded the cost of recycling the other appliances, APS paid Sears for each appliance received from haul-away services. *Id.,* ¶ 1.

APS had been providing Sears with recycling services since 1994. *Id.,* ¶ 28. In 2011, Sears decided to award contracts for providing recycling services via an online auction. *Id.,* ¶ 29. In advance of the online auction, Sears' representatives provided APS with a Master Service Agreement ("MSA") and a Statement of Work ("SOW") which together would constitute a contract for recycling services awarded to APS upon a successful bid. *Id.,* ¶ 31–34. APS interpreted this contract as a guarantee that APS would receive all appliances generated by haul-away services if it provided Sears with recycling services ("2011 Exclusivity Misrepresentation"). *Id.,* ¶ 31. Sears representatives also provided APS with a spreadsheet that listed each distribution center and the historical volume of each type of appliance generated by haul-away services at that distribution center. *Id.* APS alleges the volume of appliance data was inaccurate and "substantially overstated" the amount of appliances generated by haul-away services ("2011 Volume Misrepresentation"). *Id.* APS participated in the auction and was awarded a contract to provide recycling services at 16 distribution centers around the country ("2011 contract"). *Id.,* ¶ 35.

**\*2** APS participated in another online auction for a recycling services contract in 2014. *Id.,* ¶¶ 39–47. Bids were for the provision of statewide recycling services, rather than for servicing individual distribution centers. *Id.,* ¶ 40. Sears representatives again provided APS with a sample MSA and SOW that would form an awarded recycling services contract ("2014 contract") and with data regarding the volume of appliances historically generated at each distribution center. *Id.,* ¶ 42. Sears representatives also provided a list of each distribution center located in each state. *Id.* As with the 2011 contract, APS interpreted the 2014 contract as a guarantee that APS would receive all appliances generated by haul-away services ("2014 Exclusivity Misrepresentation"). *Id.* APS alleges the 2014 data, like the 2011 data, was inaccurate: the volume of appliances generated by haul-away services was overstated ("2014 Volume Misrepresentation"), as was the number of distribution centers in each state ("2014 Scope Misrepresentation"). *Id.*

During performance of the 2014 contract, APS noticed there were less resalable appliances generated by haul-away services than expected, and investigated as to why this was the case. ¶¶ 48–49. During this investigation, APS discovered that since at least 2011, some delivery truck drivers sold some of the appliances removed from customers' homes themselves for their own profit rather than placing them in APS's trailers. *Id.,* ¶ 50–55. A manager and assistant manager at a distribution center serviced by APS admitted to APS that Sears was aware of this practice. *Id.,* ¶ 53. APS also spoke with a former loss prevention manager for Sears who told APS that Sears instructed the loss prevention department in 2011 to "stop policing" how delivery truck drivers handled haul-away appliances. *Id.,* ¶ 54. When APS confronted Sears about this practice, Sears terminated the 2014 contract. *Id.,* ¶¶ 59–64. Sears' alleged willful disregard of its truck drivers' theft and its termination of the 2014 contract forms the basis of APS's claims for breach of contract, tortious interference with a contract, fraud, negligent misrepresentation, and quantum meruit.

**Legal Standard**

A complaint will survive a motion to dismiss under Rule 12(b)(6) if its allegations when accepted as true and viewed in the light most favorable to the plaintiff state a plausible claim. *Peters v. West,* 692 F.3d 629, 632 (7th Cir.2012). Facts alleged in a complaint are accepted as true except when contradicted by an exhibit considered part of the pleadings. *Bogie v. Rosenberg,* 705 F.3d 603, 609 (7th Cir.2013). Exhibits attached to a motion to dismiss are considered part of the pleadings if they are referred to in the complaint and are central to the claims. *Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994).

**Discussion**

*1. Breach of Contract and Tortious Interference with a Contract*

Sears Logistics argues that the breach of contract claims brought against it must be dismissed for three reasons. First, contrary to APS's contentions, the contract does not guarantee that Sears Logistics will give all haul-away appliances to APS. Second, APS failed to allege it substantially performed on the contracts at issue. Third, because the contracts granted Sears an unfettered right to terminate, termination of the 2014 contract was not a breach.

The Court must examine APS's contract claims under Illinois law. The parties agreed in the 2011 and 2014 contracts that Illinois law would govern interpretation of the contracts and "all other aspects of the business relationship between the parties." Dkt. 28–1 at 14, 28–3 at 16. The validity of a choice-of-law contract clause is determined by the rules of the forum state, here Illinois, and Illinois law generally respects such clauses absent a claim that the contract is invalid or contrary to public policy. *Fulcrum Fin. Partners v. Meridian Leasing Corp.,* 230 F.3d 1004, 1011 (7th Cir.2000).

Under Illinois law, the Court's first task when interpreting a contract is to determine if the language of the contract is ambiguous, which is determined as a matter of law. *Lewitton v. ITA Software, Inc.,* 585 F.3d 377, 379 (7th Cir.2009). If the contract is ambiguous, it is appropriate to look at extrinsic evidence to determine the parties' intent, but if the language is unambiguous, the contract should be enforced as it is written. *Id.* at 380. Contract language is not ambiguous simply because the parties disagree as to its meaning, but only if it is "reasonably susceptible to different constructions." *Kaplan v. Shure Bros.,* 266 F.3d 598, 605 (7th Cir.2001). Additionally, contested language in a contract should not be looked at in isolation; rather the contract should be examined as a whole. *Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1038 (7th Cir.1998).

**\*3** Although APS did not attach the contracts to its

complaint and instead quoted the provisions it considered relevant, the Court will consider the contracts in their entirety, as they were attached to the motion to dismiss, are referred to in the complaint, and are central to APS's claims. *Wright,* 29 F.3d at 1248. Under the contracts, Sears Logistics retained APS "for handling, recycling and disposing of Materials" in accordance with a five step process outlined in the SOW. Dkt. 28–2 at 5; 28–4 at 6. "Materials" includes, among other things, "all materials that are generated in connection with [Sears Holdings] Home Delivery operations." Dkt. 28–2 at 9; 28–4 at 10. The parties have put forth two different interpretations of the word "all" in the description of "Materials," demonstrating that the language is indeed susceptible to different constructions. The question for the Court thus becomes whether both constructions are reasonable.

Sears Logistics asserts the description of "Materials" includes the word "all" in order to exhaustively describe the types of items APS may not decline to handle, recycle, or dispose of. Put differently, "all" is included in the description of Materials for Sears Logistics' own protection, so that APS does not refuse items whose disposal is particularly onerous or cumbersome. When viewed in light of the contract as a whole, which is a contract by which Sears Logistics retained APS to provide it recycling services, Sears Logistics' construction of the term "all" is reasonable. It is further bolstered by the provision at the end of the description of "Materials" which states that APS "will not have the ability to 'cherry pick' items" and notes that some items may still contain hazardous substances. Dkt. 28–2 at 10; 28–4 at 11.

In contrast, APS asserts the word "all" grants APS a contractual right to everything that Sears removes from a customer's home when performing haul-away services. The problem fatal to APS's interpretation is not the description of "Materials", but the operative provision in which the term appears: "[Sears Logistics] retains [APS] for handling, recycling and disposing of Materials [which includes 'all materials that are generated in connection with Sears Holdings Home Delivery operations']." This provision does not grant APS a right, but rather creates an obligation: to handle, recycle, and dispose of the items loaded onto its trailers so long as those items meet the description of "Materials" in the contract. That APS has no particular right to any items until they are loaded on its trailers and driven off of Sears' property is further supported by the contract provision which states that "[t]itle and ownership of the Materials passes to [APS] when Materials are removed from Locations." Dkt. 28–2 at 5; 28–4 at 7. The contracts define "Locations" as various stores and distribution centers owned and operated by Sears. Dkt. 28–2 at 11, 28–4 at 12.

Customers' homes are not included in the definition of Locations. *Id.* Accordingly, the Court agrees with Sears Logistics that the theft of appliances by Sears' truck drivers does not constitute a breach of contract.

The termination of the 2014 contract likewise cannot support a claim for breach because the contract allows for termination without cause. Dkt. 28–3 at 3. Without any cognizable theory of breach, APS cannot state a claim for tortious interference. APS's breach of contract and tortious interference with a contract claims are therefore dismissed with prejudice.

### 2. Fraud

Sears Holdings moves to dismiss the fraud claims brought against it on the grounds that (1) APS has failed to establish that any alleged misrepresentations proximately caused it any injury and (2) APS has failed to plead with sufficient particularity the circumstances of the fraud.

APS bases its claims for fraud on the 2011 and 2014 Exclusivity Misrepresentations, the 2011 and 2014 Volume Misrepresentations, and the 2014 Scope Misrepresentation. A fraudulent misrepresentation claim based on the Exclusivity Misrepresentations fails for the same reason as the breach of contract claims: the SOW cannot reasonably be understood as a representation by Sears that no materials removed from customers' homes will be lost, damaged, or stolen before they are loaded onto APS trailers.

**\*4** With respect to the Volume Misrepresentations and the Scope Misrepresentation, Sears Holdings argues that even if APS relied on false data in constructing its bids for the contracts, APS cannot show that it would have been awarded the contracts if it had placed a different bid with pricing based on accurate data. Dkt. 28 at 11. While this may be true, it does not defeat APS's fraud claim. While APS might not have been awarded the contract had it placed a lower bid, it also would not have expended the costs it did in preparing for and performing on the contract. Furthermore, it would have been free to pursue other more lucrative business opportunities. These injuries can reasonably be inferred from APS's allegations that it relied to its detriment on the misrepresentations by entering into the contracts and incurring operational expenses. *See* Dkt. 5, ¶¶ 111, 133.

APS pleaded its fraud claims based on the Volume Misrepresentations and the Scope Misrepresentation with sufficient particularity. APS identifies the Sears Holdings

sesame

employees that provided the false information by name. Dkt. 5, ¶ 107, 129. It also identifies the substance of the misrepresentation (inaccurate data about the historical volume of haul-away appliances and number of distribution centers), the manner in which it was delivered to APS (in spreadsheets and in writing), and the time period in which it occurred (immediately preceding the auctions in July and August 2011 and June and July 2014). *Id.* This is sufficient to meet the requirements of Rule 9(b).

### 3. Negligent Misrepresentation

Sears Holdings argues that APS's negligent misrepresentation claims are barred by the *Moorman* doctrine, which provides that a plaintiff seeking to recover solely economic losses under a theory of negligent misrepresentation must show that the defendant "is in the business of supplying information for the guidance of others in their business transactions." *Moorman Mfg. Co. v. Nat'l Tank Co.,* 435 N.E.2d 443, 452 (Ill.1982). APS asserts Sears Holdings falls under the exception because part of its business was providing information during the bidding process that guided APS in its business dealings. Dkt. 29 at 8–9.

When determining if a defendant is "in the business of supplying information," courts must focus on the "ultimate result" of the defendant's work. *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,* 679 N.E.2d 1197, 1201 (Ill.1997). If "the information that is supplied is merely ancillary to the sale or in connection with the sale of merchandise," the exception does not apply. *Id.* Here, Sears Holdings' ultimate goal is to sell retail goods. Dkt. 5, ¶ 12. Any information supplied to APS in connection with the bidding process was for the ancillary purpose of securing a contractor to provide recycling services in furtherance of Sears' retail operations. The exception therefore does not apply, and APS's negligent misrepresentation claims are dismissed.

### 4. Quantum Meruit

To state a claim for quantum meruit, APS must allege (1) it performed a service that benefitted defendants; (2) it performed the service non-gratuitously; (3) defendants accepted the service; and (4) no contract existed to prescribe payment for the service. *Owen Wagener & Co. v. U.S. Bank,* 697 N.E.2d 902, 908 (Ill.App.1998). A plaintiff may plead a claim for quantum meruit as an alternative to its breach of contract claim in order to recover the value of its work even if it is ultimately determined that compensation for the work was not covered by the contract at issue. *Patrick Eng'g, Inc. v. City of Naperville,* 955 N.E.2d 1273, 1289 (Ill.App.2011), *rev'd on other grounds,* 976 N.E.2d 318 (Ill.2012).

Here, APS's claim for quantum meruit fails because APS did not allege that the contracts at issue failed to prescribe payment for the recycling services provided. Instead, APS merely states that Sears has not "fully compensated APS for the services it has provided." Dkt. 5, ¶ 150. Nonetheless, a review of the contracts themselves reveals there was indeed no explicit provision for payment to APS. Accordingly, this claim is dismissed without prejudice and with leave to refile a properly pleaded quantum meruit claim.

### Conclusion

**\*5** For the foregoing reasons, Defendants' motion to dismiss is granted as to Counts I, II, III, IV, VI, VIII, and IX and denied with respect to Counts V and VII. Counts I, II, III, IV, VI, and VIII are dismissed with prejudice and Count IX is dismissed without prejudice and with leave to re-plead.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 6407762

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:19-cv-05965 Document #: 26 Filed: 11/25/19 Page 47 of 74 PageID #:274

Illinois ex rel. Hammer v. Twin Rivers Insurance Company, Not Reported in Fed. Supp....

C KeyCite citing references available

2017 WL 2880899
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

People of the State of ILLINOIS, EX REL. Acting
Director of Insurance, Jennifer HAMMER,
Plaintiff,
v.
TWIN RIVERS INSURANCE COMPANY f/k/a
Cherokee Insurance Company, Defendant.

No. 16 C 7371
|
Signed 07/05/2017

**Attorneys and Law Firms**

Dominick L. Lanzito, Thomas Joseph Condon, Jr.,
Peterson, Johnson & Murray Chicago LLC, Chicago, IL,
for Plaintiff.

Christopher James Barber, Darren Bernens Kinkead,
Jonathan Daniel Miller, Williams Montgomery & John,
Ltd., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Rubén Castillo, Chief Judge

**\*1** Illinois Acting Director of Insurance Jennifer Hammer[i]
("Plaintiff") maintains this suit against Twin Rivers
Insurance Company ("Defendant") alleging breach of
contract, breach of the implied covenant of good faith and
fair dealing, unjust enrichment, and violations of the
federal Real Estate Settlement Procedures Act, arising out
of a captive reinsurance arrangement involving Defendant
and Triad Guaranty Insurance Corporation. (R. 37, First
Am. Compl.) Defendant moves to dismiss Plaintiff's First
Amended Complaint in all respects pursuant to Federal
Rule of Civil Procedure 12(b)(6) for failure to state a
claim. (R. 46, Mot.) For the reasons set forth below, the
Court grants Defendant's motion.

## BACKGROUND

This case stems from a 2012 state court "rehabilitation"
proceeding under the Illinois Insurance Code pertaining to
the now-defunct Triad Guaranty Insurance Company
("Triad").[2] (R. 37, First Am. Compl. ¶ 3.) In December
2012, Plaintiff was appointed as Triad's "rehabilitator"
and in that capacity was vested with authority to deal with
the property, business, and affairs of Triad. (Id.; R. 37-1,
Order of Rehabilitation at 3.[3]) Plaintiff also is authorized
as rehabilitator to "bring any action, claim, suit or
proceeding against any person with respect to that
person's dealings with Triad." (R. 37-1, Order of
Rehabilitation at 3-4.) This suit by the
Plaintiff-rehabilitator deals with a contractual reinsurance
arrangement between Triad and Defendant Twin Rivers.

Triad was in the business of selling private mortgage
insurance ("PMI"), a type of insurance issued in
connection with mortgages to protect lenders against
nonpayment by borrowers. (R. 37, First Am. Compl. ¶ 4.)
In September 2000, Triad entered into an "Excess of Loss
Book Year Reinsurance Agreement No. 13" (the
"Reinsurance Agreement") with Defendant, pursuant to
which Defendant would reinsure certain PMI policies
issued by Triad. (Id. ¶¶ 8-9.) Specifically, Defendant
would reinsure PMI issued by Triad on mortgages
originated by banks affiliated with Defendant. (Id. ¶¶
9-10.) In the course of originating mortgages, banks
affiliated with Defendant routinely referred some of their
borrowers to Triad to obtain PMI. (Id. ¶¶ 10, 29.) In turn,
pursuant to the Reinsurance Agreement, Defendant would
reinsure those mortgages. (Id. ¶¶ 9-10.) This arrangement,
common in the mortgage industry, is known as "captive"
reinsurance in that Defendant reinsured PMI only on
loans originated by its affiliated banks. (Id. ¶¶ 7, 20.) In
exchange for the reinsurance, Triad would pay a certain
percentage of each referred borrower's PMI premiums to
Defendant. (Id. ¶ 20.) These so-called "ceded" premiums
were deposited into a trust account and invested and used
to fund any payments due to Defendant under the
Reinsurance Agreement. (Id. ¶¶ 12-13, 20.) On a periodic
basis, Defendant would also receive dividends out of the
trust account for the benefit of itself and its affiliated
banks.[4] (Id. ¶ 37.) As of the filing of Plaintiff's original
complaint, a balance of approximately $1,741,655
remained in the trust account. (Id. ¶ 37; R. 47, Mem. at 3
n.3; R. 50, Resp. at 2 & n.4.)

**\*2** Plaintiff initiated this suit in Illinois state court on June
15, 2016. (R. 1-1, Compl. at Law; R. 1, Notice of

Removal ¶ 2.) Defendant removed this suit to federal court in July 2016, invoking both federal-question and diversity jurisdiction.[5] (R. 1, Notice of Removal ¶¶ 2, 15.) On December 13, 2016, the Court granted a prior motion to dismiss filed by Defendant and dismissed Plaintiff's complaint without prejudice.[6] (R. 36, Min. Entry.) Plaintiff subsequently filed her First Amended Complaint on January 13, 2017. (R. 37.)

In Count I of her amended complaint, Plaintiff asserts a state law claim for breach of contract under Illinois law, alleging that Defendant failed to disclose to referred borrowers the benefits that Defendant derived from the captive reinsurance arrangement. (R. 37, First Am. Compl. ¶¶ 44-45.) Plaintiff alleges that pursuant to the Reinsurance Agreement, Defendant was required to give "each borrower whose loan is or may be subject to the Agreement, a disclosure as appropriate regulatory authorities may suggest or require" and that U.S. Department of Housing and Urban Development ("HUD") regulations require the disclosure of the benefits that Defendant was receiving through the captive reinsurance arrangement. (*Id.* ¶¶ 41, 43.) In other words, Plaintiff alleges that Defendant breached the Reinsurance Agreement by failing to provide certain disclosures to the borrowers whose PMI policies it would be reinsuring. (*See* R. 47, Mem. at 5.)

In Count II, Plaintiff asserts a claim under Illinois law that Defendant breached the implied covenant of good faith and fair dealing that exists in every contract by selectively referring only the highest-risk borrowers to Triad for PMI. (R. 37, First Am. Compl. ¶¶ 51-52.) Plaintiff alleges that Defendant "vetted its borrowers" and selectively referred only "the mortgages that presented the highest risk of default" to Triad and referred other, lower-risk mortgages to other PMI providers. (*Id.* ¶¶ 11, 51.) According to Plaintiff, this selective referral enabled Defendant to "minimize [its] risk of reinsuring loans that could go into default" while at the same time maximizing its profits. (*Id.* ¶ 52.) Plaintiff alleges that this selective referral was arbitrary, capricious, and inconsistent with Triad's reasonable expectations under the Reinsurance Agreement, and therefore violated the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 49, 53.)

In Count III, Plaintiff seeks a declaratory judgment that the reinsurance arrangement between Triad and Defendant violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* Plaintiff alleges that the ceded premiums were actually kickbacks paid in exchange for Defendant referring borrowers to Triad, which violated RESPA's prohibition on giving or accepting "any fee, kickback, or thing of value pursuant

to any agreement or understanding ... that business incident to or a part of a real estate settlement service ... shall be referred to any person," 12 U.S.C. § 2607(a). (R. 37, First Am. Compl. ¶¶ 21, 24, 33-34, 62.) Plaintiff also alleges that the ceded premiums constituted a portion, split, or percentage of the PMI premiums and were either "not for services actually furnished or performed" by Defendant or "grossly exceeded ... the value of any such services." (*Id.* ¶¶ 25, 32, 35-36.) As a result, Plaintiff alleges, the ceded premiums also violated RESPA's prohibition on giving or accepting "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service ... other than for services actually performed," 12 U.S.C. § 2607(b). (R. 37, First Am. Compl. ¶¶ 25, 32, 35-36.) Plaintiff also seeks a declaratory judgment that any further payment of dividends from the trust account to Defendant violates RESPA and that the balance of the trust account is the property of Triad. (*Id.* ¶ 62.)

**\*3** In Count IV, Plaintiff asserts a claim of unjust enrichment under Illinois law, alleging that the reinsurance premiums paid by Triad "grossly exceeded" the value of any reinsurance provided by Defendant. (*Id.* ¶ 64.) Plaintiff alleges that Defendant's retention of the approximately $1.7 million corpus of the trust account (into which Triad deposited the ceded reinsurance premiums) would "violate[ ] the fundamental principles of justice, equity, and good conscience" and would therefore constitute unjust enrichment. (*Id.* ¶ 66.)

Defendant now moves to dismiss Plaintiff's complaint in its entirety pursuant to Rule 12(b)(6) for failure to state a claim. (R. 46, Mot.)

## LEGAL STANDARD

A complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "A motion to dismiss pursuant to Rule 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 825 (7th Cir. 2015) (citation and internal alteration omitted). To survive such a motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th Cir. 2016). In addition to the complaint itself, the Court may consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

## ANALYSIS

### I. Breach of Contract (Count I)
As noted, Plaintiff alleges in Count I that Defendant breached the Reinsurance Agreement by failing to disclose to referred borrowers the benefits that it derived from the captive reinsurance arrangement. (R. 37, First Am. Compl. ¶¶ 44-45.) Plaintiff alleges that the Agreement required Defendant to provide any disclosures that regulatory authorities "may suggest or require" and that HUD regulations require the disclosure of the benefits that Defendant was receiving. (*Id.* ¶¶ 41, 43.)

Defendant contends that Plaintiff's breach of contract claim (Count I) must be dismissed for two principal reasons. First, Defendant argues that there is no plausible allegation of a breach because the Agreement has no provisions requiring the disclosure to borrowers that Defendant allegedly failed to provide. (*Id.* at 6-8.) Second, Defendant argues that Plaintiff has not plausibly alleged any injury to Triad resulting from the alleged failure to provide such disclosure to borrowers. (*Id.* at 8.) The Court agrees with both of Defendant's arguments.

"To state a claim for breach of contract under Illinois law, a party must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014) (citation

and internal quotation marks omitted). Defendant argues that the Reinsurance Agreement does not contain any provisions that obligated it to disclose the captive reinsurance arrangement with Triad to referred borrowers. (R. 47, Mem. at 6-8.) Defendant contends that Plaintiff has thus failed to plausibly allege a breach, a prerequisite to stating a breach of contract claim. (*Id.*) Plaintiff does not cite any provisions of the Reinsurance Agreement in her complaint, but does allege that "[p]ursuant to the Agreement ... Twin Rivers and the Affiliated Banks were required to comply with all applicable laws and regulations including the requirement to disclose the dividends and the benefits it derived from the mortgage reinsurance premiums to the borrowers whose loan[s] w[ere] subject to the Agreement." (R. 37, First Am. Compl. ¶ 18.) Plaintiff expands on that allegation in her response by pointing to § 11.2(f) of the Reinsurance Agreement.[7] (R. 50, Resp. at 5-6.) In that provision, which is titled "No Conflict or Violation," Defendant warranted and represented that:

> **\*4** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby in accordance with the respective terms and conditions hereof will not ... (b) violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon, or any agreement with, or condition imposed by, or consent required by, any governmental or regulatory body, foreign or domestic, binding upon [Twin Rivers].

(R. 37-2 at 25, Reinsurance Agmt. § 11.2(f).) Defendant contends that § 11.2(f) is merely a representation that, at the time of contracting, it was not specifically and individually subject to any legal constraints that would preclude it from agreeing to and fulfilling its obligations under the Reinsurance Agreement. (R. 47, Mem. at 7.) Plaintiff contends that this provision is much broader. She argues that it is a continuing commitment by Defendant to comply with all generally applicable statutes and regulations, so that a violation of any applicable statute or regulation also constitutes a breach under this provision. (R. 50, Resp. at 6.) According to Plaintiff, HUD regulations required Defendant to disclose the benefits it

received under the captive reinsurance arrangement to borrowers that it referred to Triad for PMI. (*Id.*) By allegedly failing to comply with these HUD regulations, Plaintiff's theory goes, Defendant also breached § 11.2(f). Whether Plaintiff has plausibly alleged a breach of contract thus turns on the proper interpretation of this provision.

If the language of the Reinsurance Agreement is unambiguous, its interpretation "is a question of law that can be decided at the motion to dismiss stage." *Golden v. Wiznitzer*, No. 13 C 9003, 2014 WL 1329397, at *1 (N.D. Ill. Apr. 2, 2014) (citation omitted). If, on the other hand, it is ambiguous, interpretation is a question of fact which the Court cannot properly decide on a motion to dismiss. *Sullivan v. Alcatel-Lucent USA, Inc.*, No. 12 C 7528, 2013 WL 228244, at *3 (N.D. Ill. Jan. 22, 2013). Thus, the "threshold inquiry is whether the contract is ambiguous." *Int'l Capital Grp., LLC v. Starrs*, No. 10 C 3257, 2011 WL 66027, at *3 (N.D. Ill. Jan. 10, 2011). A contract is ambiguous "only if the language used is reasonably or fairly susceptible to having more than one meaning, even when considering the disputed language in the context of the entire agreement." *Id.* (citation and internal quotation marks omitted). But it is not rendered ambiguous "simply because the parties do not agree on the meaning of its terms." *Id.* (citation omitted). If the terms of the Reinsurance Agreement conflict with Plaintiff's characterizations or allegations, the terms of the instrument itself control. *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005).

The Court concludes that the language of § 11.2(f) is fairly susceptible to Defendant's interpretation, but not Plaintiff's. It is therefore unambiguous and the Court can decide its meaning as a matter of law and without any need for extrinsic evidence. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1037 (7th Cir. 1998); *see also Citadel Grp. Ltd. v. Sky Lakes Med. Ctr., Inc.*, No. 06-C-6162, 2008 WL 1924958, at *4 (N.D. Ill. Apr. 30, 2008) ("If only one interpretation is reasonable, the contract is unambiguous and the court can interpret its meaning as a matter of law[.]"). In § 11.2(f), Defendant represented and warranted that executing the Reinsurance Agreement and performing its obligations thereunder would not (1) "violate any order, judgment, injunction, award or decree of any court, arbitrator or governmental or regulatory body against, or binding upon" it or (2) "violate ... any agreement with, or condition imposed by, or consent required by, any governmental or regulatory body, foreign or domestic, binding upon" it. (R. 37-2 at 25, Reinsurance Agmt. § 11.2(f).) This language naturally reads as a representation that Defendant was not subject to any *specific and individual* legal constraints that

precluded it from agreeing to and performing its contract obligations. The language is thus fairly susceptible to Defendant's interpretation.

**\*5** For her proffered interpretation, Plaintiff focuses on the word "condition," arguing that the language "any ... condition imposed by ... any governmental or regulatory body ... binding upon [Defendant]" encompasses generally applicable statutes and regulations. (R. 50, Resp. at 6.) This is not a reasonable interpretation. To begin with, "condition" is not a word ordinarily used to refer to generally applicable statutes and regulations. *See Condition*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance."; "A stipulation or prerequisite in a contract, will, or other instrument[.]"). Ascribing Plaintiff's unusual meaning to the word "condition" would also improperly render the "binding upon" clause superfluous because generally applicable statutes and regulations are by definition "binding upon" all. *See Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 784 (Ill. App. Ct. 2005) ("[A] contract [should] be construed such that none of its terms are regarded as mere surplusage."). Put differently, for the terminal clause "binding upon [Defendant]" to have some meaning, "condition" must mean something more narrow than generally applicable laws and regulations. In addition, the phrase "condition imposed by" must be read in the context of the other types of legal constraints enumerated in § 11.2(f). *See Asta, L.L.C. v. Telezygology, Inc.*, 629 F. Supp. 2d 837, 844 (N.D. Ill. 2009) ("[I]n order to properly understand the meaning of language there must be a discerning assessment of the context in which the words are used.... This is the familiar principle of *noscitur a sociis*[.]"). All of those other constraints—orders, judgments, injunctions, awards and decrees, and agreements with or consents required by governmental or regulatory bodies—are the kind imposed specifically and individually on a particular party. Plaintiff's interpretation would imbue "condition" with a meaning qualitatively different from these other constraints. Section 11.2(f) is unambiguous and the Court concludes that it does not support Plaintiff's theory of breach. For this reason, Plaintiff has failed to state a claim in Count I for breach of contract.

Defendant's second argument as to Count I is that Plaintiff fails to adequately allege damages resulting from Defendant's purported breach, another necessary ingredient of a viable breach of contract claim. (R. 47, Mem. at 8.) As Defendant points out, Plaintiff's only allegation relating to damages is that "[a]s a result of the

breach of [the Reinsurance Agreement], Plaintiff has suffered, and will suffer damages of a pecuniary nature." (*Id.* (quoting R. 37, First Am. Compl. ¶ 46).) Defendant argues that this allegation is inadequate because it is too conclusory, and that in any event it is not plausible that Triad was injured in any way by Defendant's alleged failure to disclose the reinsurance arrangement to borrowers.[8] (*Id.*) Plaintiff responds that her one-sentence allegation is sufficient and that "[w]hether [she] can *prove* the damages is not for the court [to] consider at this time." (R. 50, Resp. at 6-7 (emphasis added).)

The Court concludes that Plaintiff has not adequately alleged damages. To state a claim, Plaintiff must plausibly allege damages resulting from Defendant's alleged breach. *Hongbo Han*, 762 F.3d at 600. "Threadbare recitals of the elements of a cause of action," do not suffice. *Iqbal*, 556 U.S. at 678. The perfunctory allegation that Plaintiff "has suffered, and will suffer damages of a pecuniary nature" is exactly that: a threadbare recital of damages that is not adequate to state a claim. *See Directv, LLC v. Spina*, No. 1:15-cv-104, 2016 WL 3097212, at *5 (S.D. Ind. June 3, 2016) (dismissing breach of contract counterclaim for failure to adequately allege damages, describing as "vague" and "bare-bones" the allegation that defendant "was damaged by [the plaintiff's] breach"); *Royal Sleep Prods., Inc. v. Restonic Corp.*, No. 07 C 6588, 2010 WL 1172555, at *4, *7-9 (N.D. Ill. Mar. 22, 2010) (dismissing breach of contract claim where plaintiff alleged only that it "has suffered damages by reason of the breach," describing the allegations as "nothing but formulaic recitations of the elements of" a breach of contract claim and as "fail[ing] to allege any factual content that satisfies the *Twombly* standard"). This allegation has no factual content, let alone enough to infer that damages resulting from Defendant's alleged breach are "more than a sheer possibility"—a threshold that Plaintiff must meet. *Iqbal*, 556 U.S. at 678. Drawing reasonable inferences in Plaintiff's favor does not lend this allegation facial plausibility, as there is no obvious or apparent way—and Plaintiff does not articulate any in her response—that *Triad* would be harmed by Defendant's alleged failure to disclose the captive reinsurance arrangement to borrowers.[9] Plaintiff has not adequately alleged damages resulting from Defendant's alleged breach, and therefore fails to state a breach of contract claim for this additional reason.[10] Plaintiff's failure to state a claim does not appear curable as to both of the grounds for dismissal discussed above. However, out of an abundance of caution, the Court will give Plaintiff sixty days to propose any amended complaint that reasserts only Count I of this lawsuit.

## II. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II)

**\*6** In Count II, Plaintiff asserts that Defendant breached the implied covenant of good faith and fair dealing by selectively referring only high-risk borrowers to Triad for PMI. (R. 37, First Am. Compl. ¶¶ 51-52.) Plaintiff alleges that Defendant vetted its borrowers and selectively referred only "the mortgages that presented the highest risk of default" to Triad, which allegedly enabled Defendant to minimize its risk of reinsuring loans that could go into default while at the same time maximizing its profits. (*Id.* ¶¶ 11, 51-52.) Plaintiff alleges that Defendant's selective referral violated the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 49, 53.)

Defendant contends that Plaintiff's implied covenant claim must be dismissed for three reasons. First, Defendant argues that the implied covenant is inapplicable because there are no express terms in the Reinsurance Agreement relating to referred borrowers' credit quality and because the agreement does not contain any provisions requiring Triad to provide PMI to borrowers referred by Defendant. (R. 47, Mem. at 9-10.) The Court agrees with Defendant. Under Illinois law, "every contract implies good faith and fair dealing between the parties to it." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992). The purpose of the implied covenant of good faith and fair dealing is "to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Bank of Am., N.A. v. Shelbourne Dev. Grp., Inc.*, 732 F. Supp. 2d 809, 823 (N.D. Ill. 2010) (citation omitted). However, it cannot be wielded as an "independent source of duties for the parties to a contract." *Beraha*, 956 F.2d at 1443. That is, it "cannot be used to create additional contractual terms." *Pharm. Horizons, Inc. v. SXC Health Sols., Inc.*, No. 11 C 6010, 2012 WL 1755169, at *3 (N.D. Ill. May 15, 2012); *see also Suburban Ins. Servs., Inc. v. Va. Sur. Co.*, 752 N.E.2d 15, 19 (Ill. App. Ct. 2001) ("The covenant of good faith and fair dealing does not allow a party to read an obligation into a contract that does not exist."). The implied covenant instead "guides the construction of *explicit terms* in an agreement." *Beraha*, 956 F.2d at 1443 (emphasis added). In other words, it is essentially "a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions." *Resolution Tr. Corp. v. Holtzman*, 618 N.E.2d 418, 424 (Ill. App. Ct. 1993).

To state a claim for breach of the implied covenant, Plaintiff must allege that the Reinsurance Agreement vested Defendant with discretion in performing an obligation and that Defendant exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties. *Shelbourne Dev. Grp.*, 732 F. Supp. 2d at 824; *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 792 (N.D. Ill. 2010). Plaintiff fails to state an claim for breach of the implied covenant because she does not allege or even argue that any express provisions of the Agreement vested Defendant with discretion to select the credit quality or risk profile of referred borrowers. *See Visco Fin. Servs., Ltd. v. Siegel*, No. 08 C 4029, 2008 WL 4900530, at *3 (N.D. Ill. Nov. 13, 2008) ("Since [defendant] failed to plead a discretionary right that [plaintiff] may have breached, he fails to state a cognizable claim under Illinois law."). Without any express provision that vested Defendant with discretion, there is no underlying contract language that the implied covenant can be tethered to or used to interpret. *See id.*; *Cook Inc. v. Bos. Sci. Corp.*, No. 01 C 9479, 2002 WL 335314, at *5 (N.D. Ill. Feb. 28, 2002) (explaining that Illinois does not recognize a "free-floating duty of good faith unattached to the underlying legal document" (citation omitted)).

**\*7** Plaintiff also fails to state a claim because she has not alleged that Triad was required to accept referred borrowers or provide them PMI. For the implied covenant to apply, one party to the contract usually must be dependent on the other party exercising its contractually afforded discretion reasonably and in good faith. *See Peterson v. H & R Block Tax Servs., Inc.*, 971 F. Supp. 1204, 1211 (N.D. Ill. 1997); *Anderson v. Burton Assocs., Ltd.*, 578 N.E.2d 199, 203 (Ill. App. Ct. 1991) ("The dependant party must then rely on the party in control to exercise that discretion fairly." (citation omitted)). There is no such dependency here because it is undisputed by Plaintiff that nothing in the Agreement required Triad to provide PMI to any referred borrowers. (*See* R. 47, Mem. at 9.) If instead Triad was contractually obligated to issue PMI to every referred borrower, then Triad might be dependent on Defendant fairly and reasonably exercising discretion over which borrowers to refer. But Plaintiff does not dispute that Triad had no such obligation under the Agreement. (*See id.*) If Triad was unhappy with what it perceived to be a selective referral of high-risk borrowers, it could simply have declined to issue them PMI. For this reason, Plaintiff has failed to state a claim for breach of the implied covenant of good faith and fair dealing.

Defendant's second argument is that Plaintiff's implied covenant claim is not facially plausible because it makes no economic sense. (R. 47, Mem. at 11-12.) The Court agrees with this argument as well. Selectively referring high-risk borrowers to Triad for PMI could serve only to *increase* Defendant's own exposure and potential liability, because—according to Plaintiff's own allegations—Defendant was reinsuring Triad's losses vis-à-vis those very same borrowers. (R. 37, First Am. Compl. ¶¶ 9-10.) Plaintiff's claim that the selective referral enabled Defendant to "minimize [its] risk of reinsuring loans that could go into default," thereby "maximizing profits," (*id.* ¶ 52), does not make economic sense. To minimize its reinsurance risk, Defendant would instead want to refer only *low*-risk borrowers to Triad—the lower the default rate among borrowers referred to Triad, the lower Triad's anticipated losses with respect to them and the less that Defendant might be on the hook for reinsuring. *See Illinois ex rel. Dowling v. AAMBG Reinsurance, Inc.*, No. 16 C 7477, 2017 WL 2378078, at *3 (N.D. Ill. June 1, 2017).

Plaintiff's only response to this argument is to point out that Defendant's reinsurance liability was capped. (R. 50, Resp. at 8.) Under the original Reinsurance Agreement,[11] for example, Defendant would only reinsure the first 10% of Triad's losses on policies issued in a given year; losses in excess of 10% for a given policy year would be borne by Triad. (R. 37-2 at 18, Reinsurance Agmt. § 3 ("[I]n no event shall Reinsurer be liable for ... cumulative Net Losses ... of ten percent (10%) or more[.]").) Plaintiff does not explain—and it is not self-evident—what significance this has for her implied covenant claim. She seems to suggest that the limits on Defendant's reinsurance liability make her claim economically plausible because once Triad's losses exceeded the reinsurance limits, Defendant's selective referral of high-risk borrowers would no longer increase its own liability. In other words, once the reinsurance limit was reached, Defendant could selectively refer risky borrowers to Triad with impunity. In that scenario, Plaintiff's claim might make economic sense because Defendant would no longer suffer adverse consequences from the selective referral. There are two problems with this theory, however.

First, Plaintiff does not allege that Triad's losses for any policy year *actually* exceeded the applicable reinsurance limit. In other words, she has not alleged that the situation where it could make economic sense for Defendant to engage in selective referral ever actually came about. Without such an allegation, Plaintiff's implied covenant claim is plausible only in a hypothetical scenario that she has not alleged ever occurred, and therefore presents only the "sheer possibility" that misconduct occurred. *Iqbal*, 556 U.S. at 678. Second, even if Plaintiff alleged that

Triad's losses had exceeded the applicable reinsurance limits for some policy-years, the claim would still not make economic sense. Selectively referring high-risk borrowers could not work in Defendant's favor unless and until Triad's losses exceed 10%, because up until that point Defendant is reinsuring Triad's losses. But Defendant could not know *ex ante* which or how many referred borrowers would eventually default on their mortgages. Defendant thus could not know for certain whether Triad's losses would ultimately remain below 10%—such that the selective referral would have been purely self-destructive—or would exceed 10%. To put it differently, Defendant could not know in advance what selectively referring risky borrowers would accomplish—whether it would be purely self-destructive, or whether it would harm Triad as well. Defendant had no apparent incentive to saddle itself with significant risk on the off chance that it could shift some of the risk back to Triad. *See AAMBG*, 2017 WL 2378078, at *3 (reaching similar conclusion that "[i]t does not make economic sense to argue that [Defendant] has an incentive to send poor risks to Triad"). Plaintiff's implied covenant claim is therefore implausible.

**\*8** Defendant's third argument is that Plaintiff's implied covenant claim must be dismissed for one of the reasons applicable to her breach of contract claim in Count I: failure to plausibly allege damages resulting from the alleged breach. (R. 47, Mem. at 12.) Plaintiff does not respond to this argument, and the Court agrees with Defendant. A claim that a party breached the implied covenant of good faith and fair dealing is properly characterized as a breach of contract claim because "Illinois provides no independent cause of action for breach of the implied covenant."[12] *LSREF3 Sapphire Tr. 2014 v. Barkston Props., LLC*, No. 14 C 7968, 2016 WL 302150, at *2 (N.D. Ill. Jan. 25, 2016); *see also Lakeside Bldg. Maint., Inc. v. Raytheon Travel Air Co.*, No. 02 C 708, 2002 WL 31115584, at *2 (N.D. Ill. Sept. 23, 2002) ("[W]e will treat this [implied covenant] claim as essentially a breach of contract claim."). To state a claim for breach of contract, Plaintiff must allege damages resulting from the alleged breach. *Hongbo Han*, 762 F.3d at 600. As discussed above for Count I, Plaintiff has failed to plausibly allege damages because her only relevant allegation—that "[a]s a result of the breach of [the Reinsurance Agreement], Plaintiff has suffered, and will suffer damages of a pecuniary nature," (R. 37, First Am. Compl. ¶ 46)—is too conclusory to state a claim and is not otherwise plausible. For this additional reason, Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing.

While some of the grounds for dismissing Plaintiff's

implied covenant claim may be curable, some are not. The absence of any contract provisions that vest Defendant with discretion or require Triad to issue PMI to referred borrowers is intrinsically fatal. So too is the economic implausibility of the claim. Plaintiff's claim for breach of the implied covenant of good faith and fair dealing will therefore be dismissed with prejudice.

### III. Declaratory Judgment and Injunctive Relief Under RESPA (Count III)

In Count III, Plaintiff seeks a declaratory judgment that the reinsurance arrangement between Triad and Defendant violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* (R. 37, First Am. Compl. ¶¶ 55-62.) As noted, Plaintiff alleges that the ceded premiums were actually kickbacks and unearned fee-splitting paid in exchange for Defendant referring borrowers to Triad, which violated the prohibitions in 12 U.S.C. § 2607(a)-(b). (*Id.* ¶¶ 21, 24, 25, 32-36, 62.) Plaintiff also seeks a declaratory judgment that any further payment of dividends from the trust account to Defendant would violate RESPA and that the balance of the trust account is the property of Triad. (*Id.* ¶ 62.)

Defendant argues that the applicable statute of limitations bars Plaintiff's RESPA claim. (R. 47, Mem. at 12-13.) The Court agrees. "[I]f a plaintiff alleges facts sufficient to establish a statute of limitations defense, the district court may dismiss the complaint on that ground." *O'Gorman v. City of Chi.*, 777 F.3d 885, 889 (7th Cir. 2015). Plaintiff's claim in Count III is essentially that the reinsurance arrangement between Triad and Defendant violated RESPA, 12 U.S.C. § 2607(a)-(b). (R. 37, First Am. Compl. ¶¶ 21, 24-25, 32-36, 62.) The statute of limitations applicable to § 2607 is one year for private actions and three years for public enforcement actions brought by State insurance commissioners, both time periods beginning from "the date of the occurrence of the violation." 12 U.S.C. § 2614. Even assuming that the longer three-year limitations period applies because Plaintiff is the Acting Illinois Director Of Insurance,[13] Plaintiff's claim is several years too late. A cause of action under RESPA accrues, and the statute of limitations begins to run, at the closing of the underlying mortgage(s) in connection with which the violation occurred. *Thomas v. Ocwen Fed. Bank FSB*, No. 01 C 4249, 2002 WL 99737, at *2 (N.D. Ill. Jan. 25, 2002) (noting that "the closing of [the borrower's] loan" is "the day upon which claims under RESPA ... typically accrue"); *see also Snow v. First Am. Title Ins. Co.*, 332 F.3d 356, 359 (5th Cir. 2003) ("The phrase 'the date of

the occurrence of the violation' refers to the closing, i.e., when the [mortgagor] paid for the insurance[.]"); *Palmer v. Homecomings Fin. LLC*, 677 F. Supp. 2d 233, 237 (D.D.C. 2010) ("A cause of action under § 2607 accrues on the date of the closing."); *Mullinax v. Radian Guar. Inc.*, 199 F. Supp. 2d 311, 325 (M.D.N.C. 2002) ("[T]he violation occurs and the limitations period begins once a borrower overpays for a settlement service that is subject to [a kickback] agreement."). Plaintiff does not dispute that Triad stopped issuing PMI in 2008 and has been operating its business in "run-off"—meaning it administers existing policies and continues to process claims but no longer issues new policies—ever since.[14] (*See* R. 47, Mem. at 3, 12.) At the latest, then, a cause of action under RESPA accrued sometime in 2008, upon the closing of the last mortgage for which Triad issued PMI. *See AAMBG*, 2017 WL 2378078, at *4 (concluding similarly that "the last possible violation of RESPA occurred in 2008 when Triad issued the last of its PMI policies"). Plaintiff commenced this action in June 2016, approximately eight years later. (R. 1-1, Compl. at Law.) Plaintiff's claim is thus tardy by approximately five years, even under the longer limitations period.

**\*9** Plaintiff offers two cursory arguments for why her RESPA claim is timely. Neither is persuasive. First, she argues that each payment of a ceded reinsurance premium by Triad to Defendant is a new RESPA violation that starts a new limitations period. (R. 50, Resp. at 9.) Plaintiff cites no authority to support this interpretation of RESPA's statute of limitations, which in any event has been repeatedly rejected by other courts. *See Snow*, 332 F.3d at 358-60 (rejecting argument that limitations period "began to run anew" each time defendant paid an alleged kickback); *Menichino v. Citibank, N.A.*, No. 12-0058, 2013 WL 3802451, at *12 (W.D. Pa. July 19, 2013) ("[T]he closing of the mortgage and continuous premium payments are more properly conceived of as a single violation followed by continuing consequences, where the closing of the mortgage is the single actionable violation and the recurring payments ... are the continuing ill effects." (citation and internal quotation marks omitted)); *Mullinax*, 199 F. Supp. 2d at 325 (rejecting argument that a new RESPA violation with a new limitations period "occurs upon each monthly payment for primary mortgage insurance premiums ... for each payment relates to the illegal kickback agreements"); *AAMBG*, 2017 WL 2378078, at *4 (rejecting argument that "each distribution to [the reinsurer] from ... Triad ... constitutes a separate violation" of RESPA).

This Court likewise rejects Plaintiff's interpretation. "The primary ill that § 2607 is designed to remedy is the potential for unnecessarily high settlement charges ...

caused by kickbacks, fee-splitting, and other practices that suppress price competition for settlement services. This ill occurs, if at all, when the [borrower] pays for the service, typically at the closing." *Snow*, 332 F.3d at 359-60 (citation and internal quotation marks omitted). An aggrieved party "could have sued at that moment, and the standard rule [is] that the limitations period commences when the plaintiff has a complete and present cause of action." *Id.* (citation and internal quotation marks omitted). A significant problem with Plaintiff's interpretation is that it would "let the statute of limitations regenerate itself like a phoenix from the ashes" because the limitations period would "begin at the closing and expire a year later, only to be restarted years later" if another payment that is alleged to be a kickback is made—even if the corresponding mortgage transaction settled years or even decades ago. *Id.* at 360. Plaintiff's interpretation would also inappropriately "encourage tardy plaintiffs to sue and hope that discovery turns up a recent [alleged kickback] payment that restarts the limitations period." *Id.* at 361. The Court therefore rejects Plaintiff's interpretation of Section 2614.

Plaintiff's second argument is that RESPA's statute of limitations is subject to equitable tolling. (R. 50, Resp. at 9.) Equitable tolling applies "when the plaintiff, exercising due diligence, was unable to discover evidence vital to a claim until after the statute of limitations expired." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 931 (7th Cir. 2015) (citation omitted). It is "granted sparingly only when extraordinary circumstances far beyond the litigant's control prevented timely filing." *Id.* at 930 (citation omitted). It is true that in this Circuit, the limitations period under RESPA can be equitably tolled because it is considered non-jurisdictional. *Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157, 1166-67 (7th Cir. 1997); *Horton v. Country Mortg. Servs., Inc.*, No. 07 C 6530, 2008 WL 2952276, at *2 (N.D. Ill. July 30, 2008) ("RESPA actions are subject to ... the doctrine of equitable tolling[.]"); *but see Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1038-41 (D.C. Cir. 1986) (holding that time limitation in 12 U.S.C. § 2614 is jurisdictional and therefore not subject to equitable tolling). But Plaintiff "bears the burden of demonstrating that equitable tolling applies." *Bolden v. Wells Fargo Bank, N.A.*, No. 14 C 403, 2014 WL 6461690, at *5 (N.D. Ill. Nov. 18, 2014); *Thomas*, 2002 WL 99737, at *3 ("[W]here, as here, the expiration of the statute of limitations is clear from the face of the complaint, the plaintiff must plead in the complaint any exceptions[.]").

**\*10** Plaintiff's one-sentence argument does not explain why equitable tolling would apply, and the complaint

contains no allegations from which that can be reasonably inferred. Indeed, the only reasonable inference from Plaintiff's allegations is rather that equitable tolling would *not* apply. According to Plaintiff's allegations, Triad itself participated in the alleged kickback scheme. Therefore, evidence to support a claim that the ceded reinsurance premiums were in fact kickbacks would be in its possession from the outset. And Plaintiff has been Triad's appointed rehabilitator since 2012, meaning that—by operation of law—she has had access to and should have had possession of all of Triad's records since then. *See* 215 ILL. COMP. STAT. 5/191 ("The Director is entitled to immediate possession and control of all property ... of the company, and is further authorized and directed to remove any and all records and property of the company to the Director's possession and control[.]"). Plaintiff offers no reason that Triad or Plaintiff would be unable to discover evidence vital to the RESPA claim until after the statute of limitations expired. And even if equitable tolling applied, Plaintiff has not established that it paused the limitations period long enough to render her claim timely, which in this case would be almost five years. *See Sidney Hillman Health Ctr.*, 782 F.3d at 931 ("[A] plaintiff who invokes equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information." (citation omitted)). Equitable tolling does not save Plaintiff's untimely RESPA claim. *See AAMBG*, 2017 WL 2378078, at *3 (dismissing Plaintiff's RESPA claim as barred by the statute of limitations). The Court therefore dismisses this claim (Count III) with prejudice.[15]

### IV. Unjust Enrichment (Count IV)

In Count IV, Plaintiff asserts a claim of unjust enrichment, alleging that the reinsurance premiums paid by Triad "grossly exceeded" the value of any reinsurance provided by Defendant. (R. 37, First Am. Compl. ¶ 64.) On this basis, Plaintiff alleges that Defendant's retention of the approximately $1.7 million remaining in the trust account, which represents the ceded reinsurance premiums, constitutes unjust enrichment. (*Id.* ¶ 66.)

Defendant argues that Count IV must be dismissed because unjust enrichment is not available where there is an express contract that governs the relationship between the parties, and according to Plaintiff's own allegations a written contract—the Reinsurance Agreement—governs the relationship between Triad and Defendant. (R. 47, Mem. at 14-15.) Plaintiff concedes that the existence of a contract usually precludes an unjust enrichment claim, but

responds that (1) her unjust enrichment claim falls outside the subject matter of the Reinsurance Agreement; and (2) she permissibly pleads unjust enrichment in the alternative to breach of contract. (R. 50, Resp at 10-11.) The Court rejects both of Plaintiff's arguments.

Illinois law does not allow a claim of unjust enrichment where there is a contract that governs the relationship between the parties, unless the claim falls outside the subject matter of the contractual relationship. *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992); *Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004). This rule prevents a contracting party from making an "end run around contract law by pursuing an unjust enrichment theory." *Duffy v. Ticketreserve, Inc.*, 722 F. Supp. 2d 977, 993 (N.D. Ill. 2010); *see also Prodromos v. Poulos*, 560 N.E.2d 942, 948 (Ill. App. Ct. 1990) ("This rule holds the contract parties to their agreement and prevents a party who made a bad business decision from asking the court to restore his expectations."). The gravamen of Plaintiff's claim in Count IV is that the reinsurance premiums paid by Triad "grossly exceeded" the value of the reinsurance provided by Defendant and that Defendant's retention of the allegedly excessive premiums constitutes unjust enrichment. (R. 37, First Am. Compl. ¶¶ 64-65.) Yet Plaintiff herself expressly alleges a written contract—the Reinsurance Agreement—that governs the reinsurance relationship between Defendant and Triad.[16] (*Id.* ¶¶ 8-9, 12, 20, 30.) Illinois law thus precludes Plaintiff's unjust enrichment claim. *See Horace Mann*, 383 F.3d at 688-89.

**\*11** Plaintiff nevertheless attempts to reframe her unjust enrichment claim as dealing with who may retain the balance of the trust account (into which the ceded premiums were deposited) and contends that this issue "potentially" falls outside of, or is not addressed by, the Agreement. (R. 50, Resp. at 10-11.) This argument is not persuasive. "In determining whether a claim falls outside a contract, the *subject matter* of the contract governs, not whether the contract contains terms or provisions related to the claim." *Horace Mann*, 383 F.3d at 689 (emphasis added). Illinois courts construe the "subject matter" of a contract broadly for purposes of this inquiry. *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *16 (N.D. Ill. Feb. 24, 2015), *aff'd in part*, 830 F.3d 735 (7th Cir. 2016). It thus does not matter whether the Reinsurance Agreement has provisions specifically dealing with payments out of the trust account.[17] *See Horace Mann*, 383 F.3d at 689 ("[Plaintiff] is correct that its contract with [defendant] contains no terms or provisions dealing specifically with soliciting cheaper proposals for telephone service. But despite the absence of specific terms, the subject matter of the contract clearly

encompasses the work [plaintiff] did for [defendant] identifying sources of savings including potential 'future savings.' "); *Stevens*, 2015 WL 791384, at *17 (finding unjust enrichment claim precluded by an express contract, even though contract "does not deal with the specific subject at issue" in the claim). Instead, it is enough if the unjust enrichment claim arises out of the subject matter—broadly construed—of the contractual relationship between Defendant and Triad. *See Stevens*, 2015 WL 791384, at *17; *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, No. 14 C 1512, 2017 WL 1105400, at *13 (N.D. Ill. Mar. 24, 2017) ("[T]he contract's existence precludes an unjust enrichment claim ... as long as the contract generally governs the parties' business relationship."). Plaintiff's unjust enrichment claim clearly does arise out of the subject matter of the Reinsurance Agreement, and the Court rejects Plaintiff's argument to the contrary.

Plaintiff also argues that she permissibly pleads unjust enrichment in the alternative to her breach of contract claim. (R. 50, Resp. at 10-11.) Plaintiff insists that because she has "questioned" the enforceability of the Reinsurance Agreement, she may maintain her unjust enrichment claim "[u]ntil it can be determined that the parties agree the Agreement is valid and enforceable." (*Id.* at 11.) In essence, Plaintiff argues that her unjust enrichment claim may proceed as an alternative to her breach of contract claim—*i.e.*, under a theory that the Reinsurance Agreement is unlawful and therefore unenforceable. A litigant may plead unjust enrichment in the alternative to breach of contract if (1) it makes clear through appropriate language that the claim is actually pled in the alternative and (2) the claim does not refer to, or incorporate allegations of, an express contract governing the parties' relationship. *Grayson v. Shanahan*, No. 16-CV-1297, 2016 WL 6962827, at *3 (N.D. Ill. Nov. 29, 2016); *Roche v. Liberty Mut. Managed Care, Inc.*, No. 07-cv-331, 2008 WL 4378432, at *3 (S.D. Ill. Sept. 23, 2008). Plaintiff's unjust enrichment claim fails on both counts. "While [plaintiffs] need not use particular words to plead in the alternative, they must use a formulation from which it can be reasonably inferred that this is what they were doing," such as either-or or if-then language. *Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000). Thus, a litigant wanting to plead unjust enrichment in the alternative to breach of contract may plead as follows: "(1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013).

Plaintiff's unjust enrichment claim does not use any language that indicates alternative pleading, and thus fails to properly plead in the alternative. The claim also improperly incorporates by reference Plaintiff's express allegations of a written contract governing the relationship between Triad and Defendant. (*See* R. 37, First Am. Compl. ¶ 63 ("restat[ing] and realleg[ing]" paragraphs 1-37); *id.* ¶ 8 ("At all relevant times hereto, Triad and Twin Rivers were parties to the [Reinsurance Agreement].")); *id.* ¶ 9 ("Pursuant to the [Reinsurance] Agreement, Twin Rivers was a reinsurer for mortgage insurance policies that Triad issued on a loan originated by an Affiliated Bank."); *id.* ¶ 30 ("The[ ] referrals of mortgage insurance business were made pursuant to the Agreements between Triad and Twin Rivers which provided that Triad would cede a portion of their mortgage insurance premiums to the referring Approved Lender's affiliated reinsurer.").) Referencing, or incorporating allegations of, an express contract governing the parties' relationship has been "the downfall of complaints" in many other cases. *Inteliquent, Inc. v. Free Conferencing Corp.*, No. 16-cv-6976, 2017 WL 1196957, at *18 (N.D. Ill. Mar. 30, 2017) (citation omitted) (collecting cases). So it is here. Not only does Plaintiff fail to use language that properly pleads in the alternative, she improperly incorporates allegations of an express contract governing the relationship between Defendant and Triad. Plaintiff has thus failed to plead unjust enrichment in the alternative to her breach of contract claim.

**\*12** Defendant argues further that even if Plaintiff cured her pleading missteps and properly pled an unjust enrichment claim in the alternative, the claim must still be dismissed because Illinois law does not permit parties to an unlawful contract to seek relief via unjust enrichment. (R. 52, Reply at 10.) Defendant reasons that even if the Reinsurance Agreement is unlawful under RESPA and therefore unenforceable—the alternative theory on which Plaintiff would base her unjust enrichment claim—Illinois law would still preclude the claim. (*Id.*) The Court agrees. "Illinois law does not allow a claim for unjust enrichment when the underlying contract has been held to be void as against public policy." *Liautaud v. Liautaud*, 221 F.3d 981, 989 (7th Cir. 2000); *see also Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers of Ill., Inc.*, 889 N.E.2d 750, 759 (Ill. App. Ct. 2008) ("[P]laintiff is unable to sue ... for unjust enrichment where there was a contract between the parties, although the contract is void as a matter of law.").[18] This is because "parties to a void contract will be left where they have placed themselves with no recovery of the money paid for illegal services." *Gamboa*, 941 N.E.2d at 1017 (citation omitted); *see also Ohio Nat'l Life Assurance Corp. v. Davis*, 803 F.3d 904, 911 (7th Cir. 2015) (quoting *Gamboa*). Thus, even if Plaintiff properly

Illinois ex rel. Hammer v. Twin Rivers Insurance Company, Not Reported in Fed. Supp....

pled her unjust enrichment claim based on an alternative theory that the Reinsurance Agreement is unlawful and therefore unenforceable, Illinois law would preclude the claim. *See Liautaud*, 221 F.3d at 989; *ABC & S, Inc. v. MacFarlane Grp., Inc.*, No. 13 C 07480, 2015 WL 300483, at *4 (N.D. Ill. Jan. 22, 2015) (denying motion to amend in order to plead unjust enrichment as alternative to breach of contract for the same reason). Because Plaintiff is unable to pursue unjust enrichment even if she properly pled this claim in the alternative, the claim will be dismissed with prejudice.[19]

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss (R. 46) is GRANTED. Count I is dismissed without prejudice, and Counts II, III, and IV are dismissed with prejudice. The parties are also requested to fully exhaust all settlement possibilities for this lawsuit in light of this opinion.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2880899

Footnotes

1    This suit previously named Anne Melissa Dowling, then Acting Director of the Illinois Department of Insurance, as Plaintiff. (R. 1, Notice of Removal.) Jennifer Hammer was subsequently appointed to that position effective January 17, 2017. (R. 47, Mem. at 1 n.1; R. 50, Resp. at 1 n.1.) She is therefore automatically substituted as the Plaintiff. *See* FED. R. CIV. P. 25(d).

2    Unless otherwise noted, the Court recounts these allegations as averred in Plaintiff's First Amended Complaint (R. 37).

3    In the context of this motion, the Court properly may consider the Order of Rehabilitation because it was attached to the complaint. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

4    For convenience, the Court will henceforth treat Defendant and its affiliated banks as one and the same, referring to them collectively as "Defendant."

5    The Court satisfied itself that subject-matter jurisdiction existed. (R. 30, Order at 8 n.5.)

6    During the December 13, 2016 status hearing addressing Defendant's prior motion to dismiss, counsel for Plaintiff explained that the parties were exploring possible resolution of the case. Counsel also explained that as a result, Plaintiff did not oppose granting the motion without prejudice, but requested 30 days to file an amended pleading.

7    Plaintiff does not contend—and therefore waives the argument—that she can survive dismissal without citing particular contract provisions. *See Peerless Network, Inc. v. MCI Commc'n Servs., Inc.*, No. 14 C 7417, 2015 WL 2455128, at *5 (N.D. Ill. May 21, 2015) ("The law on the issue of whether it is necessary to cite specific contract provisions to state a claim for breach of contract is divided in this district.").

8    The Court assumes that as Triad's rehabilitator, Plaintiff is alleging injury to Triad rather than herself.

9    If anything, Defendant's alleged breach would seem a boon to Triad. The disclosure that Defendant allegedly failed to provide to borrowers might—had it been given—have led some of them to procure mortgages elsewhere, which would mean fewer referred customers and thus lost business for Triad. In other words, the intuitive financial upshot of Defendant's alleged breach is to *help* rather than hurt Triad.

10   Because the Court finds that Plaintiff fails to state a claim for breach of contract, it declines to address Defendant's alternative argument that Plaintiff "pleads herself out of court on Count I" by effectively alleging that the Reinsurance Agreement violates RESPA and is therefore unenforceable under Illinois law. (*See* R. 47, Mem. at 5-6.)

11   It appears that the Agreement was amended six times. (*See* R. 37-2 at 1.)

12   The Court notes that because Illinois law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing, courts "regularly dismiss causes of action for breach of duty of good faith when they are not asserted *within* a breach of contract claim." *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 793 (N.D. Ill. 2010) (collecting

cases). Plaintiff appears to contend in her response that this claim is actually "within [her] breach of contract claim" and is "not a separate action." (R. 50, Resp. at 7.) Consequently, in the interest of efficiency, the Court will treat Plaintiff's implied covenant claim as part of her breach of contract claim. *See LSREF3 Sapphire Tr. 2014 v. Barkston Props., LLC*, No. 14 C 7968, 2016 WL 302150, at *2 (N.D. Ill. Jan. 25, 2016) ("[L]ooking beyond how the allegations are broken into separate counts that are captioned differently ... it appears that defendants are not asserting an 'independent' breach of implied covenant claim. Rather, they are making one claim spread across Counts II and III[.]").

13    Plaintiff contends that the three-year limitations period for actions by State insurance commissioners applies, (R. 50, Resp. at 9), but this is doubtful. As Defendant points out, she expressly brings suit in her capacity as Triad's "rehabilitator" under the Illinois Insurance Code, not in her public enforcement capacity. (R. 37, First Am. Compl. ¶¶ 1, 3.) Plaintiff's right of action is therefore derivative of whatever claims Triad had. *See* 215 ILL. COMP. STAT. 5/191 ("The Director [of Insurance] ... shall be vested by operation of law with the title to all ... rights of action of the company as of the date of the order directing rehabilitation or liquidation."). Had Triad itself brought the same RESPA claim that Plaintiff now brings, it is unquestionable that the one-year limitations period would apply. The Court sees no reason for a different outcome merely because the party stepping into Triad's shoes happens to be the Acting Director of Insurance. In any event, the Court need not definitively resolve which limitations period applies because Plaintiff's claim is barred even under the longer three-year period.

14    The Court takes judicial notice of statements in the Verified Complaint for Rehabilitation that Plaintiff filed in state court to initiate rehabilitation proceedings for Triad. *See Trs. of Local 734 Bakery Drivers Health & Welfare Plan v. Wolff*, 537 F. Supp. 2d 951, 954 (N.D. Ill. 2008) ("[J]udicial notice will be taken of the state court pleadings ... and other additional facts that plaintiff does not contend are disputed[.]"); *Brown v. Chrysler Fin. Servs.*, No. 05 C 1117, 2006 WL 850881, at *2 (N.D. Ill. Mar. 24, 2006) ("[A] court may take judicial notice of pleadings and orders in previous cases."), *aff'd*, 218 Fed.Appx. 536 (7th Cir. 2007). In that Verified Complaint, Plaintiff averred under penalty of perjury that "Triad ceased issuing new commitments for [PMI] coverage in 2008 and has been operating its business in run-off" ever since. (R. 47 at 27-45, Mem. Ex. B., Verified Compl. ¶ 4.) The Court also notes that in the bankruptcy proceeding for Triad's corporate parent, the U.S. District Court for the District of Delaware noted to similar effect that "[a]lthough [Triad] is not writing new insurance policies, it continues to run off existing policies, which remain in force." *In re Triad Guar. Inc.*, No. 14-1464, 2016 WL 3523834, at *2 (D. Del. June 27, 2016).

15    Because Plaintiff's RESPA claim is barred by the statute of limitations, the Court need not address Defendant's alternative argument that the conduct alleged does not actually violate RESPA. (*See* R. 47, Mem. at 13-14.)

16    Indeed, as previously noted, Plaintiff attached a copy of the Agreement to her complaint. (R. 37-2.)

17    The Court notes that, in any event, Plaintiff herself alleges that the Reinsurance Agreement has such provisions; she alleges that it provides for "the payment of dividends from the Trust Account to Twin Rivers ... and its affiliated Approved Originator[s]." (R. 37, First Am. Compl. ¶ 62.)

18    There is a recognized exception to this rule where "(1) the person who paid for the services was not *in pari delicto* [equally at fault] ... with the offender and (2) the law in question was passed for the protection of the person who paid for the services and the purpose of the law would be better served by granting relief than by denying it." *Gamboa*, 941 N.E.2d at 1017; *see also Ohio Nat'l*, 803 F.3d at 911 (invoking exception and granting restitution for unjust enrichment). If this exception applies, Plaintiff might be able to pursue a claim of unjust enrichment under an alternative theory that the Reinsurance Agreement is unlawful under RESPA. However, Plaintiff does not argue that this exception applies. Nor has she alleged that Triad was blameless in the alleged kickback scheme. To the contrary, she has alleged that Triad was a willing participant: she alleges that "Triad's reinsurance premiums and dividends ... ceded to Twin Rivers were ... paid in exchange for referring customers" and that "[e]ach ... ceding payment and dividend payment ... by Triad was made in consideration of [Twin Rivers'] ... continued referral of mortgage insurance business to Triad." (R. 37, First Am. Compl. ¶ 21, 33.)

19    Because the Court concludes that Plaintiff fails to state an unjust enrichment claim, it need not address Defendant's additional argument, (*see* R. 47, Mem. at 15), that the claim is barred at least in part, if not entirely, by the five-year statute of limitations set forth in 735 ILL. COMP. STAT. 5/13-205. *See Zelman v. Hinsdale Twp. High Sch. Dist. 86*, No. 10 C 00154, 2010 WL 4684039, at *2 (N.D. Ill. Nov. 12, 2010) ("Since [plaintiff] has failed to state a claim ... this Court need not reach the question of whether the claim is barred by the statute of limitations.").

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Illinois ex rel. Hammer v. Twin Rivers Insurance Company, Not Reported in Fed. Supp....

**H** KeyCite history available

2019 WL 1436018
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

FAIR ISAAC CORPORATION,
Plaintiff/Counterclaim Defendant,
v.
TRANS UNION, LLC, Defendant/Counterclaim
Plaintiff.

Case No. 17-cv-8318
|
Signed 03/30/2019

**Attorneys and Law Firms**

Michael Allen Olsen, J. Gregory Deis, Natalie Francesca
Wayne, Mayer Brown LLP, Chicago, IL, for
Plaintiff/Counterclaim Defendant.

James David Duffy, Audrey Denise Mense, Patrick
Morales-Doyle, Thompson Coburn LLP, Chicago, IL,
John Farley Thorne, Leslie Victoria Pope, Rebecca A.
Beynon, Leslie Victoria Pope, Pro Hac Vice, Mark C.
Hansen, Kellogg Hansen Todd Figel & Frederick PLLC,
Washington, DC, for Defendant/Counterclaim Plaintiff.

**MEMORANDUM OPINION AND ORDER**

SHARON JOHNSON COLEMAN, United States District
Judge

**\*1** Fair Isaac Corporation ("FICO") brings this amended
complaint against TransUnion, LLC alleging breach of
contract, breach of good faith and fair dealing, copyright
infringement, conversion, and false advertising in
violation of both federal and state law. Currently before
the Court is TransUnion's motion to dismiss the amended
complaint pursuant to Federal Rule of Civil Procedure
12(b)(6). Alternatively, TransUnion moves for a more
definite statement pursuant to Federal Rule of Civil

Procedure 12(e). For the reasons explained below,
TransUnion's motion [70] to dismiss is granted in part
and denied in part and its motion for a more definite
statement is denied.

**Background**
The following facts are undisputed unless otherwise
noted. FICO is a Delaware corporation with its principal
place of business in California. TransUnion is a Delaware
limited liability company with its principal place of
business in Illinois. Since 1989, FICO and TransUnion
have executed license agreements which allow
TransUnion to use FICO's scoring algorithm to sell credit
scores ("FICO Scores") to its customers. TransUnion,
Equifax, and Experian are the three major credit bureaus.
All three bureaus have different aggregated credit data but
use FICO's algorithm to determine a person's credit
score.

TransUnion also uses FICO's software ("Software
Modules") in applying the algorithm to an individual's
credit data. TransUnion's customers (lenders) use these
credit scores to determine individuals' creditworthiness
and risk of repayment. TransUnion was responsible for
generating credit scores, billing and collecting fees from
its customers, and making royalty payments to FICO
based on the type of service provided. The parties
executed several different agreements since 1989 that
established each party's obligations.

In 2015, FICO hired a third party to conduct an audit of
TransUnion's compliance with the parties' agreements.
According to FICO, the inspection revealed that
TransUnion committed several contractual infractions. In
its amended complaint, FICO's allegations largely stem
from the results of the 2015 inspection. Specifically,
FICO alleges that TransUnion underpaid royalties,
committed copyright infringement and conversion, and
breached several written agreements. FICO also alleges
that TransUnion committed false advertising related to
VantageScore, a rival credit company created by
TransUnion, Experian, and Equifax.

**Legal Standard**
A motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6) tests the legal sufficiency of the

complaint, not the merits of the allegations. To overcome a motion to dismiss, a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L.Ed. 2d 868 (2009), and raises the right to relief above a speculative level, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed. 2d 929 (2007). When ruling on a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012).

**Discussion**

**\*2** TransUnion moves to dismiss FICO's amended complaint entirely, arguing that Counts I through IV fail to satisfy Rule 8 and 10(b), Counts V through VIII fail to state a claim, and Counts IX through XII fail to state a claim and are barred by issue preclusion.

*1. Counts I, II, III, and IV: Breach of Contract*

TransUnion argues that FICO's breach of contract claim should be dismissed for failure to satisfy Rule 8 and 10(b). Rule 8 requires claims to contain a short and plain statement showing that the plaintiff is entitled to relief and be "simple, concise and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). Rule 10(b) states that each claim founded on a separate transaction or occurrence must be stated in a separate count, "if doing so would promote clarity." Fed. R. Civ. P. 10(b).

In Count I of the amended complaint, FICO alleges breach of contract based on TransUnion's failure to pay royalties. Specifically, FICO asserts that since 2011, TransUnion systematically underpaid royalties by underreporting the amount of services it was providing to its customers. For example, FICO alleges that TransUnion reported that its customers were using a total of two types of FICO credit scores in only two databases when it was actually providing 15 types of FICO credit scores in 15 databases.

In Count II of the amended complaint, FICO alleges breach of contract based on TransUnion's unauthorized distribution of FICO Scores. FICO asserts that the agreements restricted how TransUnion was to distribute FICO Scores. For instance, one of the parties' agreements

prohibited TransUnion from using FICO Scores related to a "Triggers" process without prior approval. FICO asserts that TransUnion distributed FICO Scores based on the Triggers process without prior approval nonetheless.

In Count III, FICO alleges TransUnion used FICO's software in ways prohibited by the parties' agreements. In Count IV, FICO alleges that TransUnion was contractually obligated to maintain accurate records but did not do so.

The Court finds that FICO's breach of contract claims satisfy Rule 8. Each breach of contract Count is separated by the specific type of contractual breach. While each Count refers to several different agreements TransUnion allegedly breached, the amended complaint references the specific provisions of the agreements, thereby putting TransUnion on notice of the claims asserted against it. TransUnion cites no legal support for the argument that the contracts themselves need to be attached to the complaint. Although it is axiomatic that TransUnion would be in possession of these contracts, any further information needed will be provided in discovery. TransUnion's motion to dismiss Counts I through IV for failure to satisfy Rule 8 and 10(b) is denied.

Alternatively, TransUnion moves for a more definite statement under Rule 12(e). Rule 12(e) motions are appropriate when a complaint is "so vague or ambiguous that the party cannot reasonably prepare a defense." Fed. R. Civ. P. 12(e). However, Rule 12(e) motions are generally disfavored. *See MacNeil Auto. Prods. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 790 (N.D. Ill. 2010) (stating that Rule 12(e) motions should be granted only when the complaint is so unintelligible that the movant cannot respond and should not be used to get additional information) (Gottschall, J.) (internal citation omitted). That is not the case here. FICO's breach of contract claims are pled sufficiently enough that TransUnion can respond. As such, TransUnion's motion for a more definite statement under Rule 12(e) is denied.

*2. Count V: Breach of Implied Covenant of Good Faith and Fair Dealing*

**\*3** TransUnion argues that Count V should be dismissed because Illinois does not recognize a stand-alone action for breach of implied covenant of good faith and fair dealing. To establish a breach of implied duty of good faith and fair dealing, a party must demonstrate that "the contract vested the opposing party with discretion in performing an obligation under the contract and the

opposing party exercised that discretion in bad faith...." *LaSalle Bank Nat'l Assoc. v. Paramount Properties*, 588 F. Supp. 2d 840, 857 (N.D. Ill. 2008) (St. Eve, J.) (internal citation omitted). Nevertheless, it is settled law in Illinois that a breach of good faith and fair dealing cannot be an independent cause of action. *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 628 (7th Cir. 2002) (citing *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 196 Ill.2d 288, 296, 256 Ill. Dec. 289 (2001)). In arguing that Illinois allows this claim as an independent cause of action, FICO relies on 1998 case that predates *Voyles*. Accordingly, to the extent that FICO's claim of good faith and fair dealing is based on Illinois law, TransUnion's motion to dismiss is granted.

### 3. Count VI: Copyright Infringement

TransUnion challenges FICO's copyright infringement claim, arguing that it is simply a rehash of FICO's breach of contract claim. FICO claims that TransUnion infringed FICO's copyrights by making copies of FICO's Software Modules in ways restricted by their agreements. Dkt. 63 at 38. To bring a copyright claim against a licensee, a party must demonstrate that (1) it owns the copyright and (2) that the licensee's actions exceeded the scope of the license. *See Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 921 (N.D. Ill. 2009) (Lefkow, J.) (internal citation omitted).

The Court find that dismissal of the copyright infringement claim is not appropriate at this stage. The Seventh Circuit has distinguished copyright protection from private contracts stating that while "a copyright is a right against the world," contracts "generally affect only their parties." *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996). TransUnion does not cite, and the Court has not found, any case law that supports the argument that breach of contract somehow preempts a copyright infringement claim, even when both causes of action have overlapping facts. Whether TransUnion's actions amounted to copyright infringement is a factual issue, and therefore, should not be considered at the 12(b)(6) stage. Accordingly, TransUnion's motion to dismiss Count VI is denied.

### 4. Count VII: Conversion of FICO Scores and Software

TransUnion argues that FICO's conversion claim fails as a matter of law because Illinois does not allow conversion

claims based on intangible rights. To establish conversion in Illinois, a plaintiff must demonstrate that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Joe Hand Promotions, Inc. v. Lynch*, 822 F. Supp. 2d 803, 806 (N.D. Ill. 2011) (Holderman, J.) (citing *Cirrincione v. Johnson*, 703 N.E.2d 67, 70, 184 Ill.2d 109, 234, Ill.Dec. 455 (1998)). Furthermore, it is well established that "Illinois courts do not recognize an action for conversion of intangible rights." *Ams. Nat. Ins. Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008) (internal citation omitted).

FICO alleges that TransUnion committed conversion when it distributed FICO Scores and the Software Modules outside the permitted uses of the parties' agreements. Dkt. 63 at 39. In its response to TransUnion's motion to dismiss, FICO argues that "[w]ith ownership comes a right to possess the property." Dkt. 82 at 13. FICO also contends that it states a claim for conversion because its Software Modules are connected to tangible written code. *Id.*

**\*4** Neither party cites, and the Court has not found, any legal support that establishes whether software is connected to tangible written code for the purpose of Illinois conversion law. However, the Court need not determine this issue because FICO's conversion claim fails on separate grounds. FICO does not allege that it had an absolute right to immediate possession of the property to which TransUnion refused to return. In any case, that would be a difficult assertion considering that the agreements provided for TransUnion to use the Software Modules and did not provide for the return at the execution of the parties' agreement. As its claim does not adequately plead conversion, FICO's conversion claim is dismissed without prejudice.

### 5. Count VIII: Unjust Enrichment

TransUnion argues that Count VIII should be dismissed as a matter of law because the parties are subject to a contract. Courts have allowed plaintiffs to plead an alternative claim of unjust enrichment when the claim does not rely on the existence of a contract. *In re: First Farmers Financial Litigation*, No. 14-cv-7581, 2016 WL 5940933 at \*6 (N.D. Ill. Oct. 13, 2016) (St. Eve, J.) (collecting cases). In its claim for unjust enrichment, FICO does not allege that the parties were bound by a

contract. As such, the Court will permit FICO to plead an alternative claim of unjust enrichment. TransUnion's motion to dismiss Count VIII is denied.

*6. Counts IX, X, XI, and XII: False Statements Related to VantageScore*

In Counts IX through XII, FICO challenges several statements made in VantageScore advertisements. VantageScore's website contained statements such as: "Getting a card? Run your credit check before the bank does," and "Buying a car? Kick the tires on your credit before the dealer does." Dkt 63 at 25. The ads would display internet hyperlinks titled "Show Me My Score [and] Report Now" that would give customers VantageScore in-house scores. FICO alleges that these statements mislead reasonable customers to believe that they would be "obtaining the same score [FICO Scores] that their lender would obtain and rely upon in deciding whether to extend them credit." Dkt. 63 at 25.

FICO also contends that the advertisement stating VantageScore 3.0 "generates consumer credit scores that are more predictive, more consistent, and more stable by using industry-leading analytics to parse credit files differently than older, other models do" falsely implies that VantageScore outperforms FICO scores. Dkt. 63 at 33.

FICO alleges that these statements are false and misleading in violation of section 43(A) of The Lanham Act, 15 U.S.C. § 1125, the Illinois Deceptive and Trade Practices Act, 815 ILCS § 510/2(a), California's Unfair Competition Law, and California's False Advertising Law.

*6.1 Issue Preclusion*

TransUnion argues that Counts IX through XII should be partially dismissed under Rule 12(b)(6) based on issue preclusion. Issue preclusion prevents successive litigation of an issue that was "actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Dexia Credit Local v. Rogan*, 629 F.3d 612, 629 (7th Cir. 2010) (internal citation omitted). To establish issue preclusion, a party must demonstrate "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; the

determination of the issue was essential to the judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action." *Id.* (internal citation omitted).

TransUnion points to *Fair Isaac Corp. v. Experian Information Solutions Inc.*, 645 F. Supp. 2d 734, 762-63 (D. Minn. 2009), where the court rejected claims made by FICO that VantageScore was liable for false and misleading statements. TransUnion argues that the central allegation in *Experian* and the instant case is the same.

**\*5** The Court disagrees with TransUnion that issue preclusion applies in this case. Although FICO alleged false and misleading advertisement in the prior case, the difference in context, timing, and language of the advertisement distinguish the issues. As an illustration, the Court in *Experian* considered the following statements:

> "Most lenders would view your creditworthiness as very poor," "Know where you stand no matter which credit bureau your lender checks," "the same type of score that lenders see," and "Most lenders offer their 'good' rates to consumers in this category."

*See Experian Information Solutions Inc.*, 645 F. Supp. 2d at 762. The Court in *Experian* found that these statements did not imply "that an appreciable number of lenders use the in-house scores of VantageScore in making lending decisions." *Id.*

Notwithstanding, TransUnion overlooks critical differences in the statements at issue in the instant case. First, while FICO claimed that the prior statements falsely conveyed that many lenders use VantageScore's in-house scores, FICO now contends that VantageScore's advertisement implies that consumers are actually getting FICO scores, when they select VantageScore's hyperlink. Second, the statements in the prior case included credit score analysis (i.e. "Most lenders offer their 'good' rates to consumers in this category"), while FICO does not make the same claim in the instant case. Moreover, the court in the prior action did not consider the internet display's effect in causing confusion between receiving FICO Scores as opposed to VantageScore in-house credit scores. The Court finds that the issue in the prior action is not the same, thereby precluding any estoppel effect.

*6.2. Product Superiority*

The Court does find that the second set of challenged

statements are puffery. An advertisement that makes exaggerated, grandiose claims about its product or service is considered "puffery" and not statements of fact. *See Martin v. Wendy's International, Inc.*, 183 F. Supp. 3d 925, 935 (N.D. Ill. 2016) (internal citation omitted) (Alonso, J.), *aff'd*, 714 Fed. Appx. 590, 592 (7th Cir. 2018). This Court has recently held that a decision of whether a representation is puffery can be determined as a matter of law. *See Segerdahl Corp. v. American Litho, Inc.*, No. 17-cv-3015, 2019 WL 157924 at *3 (N.D. Ill. Jan. 10, 2019).

VantageScore advertising that model 3.0 "generates consumer credit scores that are more predictive, more consistent, and more stable by using industry-leading analytics to parse credit files differently than older, other models do" are clearly overexaggerated marketing claims about VantageScore's quality of credit scores that buyer's cannot reasonably be expected to rely on. One would expect these types of subjective nonquantifiable statements to be posted on a company's website. That is the very purpose of advertisement. Accordingly, to the extent that FICO's false advertising claims relate to these statements, TransUnion's motion to dismiss is granted.

**CONCLUSION**

For the reasons explained above, TransUnion's motion to dismiss [70] FICO's amended complaint is granted in part and denied in part. FICO's breach of good faith and fair dealing (Count V) and its conversion claim (Count VI) are dismissed without prejudice. To the extent that FICO's false advertisement claims relate to the statement regarding VantageScore 3.0, TransUnion's motion to dismiss is granted. TransUnion's motion to dismiss is denied in all other respects. FICO has 30 days to request leave to file an amended complaint in accordance with this order.

**\*6 IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 1436018

Footnotes

1    FICO states that Triggers is defined as "monitoring the daily changes of a population of consumers for certain credit file attributes or changes and then periodically providing "customers" with scores ... on those Consumers whose attributes or changes match or otherwise meet the Selection Triggering Criteria. Dkt. 63 at 19.

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

C KeyCite citing references available

2018 WL 1726423
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.

MINNESOTA LIFE INSURANCE COMPANY,
Plaintiffs,
v.
Michael A. EISCHEN and AME Financial
Strategies Network, Inc., Defendants.

Case No. 16-cv-11231
|
Signed 04/10/2018

**Attorneys and Law Firms**

John Thomas Wagener, Kenneth D. Peters, Dressler &
Peters, LLC, Chicago, IL, for Plaintiffs.

Adam C. Maxwell, Beau T. Greiman, Greiman, Rome &
Griesmeyer, LLC, Chicago, IL, for Defendants.

**MEMORANDUM AND ORDER**

SHARON JOHNSON COLEMAN, United States District
Judge

**\*1** Plaintiff, Minnesota Life Insurance Company
("MLIC") brings this action against Michael A. Eischen
("Eischen") and AME Financial Strategies Network, Inc.
("AME") based on two separate agreements: the "2009
Contract" between MLIC and Eischen, and the "2013
Contract" between MLIC and AME. MLIC alleges that
Eischen and AME breached their respective contracts or,
alternatively, were both unjustly enriched by their actions.
Defendants now move to dismiss MLIC's entire
Complaint for failure to state a claim pursuant to Federal
Rule of Civil Procedure 12(b)(6). For the foregoing
reasons, defendants' Motion to Dismiss is granted in part
and denied in part.

**Background**
The following facts are taken as true for the purpose of
deciding this motion. MLIC is a Minnesota Corporation
operating in Minnesota. Eischen is an Illinois resident and
AME is an Illinois corporation that operates in Chicago.
Despite the existence of forum selection clauses in both
contracts, MLIC made the informed decision to waive the
agreed upon venues and file this lawsuit in the Northern
District of Illinois. (Dkt. 26). Defendants do not contest
the venue or request arbitration. (Dkt. 25).

The 2009 Broker Sales Contract
On August 15, 2009, MLIC and Eischen entered into a
Broker Sales Contract ("2009 Contract"), under which
MLIC agreed to pay Eischen a commission for each
MLIC life insurance customer he procured. The 2009
Contract contains the following "claw-back" or recapture
provisions:

2.1 COMMISSIONS

(a) Your compensation consists of commissions on
products You sell. We will pay commissions as We
receive premiums in cash, subject to Our established
practices in effect at the time.

\* \* \* \*

(d) *We have the right to refund any premiums paid on a
policy if We believe this is proper where a policy is
rescinded, cancelled, or not accepted, or for any other
reason We believe is proper. You agree to return to Us,
when we ask for it, all earnings which we credited to
You on any premiums which We refund.*

\* \* \* \*

2.3 ADJUSTMENTS

(a) RETURNED PREMIUMS. All compensation paid
to You as provided in Section 2.1 under the applicable
Brokerage Commission Schedule, on any premiums
that are subsequently returned or otherwise not
received by Us shall, upon Our demand, become a debt
You owe to Us, payable according to paragraph 2.3(b)
FIRST CLAIM ON EARNINGS; and

(b) FIRST CLAIM ON EARNINGS. You agree to
promptly repay all debts to Us including reasonable
interest as We determine. We have first claim on all of

Your earnings earned through Us. This means that, as and when elected, We may keep all or any part of Your earnings to reduce any debt You owe Us ...

(Dkt. 1, Ex. A)(emphasis added).

Pursuant to 2.1(d), the 2009 Contract allowed MLIC to recapture any commissions paid to Eischen if MLIC refunded the insurance policy's premiums to an insured in the case of rescission, cancellation, not accepted, or any additional reason that is proper.

The Dowling Policy

On November 10, 2011, Eischen submitted an application to MLIC for an insurance policy on the life of Ronald L. Dowling ("Dowling"), which resulted in the issuance of a life insurance policy to the Ronald R. Dowling Life Insurance Trust II ("Dowling Policy") effective December 10, 2011. On December 1, 2011, the servicing firm acting on behalf of Eischen informed MLIC that certain adjustments were made to the Dowling Policy based on a Life Insurance Policy Illustration prepared by Eischen on September 29, 2011. As a result of this information, MLIC amended and backdated the Dowling Policy to February 2, 2011 in order to "save age." "Saving age" is when a policyholder pays a few months in premium up front in order to set the effective date of a life insurance policy strategically at the "younger age" to lock in a price. The Dowling Policy was then assigned to Enterprise Bank and Trust ("Bank") in order to finance the premiums due. The Dowling Policy was issued and MLIC paid Eischen a commission of $612,215.96 in accordance with the 2009 Contract.

**\*2** On December 1, 2014, Mr. Dowling's premium financing loan became due. At that time, the cash surrender value of the Dowling Policy was $569,406.00 *less* than the amount owed on the loan. As a result of the difference, the life insurance policyholder and Bank decided to surrender the Dowling policy effective January 29, 2015. A "surrender" is when the insurance company pays out the policy's cash value because the policyholder voluntarily terminated the policy before its maturity or the insured event occurred. After the surrender, MLIC paid out the Dowling Policy's proceeds of 2,507,740.04 (minus the $20 administrative fee) to the Bank.

On December 16, 2014, Eischen filed a consumer complaint with the Illinois Department of Insurance ("IDOI"). The complaint stated that changing the effective date from December 10, 2011 to February 2, 2011 in order to "save age" caused irreparable harm to the policy with regards to its accumulation value. IDOI

notified MLIC of the consumer complaint two days later and advised them that the Dowling Policy should not have been issued with a "save age" of more than 6 months. Since the Dowling Policy was backdated by more than 10 months, IDOI found that it was issued in violation of Section 225(b) of the Illinois Insurance Code, 215 ILCS 5/225(b). Accordingly, MLIC took steps to remedy the situation by notifying the Bank and Dowling policyholder of the available remedies, which included rescission. A rescission is an agreement between the policyholder and insurance company to return the parties to status quo as though the contract were never made. It requires a return of all premiums paid. On March 18 and 19, 2015, respectively, the policyholder and Bank decided to rescind the Dowling Policy.

As a result of the rescission, MLIC sent the Bank an additional refund of $463,248.22, which equaled the net return of premiums minus the surrender amount previously paid to the Bank. On March 27, 2015, almost two months after the Dowling Policy was surrendered, MLIC notified Eischen that the policyholder and Bank rescinded the Dowling Policy, which permitted recapture of his commission in accordance with the 2009 Contract. MLIC determined that Eischen owed MLIC $400,135.96 ("Dowling Debt") after factoring in his earning credits and interest.

On April 23, 2015, MLIC sent a letter to Eischen stating that his account was negative and demanding payment in 30 days. Eischen refused to repay the Dowling Debt, which MLIC contends breached the 2009 Contract. MLIC has continued to demand payment from Eischen for the Dowling Debt to no avail.

Nevel Policy

On March 1, 2013, MLIC and AME Financial Strategies Network, Inc. entered into a "Brokerage General Agency Contract" ("2013 Contract"). The agreement permitted MLIC to appoint AME as a brokerage general agent and in return AME committed to procure applications for life insurance products offered by MLIC. (Dkt. 2, Ex. B). Eischen was the president of AME and signed the 2013 Contract in the officer section. The 2013 Contract contained compensation, recapture, and adjustment provisions that were substantially similar to the 2009 Contract, except the designated brokerage general agent was AME. (Dkt. 1, Ex. A and B). The same day Eischen executed an "Irrevocable Assignment of Commissions on Fixed Products" ("Assignment"), which permitted Eischen to assign any or all of the first year and renewal commissions due or to become due to him "under the

terms and provisions of Assignor's Broker Sales Contract with Minnesota Life dated March 1, 2013" to AME. (Dkt. 1, Ex. C).

On March 8, 2013, AME and Eischen applied for life insurance on behalf of Ira T. Nevel ("Nevel") that resulted in a policy to the Ira T. Nevel Irrevocable Insurance Trust ("Nevel Policy"). The Nevel Policy included a "Surrender Value Enhancement Agreement" ("SVEA") that was in effect until August 22, 2016. (Dkt. 1, Ex. D). Defendants agreed that a surrender of the Nevel Policy while the SVEA was in place would result in a compensation recapture in the following payment scheme:

**\*3** 100% of compensation paid in the last 12 months prior to surrender;

90% of compensation paid in the last 12-24 month period prior to surrender;

80% of compensation paid in the last 25-36 month prior to surrender.

(Dkt 1, Ex. D).

On August 19, 2016, the Nevel Policy holder of the Nevel Policy elected to surrender the Nevel Policy in return for the proceeds of $4,943,532.90 (minus $20 administration fee). As a result of the surrender, MLIC attempted to recapture $548,458.25 ("Nevel Debt") of the commission given to AME. On November 1, 2016, MLIC sent Eischen a letter demanding repayment within fourteen days. Defendants refused and MLIC continued demand recapture of the commission to AME for the Nevel Policy to no avail.

**Legal Standard**

A motion to dismiss pursuant to rule 12(b)(6) challenges the legal sufficiency of the complaint, not its merits. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569, 127 S.Ct. 1955, 167 L.Ed. 2d 929 (2007). When ruling on a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in a plaintiff's favor. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012). To survive the dismissal, the complaint must provide defendants with fair notice of the claim's basis and must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009). Contracts included as attachments to and referenced in the pleadings can be adopted as part of the pleadings and

considered in the Court's decision. *188 LLC v. Trinity Indus. Inc.*, 300 F.3d 730, 735 (7th Cir. 2002); *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998); Fed. R. Civ. P. 10(c).

**Discussion**

As an initial matter, despite the presence of a "choice-of-law" provision requiring the application of Minnesota law neither party asserted this right, and both parties applied Illinois law in their filings on this issue. The Court finds that the choice-of-law has been waived and accordingly, applies the law of the present forum. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014)(citing *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) )("When no party raises the choice of law issue, the federal court may simply apply the forum state's substantive law.").

*Count I—Breach of the 2009 Contract*

Eischen argues that the claim for breach of the 2009 Contract fails because rescinding the Dowling Policy after it was surrendered was a legal impossibility. He asserts that the policyholder's decision to first surrender the policy terminated the contract and thereafter foreclosed any opportunity for further action on it. Thus, MLIC could not recapture Eischen's commission. In response, MLIC contends that the noncompliant provision of the policy rendered the contract *void ab initio*, rendering rescission the only means of making the policyholder whole. So, MLIC claims that Eischen must return his commission because the 2009 Contract permits recapture of commissions in the event of rescission.

The Illinois Insurance Code ("Code") prohibits the inclusion of certain types of provisions in life insurance policies. Despite such noncompliance, an insurance policy that includes prohibited provisions, "shall be held valid, but shall be construed in accordance with the requirements of the section that the said policy ... violates." 215 ILCS 5/442; *Hubner v. Grinnell Mut. Reinsurance Co.*, 4 F.Supp.2d 803, 807 (C.D. Ill. 1998). Section 225(b) of the Code prohibits the inclusion of any "provision by which the policy purports to be issued or take effect more than 6 months before the original application for the insurance was made." 215 ILCS 5/225(b).

**\*4** In the instant case, MLIC alleges that the Illinois Department of Insurance ("IDOI") determined that the Dowling Policy was issued out of compliance with the Code because the "save age" provision of more than six months violated Section 225(b) of the Code. Even in the case where policies are issued out of compliance with the law, Section 442 is read to invalidate the non-compliant provision, not the entire contract. *Ellis v. Sentry Ins. Co.*, 124 Ill. App. 3d 1068, 1073, 465 N.E.2d 565, 569, 80 Ill.Dec. 453 (1984); *Harris v. St. Paul Fire & Marine Ins. Co.*, 248 Ill.App.3d 52, 57, 618 N.E.2d 330, 333, 187 Ill.Dec. 739 (Ill. App. Ct. 1993). Accordingly, in light of Section 442, the Court should construe the Dowling Policy as valid and in effect despite the noncompliant provision, not *void ab initio* as MLIC contends.

By surrendering the policy on January 29, 2015 and acquiring its proceeds, the Dowling Policy was effectively terminated, and the policyholder no longer had the right to exercise options related to it. *See Boyd v. Aetna Life Ins. Co.*, 310 Ill.App. 547, 35 N.E.2d 99, 100 (1941)(finding that by electing to surrender the policy and receive the cash value of the policy, the holder waived any further rights under the insurance policy); *Gen. Acci. Fire & Life Assurance Corp. v. Browne*, 217 F.2d 418, 424 (7th Cir. 1954); *see also TIG Ins. Co. v. Freeland* (In re Consol. Indus. Corp.), 330 B.R. 709, 711 (Bankr. N.D. Ind. 2004)(citing Couch on Insurance 3d, § 31:49)("cancellation of an insurance policy terminates the contract, and the parties are relieved from any liability that might otherwise accrue under the policy, though not from liability already accrued.").

The Complaint alleges that the Dowling Policy was surrendered as of January 29, 2015, which would have made the subsequent rescission and attempt at recapturing the commission two months after impermissible. Further, the surrender option involves the payout of a policy's proceeds and not the premiums, so the commission for the surrendered Dowling policy was not subject to the recapture provision. Since MLIC fails to allege a factual basis under which Eischen was required to pay back his commission pursuant to the 2009 Contract, the Court dismisses Count I.

*Counts II and IV—Unjust enrichment*
Eischen and AME move to dismiss Counts II and IV, arguing that unjust enrichment is an improper remedy where contracts exist and govern the relationship between the parties. MLIC alleges that Eishen and AME are being unjustly enriched because refusing to return the

commission violated the terms of the contracts between the parties.

Unjust enrichment occurs when a defendant retains benefits to a plaintiff's detriment, and retention of that benefit violates the principles of justice, equity, and good conscience. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). "Illinois law [however,] does not permit a party to recover on a theory of quasi-contract[, like unjust enrichment,] when an actual contract governs the parties' relations on that issue." *Keck Garrett & Assocs., Inc. v. Nextel*, 517 F.3d 476, 487 (7th Cir. 2008)(citing *Illinois ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 607 N.E.2d 165, 177, 180 Ill.Dec. 271 (Ill. 1992) ).

Here, unjust enrichment is unavailable as a remedy because there are contracts that govern the relationship between the parties and the terms for recapturing commissions. Further, a "[p]laintiff's unjust enrichment claim must not include allegations of a specific contract governing the parties relationship," and both Counts II and IV do. *Canadian Pac. Ry. Co. v. Williams-Hayward Protective Coatings, Inc.*, No. 02 C 8800, 2003 WL 1907943, at \*5, 2003 U.S. Dist. LEXIS 6518 at \*14 (N.D. Ill. Apr. 16, 2003)(St. Eve, J.). This Court finds that unjust enrichment is not viable as an alternative basis for recovery here, so Counts II and IV of the Complaint are dismissed.

*Count III—Breach of the 2013 Contract*
**\*5** AME moves to dismiss Count III of MLIC's Complaint because it fails to allege performance of its obligations under the contract—a necessary element of a breach claim. MLIC contends that all the elements can be implied by the facts alleged in the Complaint.

To state a claim for breach of contract claim in Illinois, MLIC must allege: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012)(citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). Courts have found that elements of claims not explicitly stated can be surmised from the facts in the complaint so long as

the facts alleged go beyond stating a "sheer possibility" that is consistent with a defendant's liability. *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *see e.g. Hi-Lite Prods. Co. v. Am. Home Prods. Corp.*, 11 F.3d 1402, 1410 (7th Cir. 1993)(finding that the Complaint alleged sufficient facts to reasonably infer that a party caused third-party breaches even though plaintiff failed to allege the whether the third parties terminated their contracts).

Here, the Court finds that the Complaint against AME alleges sufficient facts to state a plausible breach-of-contract claim. First, MLIC provides that the terms of the 2013 Contract require that MLIC pay AME a commission when AME procures insurance clients on MLIC's behalf. (Dkt. 1, ¶ 28). The Complaint also alleges that AME applied for and secured the Nevel Policy on behalf of MLIC. (Dkt. 1, ¶ 29). Finally, Count III specifically requests recovery of the portion of the compensation that defendants earned on the Nevel Policy. (Dkt. 1, ¶ 53). Defendants do not contest whether or not MLIC actually paid them the commission. Defendants merely argue the technicality that MLIC did not expressly state that it gave defendants compensation for the Nevel Policy in the Complaint. Reading the explicitly alleged facts in a light most favorable to the MLIC, the Court finds that there is a sufficient basis to draw the reasonable inference that MLIC compensation was given to defendants for securing the Nevel Policy. Consequently, this Court finds the factual allegations in the Complaint state a claim that AME breached the 2013 Contract, and defendants' Motion as to Count III against AME is denied.

Eischen also moves to dismiss Count III because he claims he is not a party to the 2013 Contract that was allegedly breached. MLIC's only support for Eischen's personal liability is that he signed the 2013 Contract. Under Illinois law, an agent acting on behalf of a corporation when executing a contract cannot be personally liable for the contract unless there is some evidence demonstrating contrary intent. *Zahl v. Krupa*,

399 Ill. App. 3d 993, 1012, 927 N.E.2d 262, 278, 339 Ill.Dec. 721 (2010); *Sullivan v. Cox*, 78 F.3d 322, 326 (7th Cir. 1996).

Here, Eischen signed the contract in the section designated for the company's "officer," which demonstrates that he intended to act as a proxy and not assume personal liability for the agreement. *See Sullivan*, 78 F.3d at 326 ("When an officer signs a document and indicates next to his signature his corporate affiliation, then absent evidence of contrary intent in the document, the officer is not personally bound."). MLIC does not allege any additional facts to demonstrate that Eischen had a contrary intent or that there was another basis for individual liability. *Thornbrook Int'l v. Rivercross Found.*, No. 03 C 1113, 2004 WL 1497762, at *9, 2004 U.S. Dist. LEXIS 12431 at *27 (N.D. Ill. July 6, 2004)(Kennelly, J.). As the law is clear that an officer's signature in their representative capacity alone is not sufficient to connect Eischen to the agreement, this Court finds that MLIC fails to state a claim of breach of contract against Eischen and Count III is dismissed against him without prejudice.

**Conclusion**

**\*6** Based on the foregoing, defendants' Motion to Dismiss Counts I, II, and IV of MLIC's Complaint is granted with prejudice. Defendants' Motion to Dismiss Count III is granted as to Eischen without prejudice and denied as to AME.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1726423

C KeyCite citing references available

2014 WL 1568702
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Royal Adhesives and Sealants, LLC, Plaintiff,
v.
Advanced Manufacturing Technologies, Inc., and
John Affourtit, Defendants.

No. 13 C 1695
|
Signed April 17, 2014

**Attorneys and Law Firms**

Martin D. Snyder, Law Offices of Martin Snyder, P.C.,
Chicago, IL, for Plaintiff.

Advanced Manufacturing Technologies, Inc., Lake
Forest, IL, pro se.

John Affourtit, Lake Forest, IL, pro se.

Jeremy S. Unruh, Rodney L. Lewis, Polsinelli Shughart
PC, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Thomas M. Durkin, United States District Judge

**\*1** Royal Adhesives and Sealants, LLC ("Royal"), alleges
that Advanced Manufacturing Technologies, Inc.
("AMT"), and AMT's sole-shareholder, John Affourtit
(AMT and Affourtit collectively, "Defendants"),
fraudulently sold Royal a piece of equipment known as an
E–Beam, in violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*
(Count I), and Illinois common law, including claims of
fraud (Count II), promissory estoppel (Count III), and
money had and received (Count IV). *See* R. 1. Royal also
labels its allegations that Affourtit should be held liable

for the actions of AMT as "Count V" of its complaint. *See
id.* Defendants have moved to dismiss all counts for
failure to state a claim pursuant to Federal Rule of Civil
Procedure 12(b)(6). R. 23. For the following reasons,
Defendants' motion is granted.

**Background**

In October 2012, Royal entered into discussions with
Affourtit to purchase an E–Beam. R. 1 ¶ 6.[1] AMT sent
Royal a document labeled "quotation," which offered a
"COMET ADTS 70/180 KV E–Beam Laboratory Test
System," for $165,000, paid in installments of "25% with
Purchase Order, 70% with shipment confirmation, 5%
after start up & acceptance-net 30 days." R. 1–1. The
quotation document also describes Affourtit as a
"salesperson." *Id.* Royal alleges that Affourtit was the
sole-shareholder of AMT, and that he falsely told Royal
that he had earned a PhD, was an expert in E–Beam
technology, and was an authorized representative of the
COMET Group. R. 1 ¶¶ 9–10. Based on the quotation
document and Affourtit's representations, Royal decided
to purchase the "COMET ADTS 70/180 KV E–Beam
Laboratory Test System." *Id.* ¶ 11.

On November 5, 2012, AMT sent Royal an invoice for a
"COMET ADTS 70/180 KV E–Beam Laboratory Test
System," requiring payment of $41,240, i.e., the first
installment of 25% of the $165,000 purchase price. R.
1–2. Royal paid this amount to AMT on or about
November 15, 2012. R. 1 ¶ 14.

On January 21, 2013, AMT sent Royal another invoice
requiring payment of $117,277, i.e., the second
installment of 70% of the purchase price plus $1,777.37
in shipping costs. R. 1–3. Unlike the quotation document
and the November 5 invoice, the January 21 invoice
described the equipment as an "E–Beam 70/180 KV
E–Beam Laboratory Test System," as opposed to a
"COMET ADTS 70/180 KV E–Beam Laboratory Test
System." *Id.* Royal paid this amount to AMT on or about
January 24, 2013. R. 1 ¶ 17.

Royal alleges that on or about February 14, 2013,
Defendants delivered a piece of equipment that was not a
"COMET ADTS 70/180 KV E–Beam Laboratory Test
System." *Id.* ¶ 18. The equipment Royal received was not
manufactured by the COMET Group and was "missing
critical components making the equipment useless to

Royal." *Id.*

**\*2** Royal notified AMT and Affourtit that the wrong piece of equipment had been delivered, and requested immediate delivery of the "COMET ADTS 70/180 KV E-Beam Laboratory Test System" or refund of Royal's money. *Id.* ¶ 20. Defendants did not comply with Royal's request. *Id.* ¶ 21.

### Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Mann v. Vogel,* 707 F.3d 872, 877 (7th Cir.2013) (quoting *Iqbal,* 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann,* 707 F.3d at 877.

### Analysis

### I. Count V—Affourtit's Liability

Royal alleges that Affourtit is personally liable for the four substantive counts of its complaint, and Royal reiterates this allegation in "Count V" in which it asks the Court to "pierc[e] the corporate veil." *See* R. 1. Defendants argue that the complaint "fails completely in making any substantive factual allegations against John Affourtit in his individual capacity," R. 24 at 4, and that Royal "pleads only ... conclusory statements in support of its piercing the corporate veil count." *Id.* at 6.

Under Illinois law, "a corporation as a legal entity exists separately from its shareholders, directors, and officers, who are not ordinarily liable for the corporation's liabilities." *Forsythe v. Clark USA, Inc.,* 836 N.E.2d 850, 854 (Ill.App.Ct. 1st Dist.2005), *aff'd* 864 N.E.2d 227 (Ill.2007). However, a party may "pierce the corporate veil" and assert a claim against an individual "when an 'individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business.' " *Laborers' Pension Fund v. Lay–Corn, Inc.,* 580 F.3d 602, 610 (7th Cir.2009) (quoting *Fontana v. TLD Builders, Inc.,* 840 N.E.2d 767, 775 (Ill.2005)). Thus, in an action to pierce a corporate veil under Illinois law, a plaintiff must allege that "(1) there [is a] unity of interest and ownership [such] that the separate personalities of the corporation and the individual no longer exist; and (2) ... adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Wachovia Sec., LLC v. Banco Panamericano, Inc.,* 674 F.3d 743, 751–52 (7th Cir.2012) (internal quotation marks omitted).

**\*3** Royal makes the following allegations relevant to Affourtit's liability: (1) "the accounts of AMT and Affourtit are commingled to the extent that there is no legal separation between the two," R. 1 ¶ 46; (2) "AMT was undercapitalized to the extent that it was not a viable legal entity separate from that of its shareholder, Affourtit, *id.* ¶ 47; and (3) "AMT is the alter ego of Affourtit and any liability of AMT is also attributable to Affourtit," *id.* ¶ 48. The only actual fact that Royal alleges in support of its theory of Affourtit's liability is that Affourtit was AMT's sole shareholder. That fact alone, however, is an insufficient basis to state a claim based on piercing the corporate veil. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec,* 529 F.3d 371, 381 (7th Cir.2008) ("[T]he fact that a corporation has only one single shareholder is not proof that the corporation is the 'alter ego' of that shareholder.") (internal quotation marks omitted); *Melko v. Dionisio,* 580 N.E.2d 586, 595 (Ill.App.Ct.2d Dist.1991) ("[T]he mere allegation that [defendant] was a dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate existence.").

The remaining portions of Royal's complaint relevant to

Affourtit's liability consist of bare-bones, conclusory allegations that AMT was undercapitalized and that the accounts of Affourtit and AMT were commingled. Allegations so devoid of factual content do not " 'allow[ ] the court to draw the reasonable inference that [Affourtit] is liable for the misconduct alleged.' " *Mann,* 707 F.3d at 877 (quoting *Iqbal,* 556 U.S. at 678). Royal must explain the factual basis supporting its claim to relief, and may not simply conclude that it is so entitled, as it does in its current complaint. Because Royal has failed to plausibly allege that Affourtit is liable here, Royal's allegations against Affourtit are dismissed.

In its brief in opposition to the motion, Royal makes additional factual allegations based on documents attached to the brief. The Court does not consider those allegations and documents on this Rule 12(b)(6) motion because they are "outside the pleadings" and are not "documents to which the Complaint had referred." *See Hecker v. Deere & Co.,* 556 F.3d 575, 582 (7th Cir.2009). Yet, these allegations are the type that could make Royal's claims against Affourtit plausible and "allow the Court to draw the reasonable inference that Affourtit is liable for the misconduct alleged." *Mann,* 707 F.3d at 877. Royal cites withdrawals shown on AMT's bank statements that appear to be personal in nature (i.e., Starbucks, CVS, the Apple Store, a barber shop, Home Depot, a personal home mortgage lender), as well as large payments to Affourtit, and argues that AMT and Affourtit's funds were commingled. *See* R. 27 at 6–7; R. 27–3. These are the type of factual allegations that can sufficiently support a claim for individual liability based on piercing the corporate veil. *See Auto. Fin. Corp. v. Joliet Motors, Inc.,* 761 F.Supp.2d 789, 793–94 (N.D.Ill.2011); *Beacon Textile Unit–2 v. JK Group, Ltd.,* 2010 WL 4338477, at *7, (N.D.Ill. Oct. 25, 2010); *Dimmitt & Owens Fin., Inc. v. Superior Sports Prods., Inc.,* 196 F.Supp.2d 731, 741 (N.D.Ill. Apr. 23, 2002).[2] Thus, the Court grants Royal leave to replead its claims against Affourtit.

## II. Count I: Illinois Consumer Fraud and Deceptive Business Practices Act

**\*4** Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act"), 815 ILCS 505/1, *et seq.*, " 'protect[s] consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices.' " *Siegel v. Shell Oil Co.,* 612 F.3d 932, 934 (7th Cir.2010) (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 960 (Ill.2002)). The statute,

however, is " 'not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy.' " *Greenberger v. GEICO Gen. Ins. Co.,* 631 F.3d 392, 399 (7th Cir.2011) (quoting *Zankle v. Queen Anne Landscaping,* 724 N.E.2d 988, 992–93 (Ill.2000)). "A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 844 (Ill.2005).

AMT contends that this dispute lies in contract rather than tort, as Royal alleges, and that Royal's claim under the Illinois Consumer Fraud Act must be dismissed for that reason. *See* R. 24 at 10–11; R. 37 at 9. Royal does not directly respond to this contention. Royal's lack of a substantive response is likely because Royal's allegations clearly show that its claim is for breach of contract. Royal alleges that AMT offered Royal an E–Beam manufactured by COMET for $165,000, *see* R. 1–1, and that Royal accepted that offer by paying AMT 95% of that price to secure delivery as required by AMT's invoices. *See* R. 1–2; R. 1–3; R. 1 ¶¶ 14, 17. "In Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract," *see Melena v. Anheuser–Busch, Inc.,* 847 N.E.2d 99, 109 (Ill.2006), and that is what we have here. Because a contract exists between Royal and AMT, Royal cannot state a claim under the Illinois Consumer Fraud Act, and Count I is dismissed. The Court, however, does grant Royal leave to replead a breach of contract claim.[3]

## III. Count II: Common Law Fraud

Just as with the Illinois Consumer Fraud Act, under Illinois law, a breach of a contractual promise, i.e., a false promise of future conduct, "without more" does not constitute fraud. *See Shaw v. Hyatt Int'l Corp.,* 461 F.3d 899, 901 (7th Cir. 2006); *Firstar Bank, N.A. v. Faul,* 2001 WL 1636430, at *4 (N.D.Ill.Dec. 20, 2001). The Court has already found that Royal's allegations amount to a claim for breach of contract. Thus, Royal fails to state a claim for fraud and Count II is dismissed.

In addition to AMT's failure to deliver the E–Beam Royal bargained for, Royal alleges that AMT "knowingly made false statements of material fact ... about the availability, payment terms, and delivery of the [E–Beam]." R. 1 ¶ 32. In other words, Royal alleges that AMT never had any intention to deliver a new E–Beam manufactured by COMET. Royal does not allege any facts to support this allegation, let alone facts sufficient to satisfy the heightened pleading standard of Federal Rule of Civil

Procedure 9(b) that is applicable to fraud claims. Nevertheless, even if Royal had sufficiently alleged AMT's intent to deliver the wrong E–Beam, Royal and AMT are bound by the terms of their agreement. It is a claim for breach of that agreement, and not for fraud, that Royal appears to have.

**\*5** In support of its fraud claim, Royal also alleges that Affourtit misrepresented that he had earned a PhD, was an authorized representative of the COMET Group, and was an expert in E–Beam technology. In light of the Court's holding that a contract existed between Royal and AMT, these allegations can only be relevant to a claim for fraudulent inducement. In the event that Royal chooses to replead and include a claim for fraudulent inducement, the Court notes that Affourtit's misrepresentations as Royal has alleged them are not sufficiently material to support a claim for fraudulent inducement. Royal was purchasing an E–Beam, not Affourtit's expertise. Although Royal alleges that it relied on Affourtit's misrepresentations, Royal does not explain why Affourtit's misrepresentations were necessary for Royal to feel comfortable purchasing the E–Beam from AMT. The real gravamen here is that AMT promised Royal a new E–Beam manufactured by COMET, and it delivered something else. Royal does not allege that only an expert could know whether an E–Beam was new and manufactured by COMET. Without such additional factual allegations, Royal's allegations of Affourtit's misrepresentations cannot state a claim for fraudulent inducement.

**Count III and IV: Promissory Estoppel and Money Had and Received**

Under Illinois law, a "plaintiff may not pursue a quasi-contractual claim where there is an enforceable, express contract between the parties." *Cromeens, Holloman, Sibert, Inc v. AB Volvo,* 349 F.3d 376, 397 (7th Cir.2003). Thus, neither the quasi-contractual claims for promissory estoppel, *see Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.,* 601 N.E.2d 956, 964 (Ill.1992), or money had, *see In re Factor VIII or IX Concentrate Blood Prods. Litig.,* 2002 WL 1553318, at \*1 (N.D.Ill. July 11, 2002), are available if a contract exists between the parties. Since the Court holds that a contract exists between Royal and AMT, Royal's claims for promissory estoppel and money had, Claims III and IV, are dismissed.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss, R. 23, is granted, and Royal's claims are dismissed without prejudice. Royal has up to and including May 19, 2014, to replead its claims if it can address the deficiencies the Court has identified in this Opinion and Order. If Royal fails to do so, this dismissal will become with prejudice.[4]

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 1568702

Footnotes

1    Royal does not explain what an "E–Beam" is in the complaint or its briefs. Defendants explain that "[a]n E–beam system is a piece of equipment that uses an electron beam for such applications as sterilizing food packaging or medical equipment; or curing ink or adhesives and so forth." R. 24 at 1 n.1. A detailed understanding of E–Beam technology and its applications is not necessary to address this motion.

2    In its brief on this motion, Royal also alleges that AMT was dissolved for failure to file certain corporate documents, *see* R. 27 at 5–6, and that AMT was undercapitalized because Affourtit admitted that AMT is out of business and has no assets. R. 27 at 7–8. Royal cites no evidence that AMT failed to file certain corporate documents or that AMT was dissolved on this basis. In support of its allegation that AMT was undercapitalized, Royal cites a document handwritten by Affourtit in which he writes, "*AMT* closed accounts, closed company—no cash no assets." R. 27–4 at 2. This document does not appear to support Royal's allegation because Affourtit's statement appears to refer to AMT's current status not its capitalization while it was still in business. *See id.* In any event, the Court does not need to address these allegations in detail as they are also "outside the pleadings," *Hecker,* 556 F.3d at 582, and are not necessary to the Court's ruling on this motion.

3    That Royal has not alleged a breach of contract claim is of no moment. *See Shaw v. Hyatt Int'l Corp.,* 461 F.3d 899 (7th Cir.2006) (affirming the district court's finding that the plaintiff's claim was one for breach of contract and dismissing plaintiff's claim under the Illinois Consumer Fraud Act despite the plaintiff's failure to allege a breach of contract claim).

4        Defendants have also moved to strike a letter Royal attached to its brief from a person opining as to the value of the equipment that AMT delivered to Royal. R. 35. Royal argues that it only included this letter with its brief because AMT included an affidavit from Affourtit describing the functionality and value of the equipment at issue. R. 24–1. Neither of these submissions is necessary for the Court to render its decision, thus, Defendants' motion to strike, R. 35, is denied as moot.

**End of Document**                                               © 2019 Thomson Reuters. No claim to original U.S. Government Works.