## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ALICIA M. PAGE, CARMEL COOPER, and CINDY MUNIZ, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLIANT CREDIT UNION, and DOES 1-100,<br><br>Defendants. | Case No.: 1:19-cv-05965<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Alicia M. Page, by her attorneys, brings this class action against Alliant Credit Union and DOES 1 through 100 (collectively "ACU" or "Defendant") through her First Amended Class Action Complaint and Demand for Jury Trial.

## NATURE OF THE ACTION

1. All allegations herein are based on information and belief except those allegations which pertain to Plaintiff or her counsel. Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2. This is a class action brought by Plaintiff to assert claims in her own right, and in her capacities as class representatives of all other persons similarly situated. ACU

wrongfully charged Plaintiff and the Class members overdraft and non-sufficient funds (NSF) fees.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to ACU's policy and practice of assessing overdraft and/or NSF fees on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment, and for charging repeat NSF fees on the *same* electronic item. The charging for such NSF fees and overdraft fees violates the Illinois Consumer Fraud and Deceptive Business Practices Act.  It also breaches ACU's contracts with its members, who include Plaintiff and the members of the Class.

4.     Defendant in this litigation attempts to argue there are only two types of "balances" in its accounts with class members, those being "Balance", and what Defendant would like to characterize as "everything else besides 'Balance'", which it deceptively calls in this litigation "available balance."  This is a deceptive and fraudulent argument.  In reality, notwithstanding Defendant's attempted fiction about their being only two types of balances, there are actually three types of balances in an ACU account, as follows:

    a.     The "Balance"

    b.     The "Collected Available Balance" and,

    c.     The "Artificial Available Balance."

5.     The "Balance" is all of the money in the account, without deductions for holds on pending deposits or on pending debit card transactions which have been authorized but not yet posted. It is the official balance of the account. It is the balance provided to the member in monthly statements, which are the official record of activity in the account. It is the balance used to determine interest on deposits and any minimum balance requirements. Further, based on information and belief, ACU uses this "Balance" to report its deposits to regulators, shareholders, and the public. The "Balance" is provided to regulators in call reports and reserve

reports. The "Balance" is used in financial reports to shareholders and for internal financial reporting. Credit reporting agencies use the "Balance" in providing credit ratings of ACU.

6.    The "Collected Available Balance" is the "Balance" less holds placed on certain deposits pursuant to the financial institution's "Funds Availability Policy" ("FAP"). Regulation CC, 12 C.F.R. part 229, establishes maximum permissible hold periods for checks and other deposits and all financial institutions are required by it to have an FAP.  It has nothing to do with holds placed on pending debit card transactions.

7.    The "Artificial Available Balance" as programmed by ACU to be used in its software for imposing overdraft and NSF fees and all of its members, and which it would like to try to call "available balance" in this litigation to try to pretend there are only two balances rather than three balances in its members'' accounts, is a completely different calculation from the "Collected Available Balance."  The "Artificial Available Balance" takes the "Collected Available Balance" and then further deducts from it pending debit card transactions which have not yet posted, meaning the money is still in the account of the credit union member. ACU does this so that it may increase the number of NSF and overdraft fees it charges its members. There is no requirement to use the "Artificial Available Balance", and ACU had no authority or disclosure or statement in any of its contracts or documents during the relevant class period that it would use the "Artificial Available Balance" for purposes of assessing overdraft or NSF fees. Only after the class period ended did ACU amend its contracts to allow it to charge Overdraft Fees or NSF Fees of its members based on the "Artificial Available Balance" rather than on the "Balance" or arguably on the "Collected Available Balance."  ACU breached its contracts with Plaintiff and Class members by using the "Artificial Available Balance" to calculate the Overdraft and NSF fees that it charged.

## PARTIES

8.    Plaintiff Alicia M. Page is a resident of Hoboken, New Jersey, was a member of and had a checking account with ACU at all times relevant to the class action allegations.

9. Based on information and belief, Defendant ACU is and has been an Illinois state-chartered credit union with branch offices located throughout the country, including in Illinois.

10. Without limitation, Defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of ACU and, upon information and belief, also own and/or operate ACU branch locations. As used herein, where appropriate, the term "ACU" is also inclusive of Defendants DOES 1 through 100.

11. Plaintiff is unaware of the true names of Defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

12. There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named Defendants (including DOES) such that any corporate individuality and separateness between the named Defendants has ceased, and that the named Defendants are alter egos in that the named Defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

13. At all material times herein, each Defendant was the agent, servant, co-conspirator and/or employer of each of the remaining Defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and ratified and approved the acts of the other Defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

14. Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

15.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

16.     This Court has jurisdiction over this case, *inter alia*,  under 28 U.S.C. § 1331 and 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendants, *inter alai*, under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure because they would be subject to the jurisdiction of a court of general jurisdiction in Illinois. Furthermore, Defendant is headquartered in Chicago, Illinois.

18.     Venue is proper in this District, *inter alia*, pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## FACTUAL ALLEGATIONS

19.     ACU is one of the largest credit unions in the country, with over $11 billion in assets nationwide. ACU offers its consumer banking customers a checking account. One of the features of an ACU checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services. In addition to receiving a debit card, other features of an ACU checking account include: the ability to write checks; withdraw

money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

20.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), ACU assesses NSF fees to member accounts when it purports to determine that a member's account has been overdrawn.

21.     Overdraft and NSF fees constitute the primary fee generators for banks and credit unions. In 2009 alone, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions. While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks. For credit unions such as ACU, overdraft fees are a major source of revenue. According to a 2010 report by Georgetown University Law Professor Adam Levitin, overdraft fees comprise 6% to 7% of the gross revenue of credit unions. Filene Research Institute Report, *Overdraft Regulation A Silver Lining In The Clouds?* (Filene Research Institute 2010).

22.     The high cost of an overdraft fee is usually unfairly punitive. In a 2012 study, more than 90 percent of customers who were assessed overdraft fees overdrew their account by mistake. Pew Charitable Trust Report, p.4 (May 2012). More than 60 percent of the transactions that resulted in a large overdraft fee were for less than $50. Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014). More than 50 percent of those who were assessed overdraft fees do not recall opting into an overdraft program, *id*. at p. 5, and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee, *id*. at p.10.

23.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among

those who were more likely to be assessed overdraft fees. *Id*. at p.1. A 25-year-old is 133 percent more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. at p.3. More than 50 percent of the customers assessed overdraft fees earned under $40,000 per year. *Id*. at p.4. Non-whites are 83 percent more likely to pay an overdraft fee than whites. *Id*. at p.3.

24.　　With regard to ACU, as a result of charging overdraft and NSF fees when none were due, members of ACU's upper executive management, on information and belief, have compensated themselves millions of dollars in personal salary. For example, according to ACU's Form 990, <u>for an average forty hour workweek</u>, ACU CEO David Mooney in 2016 alone was compensated $1,863,652; CFO Harry Zhu, $466,355; Senior Vice President Philip Salis, $558,579; Senior Vice President Timothy Wartman, $546,165; Senior Vice President Jason Osterhage $475,327; Senior Vice President Lee Shafer, $528,310; and Senior Vice President George Rudolph, $496,658. (*See* **Exhibit A**, Alliant Credit Union Form 990 for Fiscal Year Ending December 2016, pp.7-8.)　And in 2017, again, <u>for an average forty hour workweek,</u> they all gave themselves raises, which on information and belief, substantially were possible due to the overdraft and NSF fees they deceptively took from class members: according to ACU's Form 990, ACU CEO David Mooney in 2016 alone was compensated $1,696,688; CFO Harry Zhu, $550,355; Senior Vice President Philip Salis, $591,719; Senior Vice President Timothy Wartman, $5603,997; Senior Vice President Jason Osterhage $550,016; Senior Vice President Lee Shafer, $593,342; and Senior Vice President George Rudolph, $550,701. (*See* **Exhibit B**, Alliant Credit Union Form 990 for Fiscal Year Ending December 2018, pp.7-8.)　The only female executive on the list, Meredith Richie, VP and General Counsel, for some reason was paid substantially less, $301,398. than these male executives, despite working the same 40 hours per week. (*Id*.)

27.　　Plaintiff and the Class members entered a contract, titled "Account Agreement and Disclosures," and referred to herein as the "Account Contract" when they opened their

accounts. (**Exhibit C**, Account Contract dated November 2013; **Exhibit D**, Account Contract dated November 2017; collectively referred to as "Account Agreement" or "Account Agreements" or "Account Contract" or "Account Contracts".) The Account Contracts contained a promise that ACU will not charge an overdraft or NSF fee for any type of transaction where there is enough money in the account to pay for the transaction. It stated in the section titled "Overdraft Protection Plan," that "If an item is presented for payment and there are not sufficient funds in your account to pay it…." It did not state, "If an item is presented for payment and there are not sufficient funds in your account to pay it *after deducting holds we have placed on deposits and after also deducting holds we have placed on pending debit card transactions….*" Thus, under the best interpretation of the Account Contracts, a fee should only be imposed when there are "not sufficient funds" in the account; *i.e.*, when the account as a whole contains less money than has been called for. Nowhere in the Account Contracts was there any indication or statement whatsoever that in determining when an overdraft or NSF fee is imposed that ACU will place holds on pending debit card transactions or deposits for purposes of imposing a fee, or that these funds will not be counted in determining when a fee is imposed. That is one of the practices this case confronts. The Account Contracts, at most, states in a separate section pertaining to deposits rather than to overdraft or NSF fees, that temporary holds might be placed on certain deposited items before they can be withdrawn (the "Collected Available Balance") but this section does not state that such holds will be considered in determining when overdraft or NSF fees occur, and indeed nowhere is it stated in the Account Contracts in existence during the class period that overdraft or NSF fees can result from holds placed on funds earmarked for pending debit card transactions (the "Artificial Available Balance").

28. Therefore, under the Account Contracts in existence at the time of the class period, although Plaintiff disputes it, the only funds which even *arguably* could not be considered as "available" for purposes of overdrafts or NSFs were those which were subject to

temporary holds upon deposit (meaning the "Collected Available Balance," even though this was not stated or disclosed in the section pertaining to overdrafts) but not funds on which holds were placed due to pending transactions (the "Artificial Available Balance"). Although it is Plaintiff's position that the best interpretation of the contracts during the class period is that ACU, under its contractual terms with the class members, could only charge an overdraft or NSF fee if the balance in the account became negative without regard to any deductions for holds on deposits, or any other holds, the absolute best case scenario for ACU is that it was allowed under the Account Contract in certain circumstances to place holds on recently deposited funds in the account and deduct those from the balance in determining whether or not an NSF has occurred ( *i.e.*, the "Collected Available Balance"), but ACU was not even arguably permitted by any language in any of its documents during the class period to deduct from the account funds on which holds had been placed for transactions which had not yet gone through (the "Artificial Available Balance").

29.     On information and belief, ACU also provided its members a document titled, "What You Need To Know About Overdrafts And Overdraft Fees" (the "Opt-In Disclosure").  (**Exhibit "E**.")  In the Opt-In Disclosure, ACU states that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  Additionally, ACU states in that document, "If you opt in for enhanced coverage, Courtesy Pay may also cover Point-of-Sale and signature-based transactions on your Alliant Visa debit card that would not have cleared otherwise due to insufficient funds." These statements mean that ACU is not authorized to assess a fee— because an overdraft has not occurred—unless there is not enough money in the member's account to cover the transaction.  The disclosure does not in any way state that there will be deductions made from the money in the member's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed, nor does

it even state that holds placed on deposited funds in the account would reduce the amount of money in the account for the purposes of determining when an overdraft has occurred, and an overdraft fee will be assessed. The Opt-In Disclosure contains promises to which ACU is contractually bound. (*See* **Exhibit E**, Opt-In Disclosure.)

30. Defendant did **not** have two separate algorithms by which it determined whether to charge overdraft fees and NSF Fees, one for Regulation E transactions and one for non-Regulation E transactions. Rather, it had one identical pre-programmed algorithm to which it subjected all transactions to determine whether to asses an overdraft or NSF Fee. Therefore, this Opt-In Disclosure (**Exhibit E**) therefore further informed what the policy for assessing overdraft and NSF Fees was, as it was not addressing or creating a different algorithm or method for Reg E transactions only.

31. Contrary to these promises in the Account Contract and Opt-In Disclosure, ACU's policy and practice was to ignore whether there is money in the account or a negative "Balance" or "Collected Available Balance". Instead, ACU's policy and practice was, and at all times relevant herein has been, to assess overdraft and NSF fees based on the third type of balance which it nowhere disclosed during the class period, that being the artificial internal calculation by which it deducts holds it has placed on deposits as well as on pending debit card transactions, the "Artificial Available Balance".

32. ACU's statements to assess overdraft or NSF fees only when there was not enough money in the account to cover the item was also repeated to members in other disclosures and marketing materials. It was also presented deceptively and unfairly innumerous ACU documents, including statements about how fee friendly and "delightful" ACU was towards its members.

33. Plaintiff anticipates that ACU might try to argue that with regard to the Opt-In Disclosure (**Exhibit E**) it was required by Regulation E to use the language: "[a]n overdraft occurs when you do not have enough money in your checking account to cover a transaction, but

we pay it anyway." However, Regulation E contains no such requirement. Numerous credit unions and banks, when utilizing an overdraft fee regime which assesses overdraft fees in a manner in which the financial institution creates an artificially lower balance by placing holds on pending debit card transactions or on deposits, affirmatively disclose this hold to be placed on pending debit card transactions or deposits in their Opt-In Contracts. To the extent that Defendant attempts to argue it was not allowed to deviate from suggested form language such that it was required to use a description of its overdraft fee practices which was inaccurate, Plaintiffs will demonstrate not only that this is contrary to the law and common sense, but it is also contrary to the language used by numerous other financial institutions in their Opt-In Contracts which affirmatively disclose that holds would be placed on pending debit card transactions and/or deposits when the financial institutions do so in assessing whether to impose overdraft fees. As just one example, TD Bank's Opt-In Contract states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals), and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." As another example, Credit Union 1, another Illinois credit union serving the greater Chicago Metropolitan area, with over 87,000 members, states in its Overdraft Opt-In Contract, "An overdraft occurs when you do not have enough available money (i.e., less any holds) in your checking account to cover a transaction, but we pay it anyway." (**Exhibit F**, Credit Union 1 Opt-In Contract.) For further example, the Overdraft Opt-In Contract of EECU, a credit union based in Texas with over 300,000 members, states:

**"AVAILABLE" BALANCE IS USED TO DETERMINE**
**WHEN MY ACCOUNT IS OVERDRAWN."**

(**Exhibit G**, EECU Opt-In Contract, (emphasis in original).)

It goes on to state,

**Available Balance**

My available balance is the amount of the actual balance that is available to me for use without incurring an overdraft fee or transfer fee (as applicable). My available balance takes into account holds that have been placed on deposits and pending transactions (such as pending debit card transactions) that the credit union has authorized but that have not yet posted to my account. **In other words, the available balance is my actual balance less any pending ATM withdrawals, debit card purchases, ACH transaction, checks being processed or other pending withdrawals from my account and less any deposits that are not yet available due to the credit union's funds availability policy.**

(*Id.* (emphasis in original).)

34.     ACU clearly could have, but did not, accurately describe its overdraft program in its Opt-In Contract.  Because it did not, it breached that agreement when it charged overdraft fees on a positive balance, and it violated Regulation E, *inter alia*, by charging any overdraft fees whatsoever on ATM and debit card transactions, given that it did not accurately describe its overdraft program in the required notice.

35.     Similarly, countless banks' and other credit unions' account contracts, unlike ACU's, when artificially lowering the balance to increase revenue from overdraft fees as ACU does, clearly state they are doing so.  For example, Navy Federal Credit Union is the largest credit union in the country, with over $100 billion in assets, and its account contract provides: "The Available Balance includes pending transactions that have been authorized but may not yet have been processed (posted) . . . ."  The Golden 1 Credit Union, with an asset size very similar to ACU's asset size, that being about $11 billion, states in its account contract: "Your available balance does not reflect all your outstanding checks, automatic bill payments that you have authorized, or other outstanding transactions that have not been paid from your account."  As yet another example, Suncoast Credit Union, another credit union with an asset size very similar to ACU's, states in its account contract: "Your available balance is your actual balance less: (1) holds placed on deposits; (2) holds on debit card or other transactions that have been authorized but are not yet posted . . . ."  And San Diego County Credit Union, yet another credit

union similar in asset size to ACU, states in its account contract: "In determining the available balance in your account, we will consider all transactions that have posted to your account, any holds that may be in place on deposits you have made, and any pending transactions (such as pending debit card purchases) . . . ." In stark contrast to these other credit unions, ACU's Account Contract nowhere states that holds placed on pending debit card purchases would affect the balance, let alone that such holds would cause an overdraft fee to be imposed.

36.     ACU corrected its Account Agreement to match its actual practice of putting holds on pending debit card transactions to determine whether it will assess an overdraft and/or NSF Fee on its members by disclosing this in a new Account Agreement dated August 2019 ("New Account Contract", attached as **Exhibit H**), which completely rewrote this section, and disclosed this practice, and contracted for it with its members as follows:

> **Your "actual or current balance" is the full amount of all deposits made into your account** less payment transactions that have actually "posted" to your account. Thus, any purchases, holds on deposits, fees or other charges that have not yet posted to your account will not appear in your "actual or current balance." (See "Funds Availability Policy" for further explanation and examples about holds on deposits).

> **Your "available balance" is** the amount of money in your account that is available to you to use without incurring an overdraft fee. It is **the actual balance less holds on deposits and amounts you have asked us to authorize for certain purchases you have made with your debit card**.

> Available balance is determined at the time a check, an ACH, and certain debit card transactions are posted to your account, not when they are authorized. **The available balance is used to determine when your account is overdrawn**…The following example illustrates how this works:

> • Assume your actual and available balances are both $100, and you swipe your debit card at a restaurant for $60. As a result, your available balance will be reduced by $60, so your available balance is only $40. Your actual balance is still $100. Before the restaurant charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available (you have committed to pay the restaurant $60), your account will be overdrawn by $10, even though your actual balance was $100 before the check posted and is still $50 after the check posts. In this case, we may pay the $50 check, but you will be charged an overdraft fee. That fee will be deducted from your account, further reducing both the available and

actual balances. When the $60 restaurant charge is presented to Alliant and posted to your account, you will not have enough money in your available balance because of the $50 check that just cleared. However, you will not be charged a fee for this type of debit card transaction because your available balance was sufficient at the time it was authorized.

New Account Contract, attached as **Exhibit H**., at page 34.

37. Therefore, in the above "New Account Agreement," although ACU does not call them "Balance," "Collected Available Balance", and "Artificial Available Balance," ACU is actually now agreeing with Plaintiff that there are three types of "balances" in an account, not just two as it argued previously in this case, and now disclosing for the first time the third type of "balance," the one which deducts holds on pending debit card transactions: It states the first type of balance is "**Your "actual or current balance" is the full amount of all deposits made into your account**;" it states the second type of balance is "**the actual balance less holds on deposits and "**; and, it states the third type of balance "**the actual balance less holds on… amounts you have asked us to authorize for certain purchases you have made with your debit card**. (**Exhibit H**, at page 34.) The New Account Agreement discloses and contracts for overdraft fees and NSF fees to be imposed on members by using the "Artificial Available Balance", the one which deducts from the balance holds on deposits, and also deducts holds on pending debit card transactions. Per the class definition, the class period for this theory therefore ends whenever this new disclosure language became effective, as it no longer was deceptive or unfair, and also, separately, no longer was in breach of contract.

38. ACU also had an improper practice of charging multiple NSF fees for the *same* electronic transaction. ACU charged a $25 NSF fee when an electronic transaction is processed for payment and ACU determined that there is not enough money in the account to cover the transaction. ACU then charged *additional* NSF or overdraft fees if the same transaction was re-presented for processing again by the payee, even though the account holder took no action to resubmit the transaction for payment. This violated the Account Contract, *inter alia*, at paragraph 8.a., which states that once ACU makes its "determination of an insufficient account

balance . . . [w]hether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule." The foregoing language unambiguously states that once the insufficiency of an account balance is determined, the item, whether "paid or returned[,]" subjects the accountholder to "*a charge . . . .*" "A charge" is singular and does not mean *several charges or multiple charges*. Furthermore, "the item" means "the item," and does not mean "*every time the same item is re-presented*." Furthermore, the Schedule of Fees referenced by the Account Contract stated the fee is for "each item," not "*per each occurrence*" or "*for each presentment of the item*." In contrast to this "per item" language for the NSF fee, in the same Schedule of Fees for Courtesy Pay Fees it states, "per occurrence."

39.     An electronic item reprocessed after an initial return for supposed insufficient funds, especially through no action by the member, cannot and does not fairly become a new, unique additional item for multiple fee assessment purposes as Defendant has been doing. At a minimum, to be even arguably allowed to do that, the contract would have needed to state, "per occurrence" or "per presentment." Instead it states, "per item."

40.     The same check, ACH debit, debit card transaction or ATM withdrawal on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit them.

41.     There is zero indication anywhere in the Account Documents that the same item is eligible to incur multiple NSF Fees.

42.     Even if ACU reprocesses an instruction for payment, it is still the same item. ACU's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

43.     The disclosures described above never discuss a circumstance where ACU may assess multiple NSF Fees for a single check or ACH transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

44. In sum, ACU promises that one NSF Fee will be assessed per electronic payment or check, and these terms must mean all iterations of the same instruction for payment. As such, ACU breached the contract when it charged more than one fee per item.

45. Taken together, the misrepresentations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "item," which ACU will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere does ACU disclose that it will treat each reprocessing of a check or ACH payment as a separate item, subject to additional fees, nor do ACU members ever agree to such fees.

46. Customers reasonably understand, based on the language of the Account Documents, that ACU's reprocessing of checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees. In other words, it is always the same item or transaction.

47. This abusive practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one NSF Fee on the same item when it is reprocessed. Instead, Chase charges one NSF Fee even if a transaction is reprocessed for payment multiple times.

48. Banks and credit unions like ACU that employ this abusive practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something ACU here never did.

49. For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as ACU, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft. (emphasis added).

50. First Hawaiian Bank engages in the same abusive practices as Defendant, but at

least currently discloses it in its online banking agreement, in all capital letters, as follows:

YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.  (emphasis added).

51.     Klein Bank similarly states in its online banking agreement:

[W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

52.     Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

53.     Community Bank, N.A. unambiguously contracts:

**You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

54.     First Financial Bank contracts unambiguously:

Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

55.    First Northern Credit Union unambiguously contracts its NSF fee as,

"$22.00 **per each presentment and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count (emphasis added) [last visited on or about March 17, 2020.

Further, in its Account Contract, First Northern unambiguously contracts as

follows:

**You further agree that we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again.  **If the second and any subsequent presentments are returned unpaid, we may charge a NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check that you wrote as that check could be presented and returned more than once. Similarly, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees.**

*See,*
(https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf (emphasis added) [last visited on or about March 17, 2020].

56.    Liberty Financial contracts its NSF fee unambiguously as:

"$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/  (emphasis added) [last visited on or about March 17, 2020].

57.    Members First Credit Union contracts unambiguously:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,*
http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf (emphasis added) [last visited on  or about March 17, 2020].

58.    Partners 1st Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item**. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

59.     RBC Bank unambiguously contracts:

"We may also charge against the Account an NSF fee for each item returned or rejected, **including for multiple returns or rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

60.     Regions Bank contracts unambiguously:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. **If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

61.     USE Credit Union contracts unambiguously:

"**Fees are charged per presentment, meaning the same item is subject to multiple fees if presented for payment multiple times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

62.     ACU argued to this Court and to Plaintiff that its Account Agreement was not ambiguous on this issue, and that Plaintiff was wrong to believe it was deceptive or unfair to engage in this practice. But unbeknownst to Plaintiff, while arguing this, Defendant had actually already changed its Account Agreement language on this issue in its October 2019 Account Agreement (**Exhibit H**) to know disclose this and state it will engage in tis conduct of charging multiple NSF Fees for the same "item":

| Associated Fees | • There is no limit to the number of fees or the total amount of fees that may be incurred if you overdraw your account.<br>• You may be charged multiple fees for the same payment transaction if it is presented to us for payment multiple times.<br><br>*Refer to the Alliant Fee Schedule. | • There is no limit to the number of fees or the total amount of fees that may be incurred if you overdraw your account.<br>• You may be charged multiple fees for the same payment transaction if it is presented to us for payment multiple times.<br><br>*Refer to the Alliant Fee Schedule. |
|---|---|---|

New Account Contract, attached as **Exhibit H**., at page 36.

63.     The class period for the Repeat NSF or overdraft fees for the same item ends when the above disclosure made by ACU in **Exhibit H** at page 36 became effective, since ACU now discloses: "You may be charged multiple fees for the same payment transaction if it is presented to us for payment multiple times."

64.     ACU's practice of charging multiple NSF fees for a single electronic transaction was made all the more egregious because, as alleged, ACU assessed such fees using the improper calculation of the balance in a member's account (the "Artificial Available Balance"), causing additional confusion and ambiguity. ACU often charged overdraft and NSF fees improperly, and that improper $25 deduction from a member's balance further decreased the "balance," generating even more NSF fees or overdraft fees.

65.     Members reasonably understood, based on the language of the account documents, that Defendant's reprocessing of checks, electronic payment transactions, and ACH transactions are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF Fees. In other words, it is always the same item.

66.     Indeed, as Defendant's amendments to its Account Contracts demonstrate, Defendant also understood that an item remains the same "item" or "instruction" no matter how many times it is returned, reprocessed, and returned again.

67.     Prior to when these amendments to the Account Contracts became effective, Plaintiff and Defendant's other members never agreed that Defendant could charge more than one NSF Fee on the same item.  The conduct was unfair and deceptive.

68.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

69.     Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods. When ACU referred to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official Balance in the account—which is the Balance without deduction for pending debit card transactions or holds on deposits, or at most the "Collected Available Balance", meaning the "Balance" less holds on deposits, since nowhere was it disclosed that a third different type of balance would be used, that being the "Collected Available Balance" less holds also placed on pending debit card transactions, to create the never disclosed "Artificial Available Balance" for imposing overdraft and NSF Fees.   In its study, the Consumer Finance Protection Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive." The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)." Consumer Finance Protection Bureau, *Supervisory Highlights*, at p. 9 (Winter 2015).[1]

70.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seek relief as set forth below.

71.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft and NSF fees when there was money in her account to cover the transaction, and by assessing repeat NSF fees, or NSF Fees followed by an overdraft fee. Plaintiff and Class members entered into

---

[1] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf [last viewed September 5, 2019]

agreements with ACU, wherein ACU contracted to charge NSF fees only if their accounts did not contain enough money to cover the transaction. By nonetheless charging Plaintiff overdraft or NSF fees when her account did contain enough money to cover the transaction, and also repeat NSF or overdraft fees, ACU was deceptive and unfair, and also breached its contracts with Plaintiff. It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft and NSF fee; however, Plaintiff has already uncovered many. With regard to fees when there was enough money in the account to cover the transaction, to give one example, on January 4, 2017, Plaintiff was charged a $25 fee labeled "NSF" for attempting to pay a bill in the amount of $6,000 when her account contained $6,670.94. While Plaintiff's fee was labeled "NSF" rather than "Courtesy Pay," and while it was assessed for a transaction which was returned, rather than paid, it violated the contracts in this case. Plaintiff's fee was charged against her as a result of ACU's refusal to pay a transaction when there was enough money in her account to pay for that transaction. Under the contract(s), when there are sufficient funds to pay for a transaction in the account, no fee can be charged for that transaction, yet ACU charge her a fee.[2] The NSF fee therefore violates of the Account Contract. This is just an example for illustrative purposes at this time. Plaintiff has a reasonable belief that discovery and a complete review of Plaintiff's and ACU's records will show multiple instances in which ACU improperly charged Plaintiff fees for transactions despite the fact that Plaintiff had enough money in her account to cover the transactions.

72.     Regarding repeat NSF fees, as just one example, on information and belief, on January 12, 2017, ACU charged Plaintiff repeated $25 NSF fees multiple times, on information and belief, for the same item. On information and belief, there are other such examples. This is just one example for illustrative purposes at this time. Plaintiff has a reasonable belief that

---

[2] Discovery will be necessary to determine whether Defendant is also incorrectly labeling its fees, not necessarily calling them appropriately as NSF Fees or Overdraft Fees o Courtesy Pay Fees.

discovery and a complete review of Plaintiff's and ACU's records will show multiple instances in which ACU improperly charged Plaintiff repeat NSF fees for transactions.

73.     Moreover, the assessment and unilateral taking of improper overdraft fees and NSF fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which ACU assesses further overdraft/NSF fees. This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

Consumer Financial Protection Bureau, *Supervisory Highlights*, at pp. 8-9 (Winter 2015). A complete evaluation of ACU's records is necessary to determine the full extent of Plaintiff's harm from this practice.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of the following class.

75. The "Class" is**:**

> **All United States residents who are not bound by ACU's binding arbitration clause who have or have had accounts with ACU and incurred an overdraft or NSF fee when the balance in the checking account was sufficient to cover the transaction, or who were charged an NSF or overdraft fee more than once for the same item, during the period beginning ten years preceding the filing of the Complaint in this action and ending on the effective date of the Revised Contract.**

76. Excluded from the Classes are: (a) any entity in which Defendant has a controlling interest; (b) officers or directors of Defendant; (c) this Court and any of its employees assigned to work on the case; and (d) all employees of the law firms representing Plaintiff and the Class members.

77. This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

78. **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that a joinder of all members would be impracticable. While the exact number of Class members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes that the Class is likely to include thousands of members based on the fact that ACU has approximately $11 billion in assets and operates hundreds of branches nationwide.

79. Upon information and belief, Defendant has databases, and/or other documentation, of its members' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of ACU's members have been harmed by its practices and thus qualify as Class members. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice by mail or email, alternatively proper and sufficient notice of this

action may be provided to the Class members through notice published in newspapers or other publications.

80. **<u>Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))</u>** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class members include, but are not limited to, the following:

a.       Does the New Account Agreement dated August 2019 (**<u>Exhibit H</u>**) clarify an ambiguity on whether ACU was allowed to charge more than one NSF or overdraft fee for the same item when that same item was "re-presented";

b.       Does the New Account Agreement dated August 2019 (**<u>Exhibit H</u>**) clarify ambiguities on whether ACU was allowed to charge an NSF or overdraft fee in a manner which deducted holds on pending debit card transactions to determine whether to assess such a fee;

c.       Whether Defendant is liable for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

d.       Was it deceptive or unfair not to disclose that more than one overdraft or NSF fee can be charged on the same "item;"

e.       Was it deceptive or unfair prior to the New Account Agreement not to disclose there are three balances in an account rather than two, and use the third undisclosed balance calculation, the one which leads to the most fees;

f.       Whether, pursuant to the Account Contract, Defendant disclosed it would charge an NSF or overdraft fee if there was enough money in the account to cover the transaction;

g.       Whether Defendant breached the Account Contract by assessing NSF or overdraft fees for transactions when members' accounts contained enough money to cover the transactions;

h. Whether, pursuant to the Account Contract and Schedule of Fees, Defendant represented or contracted it would charge an NSF every time the same item was "re-presented," or was this language ambiguous on the issue;

81. **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its members, including the Account Contract and Schedule of Fees, were identical as to all relevant terms, and also because the challenged practices of charging members for overdraft or NSF fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and Class members. Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

82. **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection. There are no material conflicts between the claims of the Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and her counsel intend to prosecute this action vigorously.

83. **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any

individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

84. Plaintiff is not aware of any separate litigation instituted by any of the Class members against Defendant. Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because Defendant resides in this District, and its principal place of business is in this district. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

85. Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To

the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

86.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.      Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

1.      Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

2.      Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b.      Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1.      The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2.      The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION

### (Breach of the Opt-In Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing)

87. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

88. Class members entered into the Opt-In Contract with Defendant covering the subject of overdraft transactions. This contract was drafted by and is binding upon Defendant.

89. In the Opt-In Contract, Defendant promised that ACU would assess overdraft fees only when there was not enough money in the account to cover the transaction.

90. The contract incorporated by reference all applicable laws regarding its subject matter, including 12 C.F.R. § 1005.17, which mandates that all Opt-In Contracts for assessing overdraft fees for ATM and non-recurring debit card transactions be separate from the account agreement and accurately describe the overdraft fee practice, and bars financial institutions from assessing fees for non-recurring debit card and ATM transactions if they have not fully complied with that section's requirements.

91. Plaintiffs and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

92. Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing fees when there was money in the account to cover the transaction or transactions at issue.

93.     Additionally, the implied covenant of good faith and fair dealing are elements of every contract. Under the implied covenant, parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. The parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

94.     ACU has breached the implied covenant of good faith and fair dealing in the Opt-In Contract through its abusive overdraft fee policies and practices as alleged herein. Instead of exercising any discretion that it has in good faith and consistent with Plaintiffs' and Class members' reasonable expectations, ACU abused that discretion to assess overdraft and take money out of their checking accounts without their permission and contrary to their reasonable expectations that they would not be charged overdraft fees when they had money in their accounts.

95.     By exercising its discretion to enrich itself and gouge its customers as it did, ACU consciously and deliberately frustrated the agreed common purposes of the contract and reasonable expectations of the Plaintiffs and Class members, thereby depriving them of the benefit of their bargain.

96.     To the extent the Opt-In Contract does not explicitly bar the policy described herein, ACU exploited any contractual discretion to the detriment of accountholders and breached good faith and fair dealing when it used the policy. The allegations that ACU has contractual discretion are made in the alternative to the allegations that the overdraft practices are expressly in breach of the contracts.

97.     As a proximate result of Defendant's breach of the contract, class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

/ / /

## SECOND CAUSE OF ACTION

### (Breach Contract)
### (Dismissed with Prejudice, Re-Alleged for Proposed SAC)

98.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

99.     Plaintiff and each of the Class members entered into the Account Contract with Defendant covering the subject of overdraft and NSF fees. This contract was drafted by and is binding upon Defendant.

100.     In the Account Contract, Defendant nowhere stated that it would place holds o pending debit card transactions to determine whether or not it would assess an overdraft or NSF fee on a transaction, and Defendant also nowhere stated it would impose more than one fee on the same "item" if that same item was "re-presented".   Only in a subsequent Account Contract did Defendant disclose this or contract for it.   In the operative contracts at issue in this matter during the class period, ACU stated it would assess overdraft/NSF fees only when there were "not sufficient funds" in the account to pay for the transaction in question. Nowhere did the operative Account Contracts state that ACU would create an artificial system by which it would deduct pending debit card transactions for purposes of determining whether sufficient funds existed when assessing an overdraft or NSF fee. Defendant also promised that once it determined an account had an insufficient balance to cover an item, it would either pay it, subject to an overdraft fee, or return it unpaid, subject to an NSF fee. At best for ACU, it arguably might have been ambiguous as to whether ACU could use the "Collected Available Balance" rather than the "Balance" to determine whether to assess a fee.   But nowhere did it disclose in its Account Contracts during the class period it would use a third different type of balance which in addition to hold son deposits also deducted holds on pending debit card transactions.   Regarding the repeat NSF fees on the same "item", only after the proposed class period did ACU revise its contract to state that more than one fee can be charged on the same "item" if that same item

were to be re-presented.  Prior to this revision to ACU's contract, ACU had contracted it would charge for "each item", and not for "each presentment of the item."

101.    Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

102.    Prior to revising its Account Agreement, Defendant breached the express terms of the Account Contracts by, *inter alia*, assessing overdraft fees and NSF fees when there were sufficient funds in the account to cover the transaction or transactions at issue. Prior to revising its Account Agreement, Defendant also breached the Account Agreements by charging more than one NSF fee, or an NSF fee followed by an overdraft fee, for the same "item."

103.    As a proximate result of Defendant's breach of the Account Contracts, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

<div align="center">

### THIRD CAUSE OF ACTION

**(Unjust Enrichment/Restitution)**
**(Dismissed with Prejudice, Re-Alleged for Proposed SAC)**

</div>

104.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

105.    As a result of the wrongful misconduct alleged above, including as well as pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, Defendant unjustly received millions of dollars in overdraft and NSF fees.

106.    The Consumer Finance Protection Bureau has concluded that inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an unfair, deceptive, or abusive act or practice. Consumer Financial Protection Bureau, *Bulletin 2013-07*, at p. 2 (July

10, 2013) (defining unfair, deceptive, or abusive acts or practices based on the FTC balancing test as: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition")[3], Consumer Financial Protection Bureau, *Supervisory Highlights*, at p. 9 (Winter 2015) ("Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.").

107.    Because Plaintiffs and the Class members paid the erroneous overdraft and NSF fees assessed by Defendant, Plaintiffs and the Class members have conferred a benefit on Defendant, albeit undeservingly. Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred. Should it be allowed to retain such funds, Defendant would be unjustly enriched. Therefore, Plaintiffs and the Class members seek relief as set forth in the Prayer below.

<div align="center">

**FOURTH CAUSE OF ACTION**

**(Money Had and Received)**
**(Dismissed with Prejudice, Re-Alleged for Proposed SAC)**

</div>

108.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

109.    Defendant has obtained money from Plaintiffs and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf.

and/or fact, as well as its violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,.

110.  As a result, Defendant has in its possession money which, in equity, belongs to Plaintiffs and the Class members, and thus, this money should be refunded to Plaintiffs and the Class members. Therefore, Plaintiffs and the Class members seek relief as set forth in the Prayer.

## FIFTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E) 12 C.F.R. § 1005 *et seq.* (authority derived from 15 U.S.C. § 1693 *et seq.*))

111.  The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

112.  By charging overdraft fees on ATM and nonrecurring transactions, ACU violated Regulation E, 12 C.F.R. §§ 1005 *et seq.*, whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act [15 U.S.C. §§1693 *et seq.*, the "EFTA"]," 12 C.F. R. § 1005.1(b).

113.  Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added). The description "shall be clear and readily understandable." 12 C.F.R. § 205.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated writing of its overdraft practices that is accurate, non-misleading, and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

114.    The intent and purpose of this Opt-In Contract is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable</u> way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, and 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S.Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).) Numerous credit unions and banks, when utilizing an overdraft fee regime which assesses overdraft fees in a manner in which the financial institutions create an artificially lower balance by placing holds on pending debit card transactions or deposits, affirmatively disclose this hold to be placed in pending debit card transactions or deposits in their Opt-In Contracts. To the extent that Defendant argues it was not allowed to deviate from supposed suggested form language such that it was required to use a description of its overdraft fees which was inaccurate, Plaintiffs will demonstrate not only that this is contrary to the law and common sense, but it is also contrary to the language used by numerous other financial institutions in their Opt-In Contracts which affirmatively disclose that holds would be placed on pending debit card transactions and/or deposits when the financial institution does so in assessing whether to impose overdraft fees, as already partially set forth in Paragraph 42 of this complaint.

115.    ACU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions. ACU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17 because, *inter alia*, it states that an overdraft

occurs when there is not enough money in the account to cover a transaction but ACU pays it anyway, when in fact ACU assesses overdraft fees when there is enough money in the account to pay for the transaction at issue. The same deceptive practice by which it violated Regulation E, including putting holds on pending debit card transactions, was the same practice by which it also imposed improper deceptive fees on Regulation E transactions. In other words, the same alleged core wrongful deceitful conduct affected Regulation E overdraft fees, non-Regulation E overdraft fees, and NSF fees. The manner in which these Regulation transaction fees were imposed involved the same software and algorithm as the manner for assessing other overdraft and NSF fees.

116.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions, ACU has harmed the class members.

117.    Due to ACU's violation of Regulation E, 12 C.F.R. § 1005.17, Plaintiffs and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C.A. § 1693m.

## SIXTH CAUSE OF ACTION

### (Violation of 815 ILCS §§ 505/1 *et seq.*, The Illinois Consumer Fraud and Deceptive Business Practices Act)

118.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

119.    Defendant has violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, *et seq.*, both as an unfair practice as well as a deceptive fraudulent practice.

120.    Section 2 of the ICFA, 815 ILCS 505/2, provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or

omission of such material fact, or the use or employment of any practices described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

121. Section 10a of the ICFA, 815 ILCS 505/10A, provides in relevant part:

Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper . . .

* * *

(c) Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

122. Defendant is a "person" as defined by section 505/1(c) of the ICFA. Defendant's conduct, as alleged in this complaint, occurred in the course of trade and commerce.

123. Plaintiff and each of the Class members are "consumers" as defined by section 505/1(e) of the ICFA. Plaintiff and each Class member are natural persons who primarily for personal use, or for that of a member of their households, purchased banking account services from Defendant.

124. Defendant knowingly and intentionally employed an unfair and deceptive policy and practice of charging NSF fees when there was enough money in its members' accounts to pay for the transactions in question, and by charging more than one NSF fee for the same item, in direct contradiction not only of its representations and promises to those members, but also deceptively and unfairly, and to induce reliance, affecting Plaintiff and members of the Classes. ACU failed to inform its members as to what the third balance, the "Artificial Available Balance" was, or how it differed from the other two balances in the account, those being the "Balance" (the amount of money in the account without deducting for holds on deposits or

pending debit card transactions) and the "Collected Available Balance" (the amount of money in the account less holds on deposits but not less holds on pending debit card transactions). At most, ACU disclosed there were two balances, the "Balance" and the Collected Available Balance", and that therefore it was reasonable for consumers to believe overdraft or NSF fees would be based on one of those two balances. It was deceptive for ACU to never disclose it would use this third different balance when determining whether to impose NSF and overdraft fees on its members. Nowhere in any documents during the relevant class period did ACU disclose there was a third type of balance, the "Artificial Available Balance," which took the already lowered "Collected Available Balance" and reduced it further by also deducting from the "Collected Available Balance" holds placed on pending debit card transactions, and that it would use this third balance for purposes of assessing overdraft and NSF fees on consumers. Only in a later Account Agreement after the class period in this case ends, did ACU disclose this. Additionally, nowhere during the class period, in any document, did ACU disclose it would charge more than one fee for the same "item," if that same "item" happened to be re-presented to ACU with no intervention or involvement by the member. Rather, all of ACU's representations stated its fee would be for "each item" and not for "each time the item was presented." Only in a later Account Agreement after this class period ends did ACU state that it would charge a fee each time the same item was re-presented.

125. By concealing this information from its members, and misrepresenting it, as well as disseminating numerous other misrepresentations, some of which are listed below, ACU was able to increase its revenues from fees due to the unfair and deceptive assessment of overdraft and NSF fees, and also thereby pay its executives outsized bonuses and salaries. (Exs. A and B.) ACU was capable at all times of explaining the existence of three different balances to its members, rather than only disclosing two balances as it did, but opted not to do so because misrepresenting how its overdraft and NSF fee practice worked and confusing members would lead to more fee revenue for ACU, which would allow it to pay its executives higher salaries and

bonuses.  ACU was capable at all times of explaining that it would charge a NSF fee every time the same "item" was re-presented", but opted not to do so because misrepresenting how its overdraft and NSF fee practice worked and confusing members was resulted in more revenue for ACU.

126.    By way of example as to Defendant's deceptive practices, in a December 13, 2014, blog entry posted on its website, Defendant described its "79th year of providing you with superior value."  Defendant deceptively represented that "Alliant's fees are well below those of most banks and credit unions." https://www.alliantcreditunion.org/money-mentor/2014-our-79th-year-of-providing-you-with-superior-value. In reality, Defendant's overdraft and NSF fee practices were predatory and more onerous that those of many other financial institutions. For example, Chase, the largest consumer bank in the country, does not engage in the practice of charging more than one NSF fee per item.  For further example, many other financial institutions across the country, when determining whether to assess an overdraft or NSF fee, do not deduct a pending debit card transaction from the balance for purposes of determining whether to impose a fee on the consumer. But Alliant engaged at all relevant times in these deceptive, unfair predatory practices to the harm of consumers to the tune of millions of dollars.

127.    For further example, Defendant represented in a January 21, 2015 news release posted on its website that Defendant "delights members" by introducing $20 per month ATM rebates as its way of "[r]esponding to member feedback and the increasing fees charged by ATM owners."  https://www.alliantcreditunion.org/news/alliant-responds-and-delights-members-with-atm-rebates.  Defendant further represented in this news release that it "regularly surveys its members to assess their satisfaction and likelihood to recommend Alliant."  This news release deceptively portrayed Defendant as a financial institution that members find delightful because Defendant pays members rebates for using its account services and regularly surveys them to assess their satisfaction, when in reality Defendant imposed predatory NSF and overdraft fees on its members that were anything but delightful. These not so "delightful"

practices include charging more than one NSF fee for the same item, and also electing to charge members overdraft fees and NSF fees on a balance that was reduced by pending debit card transactions, while only disclosing in its Account Agreement that it might in certain circumstances reduce the balance by pending deposits (not pending debit card transactions). The charging of more than one NSF fee on the same item is considered so predatory that not all banks do this. For example, Chase, the largest consumer bank in the country, while not claiming to be "delightful" like Defendant claims to be, nonetheless does not engage in the practice of charging more than one NSF fee per item. For further example, many other financial institutions across the country, while not claiming to be "delightful" like Defendant claims to be, when determining whether to assess an overdraft or NSF fee, do not deduct a pending debit card transaction from the balance for purposes of determining whether to impose a fee on the consumer.

128.     In a June 21, 2019, news release posted on its website, Defendant described how "[t]he addition of 48 phone reps in the member care center last year alone has helped improve service and cut average call times significantly." This news release deceptively and unfairly portrayed Defendant as a good communicator with its members when in reality, Defendant failed to communicate basic information such as when members could expect to be charged NSF fees. https://www.alliantcreditunion.org/news/alliant-named-credit-union-of-the-year-by-nafcu. In reality, Defendant nowhere disclosed in any of its documents that it used three balances rather than two balances for purposes of determining whether to impose an overdraft fee or NSF Fee, and that the most onerous limiting balance, the undisclosed "Artificial Available Balance", would be used for imposing overdraft and NSF fees. Nowhere was it communicated during the class period that holds would be placed on pending debit card transactions to reduce the balance beyond the reduction already arising from the holds on deposits, and that this doubly reduced balance would be what Defendant would use to impose overdraft and NSF Fees. Only in a subsequent Account Agreement after this alleged class period ends did Defendant disclose any

of this.  Nowhere did Defendant during the class period disclose, or even hint, that the same "item" can be re-presented over and over and a fee charged each time, even though none of the re-presentments were due to the consumer. Only in a subsequent Account Agreement after this class period ended did Defendant disclose this.

129.    Similarly, in a September 23, 2019, news release posted on its website, Defendant described its efforts to reduce customer call waiting times and call drop rates, noting: "Like everything we do at Alliant, the changes we made were in service to our members."  This news release deceptively portrayed "everything" Defendant does as "in service to our members" when, in reality, Defendant engages in predatory overdraft and NSF fee practices aimed at maximizing fees at the expense of its members.  How is charging an NSF fee on the same item every time it is re-presented, and without disclosing this, "in service to our members"?  It is not. How is deducting holds on pending debit card transactions from the Balance and from the Collected Available Balance", without ever disclosing it, "in service to our members"? It is not. https://www.alliantcreditunion.org/news/alliant-receives-excellence-award-for-sales-and-service-management. These all were false, deceptive, unfair statements.

130.    In a December 4, 2019, news release posted on its website, Defendant described how it "Puts Member Experience at the Forefront."  Defendant further described its efforts to "address our members' needs and make managing their accounts simpler and more convenient. … The feedback we get from our members is the driving force behind everything we do at Alliant…."  Contrary to this representation, however, how does charging an NSF fee on the same "item" every time it is re-presented, and without disclosing this, "address our members' needs"?  It does not.  Contrary to this representation, however, how is deducting holds on pending debit card transactions from the Balance and from the Collected Available Balance", and without disclosing this, "address our members' needs"?  It does not. Further contrary to these representations, Defendant's account-related contracts and documents are anything but simple and, instead, contribute to a "member experience" that includes being charged overdraft

and NSF fees in a manner designed to maximize Defendant's fee revenues to the detriment of its members.

131.    These were deceptive acts, omissions, and/or practices designed to mislead members and drive up the number of assessed overdraft and NSF fees.

132.    By way of example of Defendant's unfair practices, in a January 23, 2014, blog entry posted on its website, Defendant purported to discuss "[h]ow money management tools can help you avoid overdrafts."  Defendant acknowledged that "[c]hecking account overdrafts are annoying because the fees that come with them add insult to injury."  However, rather than advice its members and prospective members about its predatory overdraft and NSF fee practices, such as charging more than one overdraft or NSF fee for the same item, or charging an overdraft or NSF fee on a secret third more onerous balance that deducts pending debit card transactions, Defendant instead touted its "personal financial management tools to keep you on top of your expenses and account balance."  Defendant represented: "By utilizing a personal financial management system with the above capabilities, you will not only be able to see an overdraft before it happens and dodge it, but you will also be able to build on the money you will save from avoiding any associated fees."  Such communications were deceptive and misrepresentative, and would lead consumers to reasonably expect that Defendant will help them "be able to see" fees before they happen, when in reality, Defendant engaged in fee maximizing practices at the expense of its members, such as charging repeat NSF fees for the same item, and imposing overdraft and NSF fees on an artificially reduced balance that deducted holds on pending debit card transactions without disclosing it ever would do that, and other predatory fee practices. https://www.alliantcreditunion.org/money-mentor/how-money-management-tools-can-help-you-avoid-overdrafts.

133.    In a February 14, 2014, blog entry posted on its website, Defendant proclaimed: "It pays to be a member of Alliant."  Defendant further represented that "Alliant offers low fees to its members. This no or low-fee banking experience lets them save more and helps their

savings grow faster."  Such communications are unfair and deceptive to consumers looking for actual "no or low-fee banking experiences" because Defendant's overdraft and NSF fee practices are anything but "no or low-fee" and instead are aimed at maximizing fees at members' expense. https://www.alliantcreditunion.org/money-mentor/it-pays-to-be-a-member-of-alliant-213-a-year-or-more. This includes charging repeat NSF or overdraft fees on the same item every time it is presented, and also charging overdraft fees based on a super-aggressive formula that deducts pending debit card transactions from the "collected available balance" to create an even lower balance.  Defendant does this to increase its fees, and pay its executives higher salaries at the expense of its members.

134.    Defendant also engaged in unlawful conduct, made affirmative misrepresentations, or otherwise violated the ICFA by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and beneficial to Defendant.

135.    As a proximate result of Defendant's conduct Plaintiff and the Class members have been damages in an amount to be proven at trial and seek relief as set forth in the Prayer below.

136.    Had Plaintiff and Class members known the actual facts or legal implications of those acts, they would have avoided the overdraft and NSF fees. Therefore, a causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff and the members of the Class.

## **PRAYER**

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

1.      For an order certifying this action as a class action;

2.      For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.      For punitive damages under the ICFA;

4. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

5. For costs;

6. For pre-judgment and post-judgment interest as provided by law;

7. For attorneys' fees under the common fund doctrine, and all other applicable laws; and,

8. For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

Dated: September 24, 2020        Respectfully Submitted,

<div style="margin-left:3em">

_____/s/ Taras Kick_____

Taras Kick (*Pro Hac Vice*)
Taras@kicklawfirm.com
**THE KICK LAW FIRM, APC**
815 Moraga Drive
Los Angeles, California 90049
Telephone: (310) 395-2988
Facsimile: (310) 395-2088

Katrina Carroll
kcarroll@carlsonlynch.com
Nicholas R. Lange
nlange@carlsonlynch.com
**CARLSON LYNCH LLP**
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
Facsimile: (773) 598-5609

Attorneys for Plaintiff Alicia M. Page and the Putative Class

</div>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 24th day of September, 2020, the foregoing document was filed electronically on the CM/ECF system, which caused all CM/ECF participants to be served by electronic means:

*/s/ Taras Kick*
Taras Kick